06 CV 588

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN ACADEMY OF RELIGION; AMERICAN
ASSOCIATION OF UNIVERSITY PROFESSORS;
PEN AMERICAN CENTER; TARIQ RAMADAN,

Plaintiffs,

v.

MICHAEL CHERTOFF, in his official capacity as
 Secretary of the Department of Homeland Security;
CONDOLEEZZA RICE, in her official capacity as
 Secretary of State,

Defendants.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Case No.

Hon.



## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.  This is a lawsuit for declaratory and injunctive relief challenging the government's exclusion of an otherwise admissible foreign scholar from the United States in order to prevent United States citizens and residents from hearing speech that is protected by the First Amendment.  This suit also challenges the constitutionality of section 411(a)(1)(A)(iii) of the USA Patriot Act, as amended and codified in 8 U.S.C. § 1182(a)(3)(B)(i)(VII).

2.  Tariq Ramadan, a symbolic plaintiff in this suit, is a national of Switzerland and a widely respected scholar of the Muslim world.  Until recently, Professor Ramadan visited the United States freely to lecture, attend conferences, and meet with other scholars.  In August 2004, however, the government revoked a nonimmigrant visa that would have permitted Professor Ramadan to assume a tenured teaching position at the University of Notre Dame.  According to a government spokesperson, the revocation was

based on section 411(a)(1)(A)(iii) of the USA Patriot Act, a provision that, as then written, rendered inadmissible any alien who "ha[d] used [his] position of prominence within any country to endorse or espouse terrorist activity, or to persuade others to support terrorist activity or a terrorist organization, in a way that the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities." 8 U.S.C. § 1182(a)(3)(B)(i)(VI) (2004) (as amended and codified at 8 U.S.C. § 1182(a)(3)(B)(i)(VII) (2006), the "ideological exclusion provision"). The revocation prevented Professor Ramadan from teaching at the University of Notre Dame and more generally from lecturing, attending conferences, and meeting with scholars and others in the United States.

3.  Professor Ramadan does not endorse, espouse, or persuade others to support terrorism and he has never done so. To the contrary, he has been a consistent and vocal critic both of terrorism and those who use it. The government's arbitrary application of the law has prevented Professor Ramadan from accepting invitations to teach and speak inside the United States and, most relevant to this lawsuit, has prevented United States citizens and residents from meeting with Professor Ramadan and inhibited them from hearing his views, in violation of their First Amendment rights. Notably, the government's unlawful actions stifle intellectual exchange about Islam and the Muslim world at a time when robust and unfettered intellectual exchange about these subjects is of extraordinary importance to American citizens and others living in the United States.

4.  Plaintiffs American Academy of Religion (AAR), American Association of University Professors (AAUP), and PEN American Center (PEN) are associations whose members seek to meet with Professor Ramadan and to hear him speak. The AAR, the

AAUP, and PEN are committed to the free exchange of ideas and oppose the government's use of the immigration laws as instruments of censorship. They seek, <u>inter alia</u>, a declaration that the ideological exclusion provision is unconstitutional on its face and as applied to exclude Professor Ramadan, and an injunction preventing the government from relying on the ideological exclusion provision to exclude Professor Ramadan or any other foreign national.

**JURISDICTION AND VENUE**

5.   Jurisdiction is properly vested in this Court pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702 over causes of action arising under 5 U.S.C. § 702, 8 U.S.C. § 1182, and the First and Fifth Amendments to the United States Constitution. The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, <u>et seq.</u> The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

6.   Venue is proper in this district under 28 U.S.C. § 1391(e).

**PLAINTIFFS**

7.   Plaintiff AAR, a non-profit organization based in Georgia, is the preeminent scholarly and professional society in the field of religion. In a world where religion plays so central a role in social, political, and economic events, as well as in the lives of communities and individuals, the AAR's mission is to meet the critical need for ongoing reflection upon and understanding of religious traditions, issues, questions, and values. The AAR promotes such reflection through excellence in scholarship and teaching in the field of religion. The AAR has more than 10,000 members who teach in some 2,000

3

colleges, universities, seminaries, and schools in North America and abroad. The AAR sues on its own behalf and on behalf of its members.

8.   Plaintiff AAUP is a non-profit organization based in Washington, D.C., with 45,000 members consisting of university faculty, librarians, graduate students, and academic professionals. The AAUP's mission is to advance academic freedom and shared governance, to define fundamental professional values and standards for higher education, and to ensure higher education's contribution to the common good. The AAUP sues on its own behalf and on behalf of its members.

9.   Plaintiff PEN is an association of authors, editors, and translators committed to the advancement of literature and the unimpeded flow of ideas and information throughout the world. PEN, which is based in New York, has approximately 2,900 members and is the largest of the 141 centers of International PEN, the world's oldest international literary organization. PEN sues on its own behalf and on behalf of its members.

10. Plaintiff Tariq Ramadan, a symbolic plaintiff in this suit, is a national of Switzerland and one of Europe's leading scholars of the Muslim world. Professor Ramadan currently resides in the United Kingdom. He is a visiting fellow at St. Antony's College at the University of Oxford and a Senior Research Fellow at the Lokahi Foundation in London.

## DEFENDANTS

11. Defendant Condoleezza Rice is Secretary of State and has ultimate authority over the operations of the Department of State. In that capacity and through her agents she is authorized to deem an alien inadmissible under the ideological exclusion provision.

She also oversees, with the Secretary of Homeland Security, the visa waiver program described in 8 U.S.C. § 1187. Defendant Rice is sued in her official capacity.

12. Defendant Michael Chertoff is Secretary of Homeland Security and has ultimate authority over the Department of Homeland Security. In that capacity and through his agents he is authorized to deem an alien inadmissible under the ideological exclusion provision. He also oversees, with the Secretary of State, the visa waiver program described in 8 U.S.C. § 1187. Defendant Chertoff is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

13. A nonimmigrant alien is ordinarily inadmissible to the United States unless he or she is in possession of a valid nonimmigrant visa. See 8 U.S.C. § 1182(a)(7)(B)(i)(II). Certain classes of aliens are ineligible to receive visas. Aliens ineligible to receive visas include those who have engaged in terrorist activities, see id. § 1182(a)(3)(B)(i)(I); those who have, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity, see id. § 1182(a)(3)(B)(i)(III); and those who are representatives of foreign terrorist organizations designated by the Secretary of State, see id. § 1182(a)(3)(B)(i)(IV)(aa).

14. The USA Patriot Act added to the list of aliens ineligible to receive visas those who have used their "position of prominence within any country to endorse or espouse terrorist activity, or to persuade others to support terrorist activity or a terrorist organization, in a way that the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities." Pub. L. No. 107-56, § 411, 115 Stat. 272 (Oct. 26, 2001) (codified at 8 U.S.C. § 1182(a)(3)(B)(i)(VI) (2004)). As

5

amended by section 103 of the REAL ID Act, Pub. L. 109-13, Division B, Title I, 119

Stat. 231 (May 11, 2005), the ideological exclusion provision now renders inadmissible

any alien who has "endorse[d] or espouse[d] terrorist activity or persuade[d] others to

endorse or espouse terrorist activity or support a terrorist organization," 8 U.S.C.

§ 1182(a)(3)(B)(i)(VII).

    15. The State Department's Foreign Affairs Manual ("F.A.M."), which guides

consular officials in the granting and denial of visas, explains that the ideological

exclusion provision is directed at aliens who have voiced "irresponsible expressions of

opinion." 9 F.A.M. § 40.32 n6.2.

    16. Congress has authorized the Secretaries of Homeland Security and State to

establish a program ("visa waiver program") under which certain nonimmigrant aliens

are permitted to enter the United States without visas. To rely on the program, the alien

must be a national of a "program country," must be seeking entry to the United States for

90 days or less, must not "represent a threat to the welfare, health, safety, or security of

the United States," must not "have failed to comply with the conditions of any previous

admission," and must possess a roundtrip transportation ticket. See 8 U.S.C. § 1187(a).

Further, the identity of the alien must have "been checked using an automated electronic

database containing information about the inadmissibility of aliens to uncover any

grounds on which the alien may be inadmissible to the United States." Id. § 1187(a)(9).

Switzerland is a visa waiver program country.

    17. Aliens who are determined to be inadmissible are not entitled to rely on the

visa waiver program. See id.

## FACTUAL BACKGROUND

<u>The Exclusion of Professor Ramadan</u>

18. Tariq Ramadan was born in Switzerland in 1962 and earned a Doctorate of Philosophy in Islamic Studies from the University of Geneva in 1996. Until 2004, he was a professor at the University of Fribourg, where he taught Philosophy and Islamic Studies. In September 2005, he became a Visiting Fellow at St. Antony's College, Oxford. Professor Ramadan is a leading scholar of the Muslim world, having published 20 books, approximately 700 articles, and approximately 170 audio tapes on subjects including Muslim identity, democracy and Islam, human rights and Islam, the practice of Islam in Europe, and Islamic law. His books include <u>Western Muslims and the Future of Islam</u> (Oxford University Press, 2003); <u>Islam, the West, and the Challenges of Modernity</u> (The Islamic Foundation, 2000); and <u>To Be a European Muslim</u> (The Islamic Foundation, 1999). Paul Donnelly, in an op-ed in the <u>Washington Post</u>, described Professor Ramadan's latest book as "perhaps the most hopeful work of Muslim theology in the past thousand years."

19. Professor Ramadan has been a respected and increasingly prominent voice for Muslims living in Europe. In December 2000, <u>Time</u> magazine predicted Professor Ramadan would be one of the most influential people of the 21st century, labeling him "the leading Islamic thinker among Europe's second- and third-generation Muslim immigrants." In 2003, the French government imposed a prohibition on the display of Islamic headscarves and other religious symbols in state schools; before that prohibition became law, Professor Ramadan debated the proposed law with France's Interior Minister, Nicolas Sarkozy, live on French national television. In September 2004,

7

Jonathan Laurence wrote in <u>Forward</u> that Professor Ramadan "may be the most well-known Muslim public figure in all of Europe" and that Professor Ramadan "has used his prominence to urge young Muslims in the West to choose integration over disaffection." In August 2005, at the invitation of Prime Minister Tony Blair, Professor Ramadan joined a U.K. government taskforce to examine the roots of extremism in Britain.

20. While Professor Ramadan has been a frequent critic of American policy in the Muslim world, he has never endorsed, espoused, or otherwise encouraged terrorist activity. To the contrary, he has been a consistent critic of terrorism and those who use it. For example, in October 2001, Professor Ramadan publicly deplored the September 11 attacks, saying to fellow Muslims, "Now more than ever we need to criticize some of our brothers . . . You are unjustified if you use the Koran to justify murder." In August 2004, Professor Ramadan publicly condemned the kidnapping of two French journalists in Iraq. In November 2003, Professor Ramadan publicly condemned the attacks on Jewish synagogues in Istanbul. Professor Ramadan has also publicly condemned the recent terrorist bombing in London.

21. Until August 2004, Professor Ramadan visited the United States frequently to lecture, attend conferences, and meet with other scholars. For example, in April 2001, Professor Ramadan delivered a lecture entitled, "Is Islam Compatible with Secularism and Democracy?," at Princeton University's Institute for the Transregional Study of the Contemporary Middle East, North Africa, and Central Asia. In January 2002, Professor Ramadan participated in a conference called "Islam and America in a Global World," which was sponsored by the William Jefferson Clinton Presidential Foundation and hosted by former President Clinton. In February 2002, Professor Ramadan participated

in a lecture series at Harvard University's Center for Middle Eastern Studies entitled,

"Islam in Europe and America after September 11." In October 2003, Professor

Ramadan delivered a lecture entitled, "Terrorism and Al-Qaeda: What Muslims in the

West Think About Them," at Dartmouth College. On each of these occasions, Professor

Ramadan entered the United States under the visa waiver program.

22. In January 2004, Professor Ramadan was offered a tenured position as the

Henry R. Luce Professor of Religion, Conflict and Peacebuilding at the University of

Notre Dame's Joan B. Kroc Institute for International Peace Studies. After Professor

Ramadan accepted the appointment, the University of Notre Dame petitioned for an H-

1B visa that would allow Professor Ramadan to work in the United States. An H-1B visa

is a nonimmigrant visa for aliens who will be employed temporarily in occupations that

require "theoretical and practical application of a body of specialized knowledge along

with at least a bachelor's degree or its equivalent." 8 U.S.C. § 1184(i)(1)(A). Professor

Ramadan was granted an H-1B visa on May 5, 2004.

23. On July 28, 2004, nine days before Professor Ramadan and his family were to

move to Indiana, and after the majority of their belongings had been shipped to the

United States, Professor Ramadan received a telephone call from the United States

Embassy in Bern, Switzerland, informing him that his visa had been revoked. Professor

Ramadan was not provided a verbal explanation for the revocation and neither Professor

Ramadan nor the University of Notre Dame has ever received a written explanation. At a

press conference on August 25, 2004, however, Russ Knocke, a spokesman for the

Department of Homeland Security, cited the ideological exclusion provision as the basis

for the revocation.

24. Numerous academic and civil rights organizations publicly protested the revocation of Professor Ramadan's visa. The American Arab Anti-Discrimination Committee issued a press release stating that it was "deeply troubled by yet another visa denial to a visiting Arab scholar, particularly one who hopes to bridge religious and cultural divides." The Jewish Council on Urban Affairs issued a press release expressing concern that "fear of Muslims, Arabs, and terrorism is being used to justify an erosion of civil liberties that poses a danger to all people, and especially to minorities, in the United States." Scholars at Risk, an international network of 90 universities and colleges working to promote academic freedom and to defend the human rights of scholars, issued a press release expressing "concern[] that Dr. Ramadan's visa ha[d] been revoked for political reasons and [was] an effort to curb Islamic intellectual thought and discourse" in the United States. Numerous newspapers, both in the United States and abroad, published editorials questioning the government's decision and calling upon it to reconsider.

25. On October 4, 2004, the University of Notre Dame submitted a second H-1B petition on Professor Ramadan's behalf. When defendants failed to act on this petition by December 2004, Professor Ramadan resigned his position at the University of Notre Dame, canceled plans to meet with and speak to academics in the United States, and began to search for an academic appointment outside the United States.

26. Defendants' decision to deem Professor Ramadan inadmissible under the ideological exclusion provision rendered Professor Ramadan ineligible for admission to the United States under the visa waiver program.

27. Since July 2004, numerous organizations have invited Professor Ramadan to lecture, attend conferences, and meet with scholars in the United States.  Professor Ramadan has had to decline these invitations.  For example, Professor Ramadan declined an invitation to speak at the France-Stanford Center for Interdisciplinary Studies in Stanford, California, in September 2004; an invitation to give the keynote address at the 41st Annual Islamic Society of North America Convention in Chicago, Illinois, in September 2004; and an invitation to speak at a conference sponsored by The Leaders' Project and hosted by former Defense Secretary William Cohen in February 2005.  But for defendants' actions, Professor Ramadan would have accepted some or all of these invitations.

28. On September 16, 2005, at the encouragement of individuals and organizations in the United States, Professor Ramadan submitted an application for a B visa, a nonimmigrant visa that would allow him to enter the United States to attend and participate in various conferences.  The application, which Professor Ramadan submitted to the United States Embassy in Bern, appended invitations including an invitation from the EastWest Institute to speak at a conference to be held in New York on September 21-22, 2005; an invitation from the Center for Global Studies to speak at George Mason University in Fairfax, Virginia, in October or November, 2005; an invitation from the AAR to attend a meeting of the Editorial Board of the Journal of the AAR in Philadelphia on November 19-22, 2005; an invitation from the Archbishop of Canterbury to participate in a seminar to be held at Georgetown University in Washington, DC, from March 27-30, 2006; and an invitation to speak at plaintiff AAUP's annual meeting in Washington, DC, on June 10, 2006.

29. The website of the United States Department of State indicates that, at the United States Embassy in Bern, the "Typical Wait Time (Calendar Days) for a Nonimmigrant Visa Interview Appointment" is 5 days.  It indicates that the "Typical Wait Time (Work Days) for a Non Immigrant Visa to be Processed" is 2 days.  While the website states that these wait times do not include "the time required for additional special clearance or administrative processing," it also states that "[m]ost special clearances are resolved within 30 days of application."

30. On December 2, 2005, approximately 11 weeks after he had submitted his B visa application, Professor Ramadan received an e-mail from the Visa Section of the United States Embassy in Bern, advising him to schedule an interview concerning his application.  Professor Ramadan scheduled an interview for December 20.  At the interview, representatives of the Departments of State and Homeland Security asked Professor Ramadan questions about his political views and associations.  Professor Ramadan answered these questions in good faith.  After the interview, Professor Ramadan asked his interviewers whether he would be granted a visa and, if so, when.  He was told that consideration of the application would likely take close to two years and that he could not be assured of receiving a visa even then.

31. The result of defendants' actions is that Professor Ramadan has been excluded from the United States since July 2004 and that he continues to be excluded today.  Defendants' actions have prevented Professor Ramadan from attending numerous events in the United States that he would otherwise have attended.  Defendants' actions are preventing Professor Ramadan from accepting invitations to attend events in the United States in the future.

12

The Impact of Professor Ramadan's Exclusion
On Plaintiffs' and Others' First Amendment Rights

American Academy of Religion

32. The AAR is dedicated to furthering knowledge of religion and religious institutions in all their forms and manifestations.  The AAR fulfills its mission through Academy-wide and regional conferences and meetings, publications, programs, membership services, grants and awards, and professional services.

33. The AAR publishes a scholarly journal, the Journal of the American Academy of Religion, which is widely regarded as the pre-eminent American journal in the field of religion.  In collaboration with the Oxford University Press, the AAR publishes scholarly and pedagogical books.  The AAR and its members also routinely serve as resources to the public, the media, and all levels of government on matters concerning religion.

34. The AAR has a special interest in ensuring that scholars and ideas can cross international borders without interference.  The study of religion, perhaps more than any other academic discipline, is an international study and requires engagement with scholars from other cultures and nations.  In 1991, the AAR created an "International Connections Committee" specifically to focus on the worldwide scope of scholarship in religion and the international composition of the AAR's membership.

35. The AAR and its members frequently invite foreign scholars to lecture, attend conferences, and meet other scholars inside the United States.

36. Defendants' exclusion of Professor Ramadan has compromised and continues to compromise the ability of the AAR and its members to meet with Professor Ramadan, to hear him speak, and to collaborate with him on academic projects.  It also entirely

deprives them of their ability to invite him to lecture, attend conferences, and meet other scholars inside the United States.

37. Professor Ramadan is a prominent figure in the field of religious studies and, before July 2004, he was a frequent presenter and participant at religious studies conferences and symposia in the United States.

38. In January 2004, the AAR invited Professor Ramadan to deliver a plenary address at the AAR's annual meeting, which is the world's largest gathering of religion scholars. The meeting was scheduled to take place in November 2004. Professor Ramadan accepted the invitation.

39. On August 30, 2004, after defendants revoked Professor Ramadan's H-1B visa, the AAR and the Middle East Studies Association of North America wrote a letter to the State Department, stating that they were "aware of absolutely no evidence for allegations that Dr. Ramadan has advocated violence or been associated with groups which perpetrate violence. On the contrary, important scholars and reputable universities have testified to his academic credentials and his character as a researcher and teacher." The letter requested that the State Department reconsider its decision to revoke the visa. The State Department rejected that request by letter dated September 3, 2004.

40. When it became clear that Professor Ramadan would not be permitted to enter the United States in order to attend the annual meeting, the AAR made plans to videoconference Professor Ramadan's one-hour session from Montreal. The videoconference facility created unanticipated costs of approximately $10,000 and required the AAR to change the time of Professor Ramadan's plenary address. The last-minute change of plans reduced attendance at Professor Ramadan's session by more than

half because the videoconference conflicted with many other sessions and because the

program book with the original time had already been printed and conference organizers

were not able to communicate the change to conference attendees.

41. Professor Ramadan's inability to attend the conference meant that AAR

members were denied the opportunity to meet with Professor Ramadan.  They were

denied the opportunity to talk with Professor Ramadan in person, to interact with him

throughout the annual meeting, and to hear him respond to other speakers.  They were

also prevented from engaging in the informal networking and exchange of ideas that

makes the annual meeting a unique and invaluable resource for members.

42. In May 2005, Charles Mathewes, Editor of the JAAR, invited Professor

Ramadan to become a member of the journal's Editorial Board for a two-year term

beginning in 2006.  Editorial Board members, who are selected on the basis of their

prominence in the field of religious studies, must perform several duties during their

tenure.  They must review manuscripts, provide a book review for publication in the

JAAR, and seek out articles for publication.  The annual meeting of the JAAR's Editorial

Board is held in conjunction with the AAR's annual meeting and Board members are

expected to attend.  Defendants' actions have prevented and continue to prevent

Professor Ramadan from fulfilling his responsibilities to JAAR and have compromised

and continue to compromise JAAR's ability to fulfill its organizational mandate.

43. On January 17, 2006, Diana Eck, the AAR's President for 2006, invited

Professor Ramadan to deliver a plenary address at the AAR's annual meeting to be held

in November 2006.  Defendants' actions are preventing Professor Ramadan from

accepting this invitation.

American Association of University Professors

44. The AAUP has long held that the free circulation of scholars is an integral part of academic freedom and that the unfettered search for knowledge is indispensable for the strengthening of a free and orderly world.

45. Since its founding in 1915, the AAUP has been committed to defending and promoting academic freedom in the United States. The AAUP believes that academic freedom comprises the liberty to learn as well as to teach. The AAUP articulated this principle in 1967 during its Fifty-Third Annual Meeting when it affirmed, in a "Resolution on Restraints on Visiting Speakers," the belief that "the freedom to hear is an essential condition of a university community and an inseparable part of academic freedom" and that "the right to examine issues and seek truth is prejudiced to the extent that the university is open to some but not to others whom members of the university also judge desirable to hear." In 1976, during its Sixty-Second Annual Meeting, the AAUP passed a "Resolution on the Free Circulation of Scholars" that stated that "[t]he free circulation of scholars to countries other than their own, to participate in symposia and to accept invitations for temporary teaching assignments, is essential to ensure the exposure of faculty and students to the broadest spectrum of academic approaches and viewpoints."

46. In furtherance of its commitment to academic freedom, the AAUP has repeatedly urged reform of United States immigration laws in order to facilitate visits to this country by foreign scholars and students. During the 1970s and 1980s, for example, the AAUP spoke out repeatedly against provisions of the McCarran-Walter Act that barred the admission of individuals thought to be associated with the Communist party.

Those provisions were used to exclude, among others, Nobel laureate Gabriel Garcia Marquez, Chilean poet and Nobel Laureate Pablo Neruda, as well as Graham Greene, Patricia Lara, Farley Mowat, Carlos Fuentes, and Dario Fo.

47. The AAUP has repeatedly intervened on behalf of foreign scholars who were excluded from the United States on the basis of their political beliefs and associations. It has also advocated against restrictions on American scholars' right to travel to foreign countries to lecture, attend conferences, and meet with their academic counterparts.

48. The AAUP and its members frequently invite foreign scholars to lecture, attend conferences, and meet with academics in the United States.

49. Defendants' exclusion of Professor Ramadan has compromised and continues to compromise the ability of the AAUP and its members to meet with Professor Ramadan, to hear him speak, and to collaborate with him on academic projects. It also entirely deprives them of their ability to invite him to lecture, attend conferences, and meet other scholars inside the United States.

50. The AAUP has actively protested defendants' exclusion of Professor Ramadan. In August 2004, after defendants revoked Professor Ramadan's H1-B visa, the AAUP wrote to the Secretaries of State and Homeland Security to urge the government to reconsider its position. The letter conveyed the Association's concern that "the action excludes a foreign scholar who was invited to teach in the United States by one of our most distinguished universities" and it stated that "[f]oreign scholars offered appointments at an American institution of higher learning should not be barred by our government from entering the United States because of their political beliefs or associations or their writings."

51. In February 2005, the AAUP invited Professor Ramadan to speak to its annual meeting to be held in June of that year. After Professor Ramadan expressed interest in accepting the invitation, the AAUP sent a letter seeking assurances from the Departments of State and Homeland Security that Professor Ramadan would be permitted to enter the United States in order to attend. The letter stated that the uncertainty surrounding Professor Ramadan's ability to enter the country made it difficult to plan the meeting and to publicize Professor Ramadan's address; that "some AAUP members, particularly those who are scholars of religion, would like to meet with Professor Ramadan while he is here"; and that "informal meetings, which would facilitate debate, collaboration, and academic exchange more generally, are difficult to plan without some assurance that Professor Ramadan will be permitted to enter the country." Both the Department of State and the Department of Homeland Security responded in writing that they would not provide such assurances. Although the AAUP ultimately provided its members with an opportunity to hear Professor Ramadan speak by videoconference, AAUP members were unable to meet with Professor Ramadan, to interact with him face-to-face, and to benefit from his participation in the remainder of the conference program.

52. After the AAUP's 91st annual meeting, the AAUP sent Professor Ramadan a letter thanking him for his video and telephone presentation. The letter stated that "[t]he assembled members of the Association were moved and enlightened by your comments, though many expressed regret that you were not physically present." The letter also stated that the assembled members had unanimously approved a proposal to invite Professor Ramadan to address the AAUP's 92nd Annual Meeting in June 2006. Defendants' actions are preventing Professor Ramadan from accepting this invitation.

<u>PEN American Center</u>

53. PEN's mission is to promote the freedom of expression in the United States and abroad, advance literature, oppose censorship, and foster international literary fellowship. These core principles are expressed in the PEN Charter: "PEN stands for the principle of unhampered transmission of thought within each nation and among all nations, and members pledge themselves to oppose any form of suppression of freedom of expression in their country or their community."

54. PEN fulfills its mission and supports its members through international literary events held in the United States; conferences, readings, and public forums that involve foreign writers and scholars; and advocacy campaigns designed to protect the right to free expression domestically and abroad.

55. In furtherance of its mission, PEN has historically taken a leading role in combating restrictive immigration laws that limit the ability of foreign scholars and writers to visit the United States. During the 1960s, 1970s, and 1980s, PEN was one of the most vocal critics of the government's practice of ideological exclusion. On May 3, 1989, Larry McMurtry, then a member of PEN's Executive Board, testified before the House Judiciary Subcommittee on Courts, Intellectual Property, and Administrative Justice about the ideological-exclusion provisions of the 1952 McCarran-Walter Act and their negative effect "on the free and open exchange of ideas among writers of differing national origins and ideological perspectives." Mr. McMurtry testified that the McCarran-Walter Act and the practice of excluding writers and scholars because of their political views and ideas "abridge[ed] the rights of American writers to engage in face to face discussion and confrontation with foreign colleagues; it violate[d] the right of

citizens to hear the speakers of their choice and make their own decisions about the ideas with which they are presented; [and] it deter[ed] foreign writers and others who hold controversial views from visiting the United States."

56. PEN and its members frequently invite foreign writers and scholars speak in the United States, to attend literary and public education programs, and to meet with U.S.-based writers and with members of the American public.

57. Last year, PEN inaugurated what will be an annual international literary event: the PEN World Voices Festival of International Literature.  The PEN World Voices Festival brings together some of the world's most celebrated writers and scholars for a week of discussion, reading, and face-to-face conversation before a large American audience.  The 2005 PEN World Voices Festival brought together writers and scholars from over forty-five countries.

58. PEN sponsors other public literary programs, readings, and forums on current issues and it frequently invites foreign writers and scholars to attend these events. Through its Foreign Exchange program, PEN regularly invites foreign writers to visit the United States to discuss their works with other writers and the general public.

59. After September 11, PEN initiated a "Core Freedoms" campaign to "protect public access to . . . a full range of voices from the United States and around the world" and "promote U.S. policies that reflect a core commitment to individual rights, preserve these rights at home, and expand them internationally."  Through this campaign, PEN and its members have sought to raise awareness of U.S. laws and policies that, like the ideological exclusion provision, impinge on the freedom of expression or effectively censor the ideas that Americans are allowed to hear from abroad.

60. Defendants' exclusion of Professor Ramadan compromises the ability of PEN and its members to meet with Professor Ramadan, to hear him speak, and to collaborate with him on intellectual projects. It deprives them of their ability to invite him to participate in public literary programs and forums and to meet with other writers in the United States.

61. On January 17, 2006, PEN invited Professor Ramadan to participate as a distinguished participant in the 2006 PEN World Voices Festival of International Literature scheduled for April 26-30, 2006, in New York City. Defendants' actions are preventing Professor Ramadan from accepting this invitation.

The Impact of the Ideological Exclusion Provision
On Plaintiffs' and Others' First Amendment Rights

62. The ideological exclusion provision, as written and as construed by defendants, has compromised and continues to compromise the ability of plaintiffs and their members to engage in intellectual exchange with Professor Ramadan and other prominent foreign scholars, to hear the views of such scholars, and to invite such scholars to lecture, attend conferences, and meet with scholars, writers, and others inside the United States.

63. The ideological exclusion provision forecloses speech that is a legitimate part of academic and political debate. Because the statute does not define the words "endorse," "espouse," or "persuade," the statute lends itself to overbroad application. For example, the statute could be used to exclude foreign intellectuals who have criticized the detention of "enemy combatants" at Guantánamo Bay Naval Base; who have contended that the invasion of Iraq was unlawful; or who have condemned the inclusion of a particular organization on the government's list of Foreign Terrorist Organizations.

21

Defendants' use of the statute to exclude Professor Ramadan is illustrative of the statute's malleability and reach.

64. Of special concern to the AAR, the ideological exclusion provision forecloses speech that is a legitimate part of academic discourse about religion. Many scholars in the field of religious studies attempt to understand and explain violence perpetrated in the name of religion. The statute could be used to exclude such scholars, including those, for example, who study the concept of "jihad" in Islam, who study the religious motives of suicide bombers, or who study institutions such as madrasas from which terrorists are said to be recruited. The statute is problematic as written, but the risk that it will be used to stifle legitimate scholarship is especially acute because the State Department's Foreign Affairs Manual affords the statute the broadest possible scope.

65. Because the ideological exclusion provision is vague and the terms "endorse," "espouse," and "persuade" are not defined, it impossible to know with any degree of certainty which scholars fall within the scope of the provision and which do not. The ideological exclusion provision therefore has a chilling effect that extends far beyond the effect of individual exclusions. This chilling effect is particularly severe because the exclusion of a foreign scholar under the ideological exclusion provision stigmatizes both the scholar and the institution that has invited the scholar into the United States. Rather than risk exclusion and the attendant stigma, some foreign scholars are likely to decline invitations. Rather than risk the possibility that invited scholars will be excluded, some U.S.-based scholars and institutions are likely to forgo inviting controversial scholars altogether. In addition, those foreign scholars who are present in the United States pursuant to valid visas or the visa waiver program will be chilled from expressing their

views fully and openly for fear that they will be deemed to have violated the statute and be denied admission in the future.

66. The ideological exclusion provision forecloses speech that is particularly valuable. Plaintiffs and their members often invite prominent scholars from abroad specifically because their views are controversial in the United States or because they bring perspectives that differ from those of U.S.-based scholars. It is these controversial scholars, however, against whom the ideological exclusion provision is most likely to be used. In effect, the provision targets precisely those scholars whose speech is most valuable to plaintiffs, their members, and the American public.

67. The ideological exclusion provision undermines the vitality of academic discourse in the United States. In February 2006, the AAUP will be convening a conference of international scholars to discuss the use of "academic boycotts" and the implication of such boycotts for academic freedom. Participants will include Andris Barblan of the Magna Carta Observatory in Switzerland; Yossi Ben-Artzi, Rector of the University of Haifa in Israel; and Lisa Taraki of Birzeit University in Palestine. The AAUP has decided to convene the conference in Italy rather than in the United States in part because of concerns that some participants would be excluded from the United States.

68. The ideological exclusion provision also imposes administrative and economic burdens on U.S.-based institutions that seek to invite controversial foreign scholars to lecture, attend conferences, or meet with scholars in the United States. Uncertainty as to whether a foreign scholar will be permitted to enter the United States makes it difficult to plan events in the United States and to publicize those events before

they take place. This uncertainty leads to higher costs because arrangements for travel and facilities must be made or cancelled at the last minute. It also leads to administrative burdens because organizers must also seek out alternate speakers who can stand in for foreign scholars who are excluded.

69. The ideological exclusion provision has compromised and continues to compromise the interests of U.S. citizens and residents. By regulating, stigmatizing, and suppressing lawful speech, the provision skews and impoverishes academic and political debate inside the United States, creates artificial barriers between residents of the United States and residents of other nations, and deprives United States citizens and residents of information that they need in order to make responsible and informed decisions about matters of political importance.

## CAUSES OF ACTION

70. Defendants' exclusion of Professor Ramadan violates the Administrative Procedures Act.

71. The ideological exclusion provision, as written and as construed by defendants, violates the First Amendment on its face and as applied to exclude Professor Ramadan.

72. The ideological exclusion provision, as written and as construed by defendants, is unconstitutionally vague and violates the Fifth Amendment on its face and as applied to exclude Professor Ramadan.

## PRAYER FOR RELIEF

For the foregoing reasons, plaintiffs pray that the Court:

1. Declare that defendants' reliance on the ideological exclusion provision to exclude Professor Ramadan violates the Administrative Procedures Act;

2. Declare that the ideological exclusion provision, as written and as construed by defendants, violates the First Amendment on its face and as applied to exclude Professor Ramadan;

3. Declare that the ideological exclusion provision, as written and as construed by defendants, violates the Fifth Amendment on its face and as applied to exclude Professor Ramadan;

4. Enjoin the defendants from relying on the ideological exclusion provision to exclude Professor Ramadan or any other individual;

5. Award plaintiffs fees and costs pursuant to 28 U.S.C. § 2412; and

6. Grant any other and further relief as is appropriate and necessary.

Respectfully submitted,

JAMEEL JAFFER (JJ-4653)
MELISSA GOODMAN (MG-7844)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500

JUDY RABINOVITZ (JR-1214)
LUCAS GUTTENTAG (LG-0392)
American Civil Liberties Union Foundation
    Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004-2400

ARTHUR N. EISENBERG (AE-2012)
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004

CLAUDIA SLOVINSKY (CS-1826)
396 Broadway, Suite 601
New York, NY 10013

*Of Counsel*
LEON FRIEDMAN (LF-7124)
148 East 78th Street
New York, NY 10021

Attorneys for Plaintiffs

January 25, 2006