# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN ACADEMY OF RELIGION; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; PEN AMERICAN CENTER; TARIQ RAMADAN,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL CHERTOFF, in his official capacity as Secretary of the Department of Homeland Security; CONDOLEEZZA RICE, in her official capacity as Secretary of State,<br><br>Defendants. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 06-588 (PAC) |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

JAMEEL JAFFER (JJ-4653)
MELISSA GOODMAN (MG-7844)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500

JUDY RABINOVITZ (JR-1214)
LUCAS GUTTENTAG (LG-0329)
American Civil Liberties Union Foundation
  Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004-2400

ARTHUR N. EISENBERG (AE-2012)
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004

(additional counsel on following page)

CLAUDIA SLOVINSKY (CS-1826)
396 Broadway, Suite 601
New York, NY 10013

Of Counsel
LEON FRIEDMAN (LF-7124)
148 East 78th Street
New York, NY 10021

Attorneys for Plaintiffs

March 15, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................i

INTRODUCTION ......................................................................1

STATUTORY AND REGULATORY FRAMEWORK ........................................2

FACTUAL BACKGROUND ..............................................................4

ARGUMENT ..........................................................................8

    I.    ABSENT INJUNCTIVE RELIEF, PLAINTIFFS WILL SUFFER
        IRREPARABLE INJURY ...................................................9

    II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS
        OF THEIR CLAIMS......................................................11

        A. Defendants' continuing exclusion of Professor Ramadan violates
           the Administrative Procedures Act because there is no evidence
           that Professor Ramadan has endorsed or espoused terrorism...........11

        B. Defendant's exclusion of Professor Ramadan violates the First
           Amendment because the government's interest in preventing
           United States residents from hearing constitutionally protected
           speech does not supply a facially legitimate and bona fide
           reason for exclusion ...................................................19

CONCLUSION ........................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Abourezk v. Reagan*, 1988 WL 59640 (D.D.C. 1988) ........................................................22

*Abourezk v. Reagan*, 484 U.S. 1 (1987) .........................................................................11

*Abourezk v. Reagan*, 592 F. Supp. 880 (D.D.C. 1984) ...............................................20, 21

*Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986) .................................................10, 19

*Allende v. Shultz*, 605 F. Supp. 1220 (D. Mass. 1985) ...................................11, 19, 20, 22

*Allende v. Shultz*, 845 F.2d 1111 (1st Cir. 1988) .............................................................1

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996) ......................................................9

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) ......................................................................10

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ....................................................................23

*Bronx Household of Faith v. Bd. of Educ. of New York*, 331 F.3d 342 (2d Cir. 2003) .......9

*Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999) ..............22, 23

*Burrafato v. United States*, 523 F.2d 554 (2d Cir. 1975) ..................................................19

*Burrafato v. United States*, 424 U.S. 910 (1976) ..............................................................19

*Cohen v. California*, 403 U.S. 15 (1971) ..........................................................................23

*Commercial Drapery Contractors, Inc. v. United States*, 967 F. Supp. 1
  (D.D.C. 1997) .................................................................................................................13

*Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788 (1985) ..24

*Dow Jones & Co. v. Simon*, 842 F.2d 603 (2d Cir. 1988) ............................................9, 10

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................................9

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) .....................................................23

*Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411
  (2d Cir. 2004) .................................................................................................................9

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .......................................................................23

i

*Harvard Law School Forum v. Shultz*, 633 F. Supp. 525 (D. Mass. 1986).............9, 20, 21

*Harvard Law School Forum v. Shultz*, 852 F.2d 563 (1st Cir. 1986)...................9

*Hill v. Colorado*, 530 U.S. 703 (2000) ...........................................................23

*I.N.S. v. Chadha*, 462 U.S. 919 (1983) .............................................................19

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ...................24

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ............................................1, 9, 10

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) .......................................10

*Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978)..................23

*Lesbian/Gay Freedom Day Comm., Inc. v. I.N.S.*, 541 F. Supp. 569 (N.D.Cal. 1982).....22

*Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133 (2d Cir. 2004)........................24

*Mandel v. Mitchell*, 325 F. Supp. 620 (E.D.N.Y. 1971)...................................9, 20

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ............................................10

*Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006) ......................9

*Melzer v. Bd. of Educ. of City School Dist. of City of New York*, 196 F. Supp. 2d 229 (E.D.N.Y. 2002) ...................................................................................13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983)..........12

*Nguyen v. I.N.S.*, 533 U.S. 53 (2001) ...............................................................20

*Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577 (2d Cir. 1989) ...................8, 9

*Police Dept. of Chicago v. Mosley,* 408 U.S. 92 (1972) ...................................20

*Rafeedie v. I.N.S.*, 795 F. Supp. 13 (D.D.C. 1992)...........................................22

*Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367 (1969) .............................10

*Regan v. Time, Inc.*, 468 U.S. 641 (1984) .......................................................20

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995).................20, 24

*Stanley v. Georgia*, 394 U.S. 557 (1969)..........................................................10

*State of New York Dep't of Social Services v. Shalala*, 21 F.3d 485 (2d Cir. 1994).........12

*Stromberg v. California*, 283 U.S. 359 (1931) .....................................................23

*Sweezy v. State of New Hampshire*, 354 U.S. 234 (1957) ................................24

*Thomas v. Collins*, 323 U.S. 516 (1945) ...........................................................21

*Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622 (1994) ...................21

*United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998)..........................................................24

*United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976) .....................................23

*Western Energy Co. v. U.S. Dept. of Interior*, 932 F.2d 807 (9th Cir. 1991)....................13

*Whitehill v. Elkins*, 389 U.S. 54 (1967) ............................................................23

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .....................................................19, 20

**Statutes**

5 U.S.C. § 706 .............................................................................................11, 12

8 U.S.C. § 1182 .....................................................................................1, 2, 3, 18

8 U.S.C. § 1187 .........................................................................................2, 3, 25

USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001) ......................1, 2

REAL ID Act, Pub. L. 109-13, 119 Stat. 231 (May 11, 2005)............................2

**Other Authorities**

Alexander Meiklejohn, *Free Speech and its Relation to Self Government* (Harper and Brothers ed., 1948) ...........................................................11, 25

Peter J. Spiro, *Explaining the End of Plenary Power*, 16 Geo. Immigr. L.J. 339 (2002).........................................................................................................20

State Department Foreign Affairs Manual ............................................1, 3, 17

*Webster's Seventh New Collegiate Dictionary* (1971) ......................................13

# INTRODUCTION

Plaintiffs American Academy of Religion (AAR), American Association of University Professors (AAUP), and PEN American Center (PEN) have filed this lawsuit to challenge the government's violation of their First Amendment and statutory rights by its continuing exclusion of Tariq Ramadan, a Swiss scholar who now teaches at the University of Oxford.[1] The suit also challenges the constitutionality of section 411(a)(1)(A)(iii) of the USA Patriot Act, as amended and codified in 8 U.S.C. § 1182(a)(3)(B)(i)(VII) (hereinafter, the "ideological exclusion provision"), the provision that defendants have invoked to justify their exclusion of Professor Ramadan from the United States. Defendants have construed the ideological exclusion provision to permit the exclusion of aliens who, in the government's view, have voiced "irresponsible expressions of opinion." 9 F.A.M. § 40.32 n.6.2.

The Complaint seeks, among other things, a declaration that the ideological exclusion provision violates the First and Fifth Amendments on its face. The instant motion, however, seeks preliminary relief only with respect to the government's exclusion of Professor Ramadan. Plaintiffs have invited Professor Ramadan to speak at events in the United States scheduled to take place in April, June, and November. Without preliminary injunctive relief, Professor Ramadan will be unable to attend these events and plaintiffs and their members will be denied their First Amendment right to meet with him, hear his views, and engage him in debate.

---

[1] The Complaint asserts the rights of the organizational plaintiffs and not those of Professor Ramadan. Professor Ramadan is "made a plaintiff because he is symbolic of the problem." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972); *see also Allende v. Shultz*, 845 F.2d 1111, 1114 n.4 (1st Cir. 1988).

Plaintiffs respectfully request that this Court preliminarily enjoin defendants from continuing to exclude Professor Ramadan from the United States.[2]

## STATUTORY AND REGULATORY FRAMEWORK

A nonimmigrant alien is ordinarily inadmissible to the United States unless he or she is in possession of a valid nonimmigrant visa. *See* 8 U.S.C. § 1182(a)(7)(B)(i)(II). Certain classes of aliens are ineligible to receive visas. Aliens ineligible to receive visas include those who have engaged in terrorist activities, *see id.* § 1182(a)(3)(B)(i)(I); those who have, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity, *see id.* § 1182(a)(3)(B)(i)(III); and those who are representatives of foreign terrorist organizations designated by the Secretary of State, *see id.* § 1182(a)(3)(B)(i)(IV)(aa).

The USA Patriot Act added to the categories of aliens ineligible to receive visas those who have used their "position of prominence within any country to endorse or espouse terrorist activity, or to persuade others to support terrorist activity or a terrorist organization, in a way that the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities." Pub. L. No. 107-56, § 411, 115 Stat. 272 (Oct. 26, 2001) (codified at 8 U.S.C. § 1182(a)(3)(B)(i)(VI) (2004)). As amended by section 103 of the REAL ID Act, Pub. L. 109-13, Division B, Title I, 119 Stat. 231 (May 11, 2005), the ideological exclusion provision now renders inadmissible *any* alien who has "endorse[d] or espouse[d] terrorist activity or

---

[2] Specifically, plaintiffs request that the Court (i) enjoin defendants from denying a visa to Professor Ramadan on the basis of the ideological exclusion provision; (ii) enjoin defendants from denying a visa to Professor Ramadan on the basis of speech that United States residents have a constitutional right to hear; (iii) require defendants immediately to adjudicate Professor Ramadan's pending visa application; and (iv) require defendants immediately to restore Professor Ramadan's eligibility to rely on the visa waiver program described in 8 U.S.C. § 1187(a).

persuade[d] others to endorse or espouse terrorist activity or support a terrorist organization," 8 U.S.C. § 1182(a)(3)(B)(i)(VII).

The State Department's Foreign Affairs Manual, which guides consular officials in the granting and denial of visas, explains that the ideological exclusion provision authorizes the exclusion of aliens who have voiced "irresponsible expressions of opinion." 9 F.A.M. § 40.32 n.6.2. It states: "This [ideological exclusion] provision does not require a finding of specific intent (as is the case in the incitement provisions discussed . . . above); rather it is directed at irresponsible expressions of opinion by prominent aliens who are able to influence the actions of others." *Id.* Where a consular official believes that an alien may be inadmissible under the ideological exclusion provision, the Foreign Affairs Manual requires the official to seek a "Security Advisory Opinion" from the Department of State before acting on the application. *See* 9 F.A.M. § 40.32 n.1.2, n.3.

Congress has authorized the Secretaries of Homeland Security and State to establish a program ("visa waiver program") under which certain nonimmigrant aliens are permitted to enter the United States without visas. To rely on the program, the alien must be a national of a "program country," must be seeking entry to the United States for 90 days or less, must not "represent a threat to the welfare, health, safety, or security of the United States," must not "have failed to comply with the conditions of any previous admission," and must possess a roundtrip transportation ticket. *See* 8 U.S.C. § 1187(a). Further, the identity of the alien must have "been checked using an automated electronic database containing information about the inadmissibility of aliens to uncover any grounds on which the alien may be inadmissible to the United States." *Id.* § 1187(a)(9). Switzerland is a visa waiver program country, but aliens who are determined to be inadmissible are not entitled to rely on the visa waiver program. *See id.*

## FACTUAL BACKGROUND

Tariq Ramadan is a prominent Swiss scholar who now teaches at the University of Oxford. Ramadan Decl. ¶ 2. Professor Ramadan has published more than 20 books, approximately 700 articles, and approximately 170 audio tapes on subjects including Muslim identity, democracy and Islam, human rights and Islam, the practice of Islam in Europe, and Islamic law. *Id.* ¶¶ 4-10. The most recent of his books, *Western Muslims and the Future of Islam*, was published in 2003 by Oxford University Press. *Id.* ¶ 4. His scholarship focuses on "the situation of Muslims living in the West, and in particular on the situation of Muslims who live in Europe." *Id.* Professor Ramadan has encouraged Muslims living in Europe to reject both isolation and assimilation, and he has "explored the possibility of a 'third path' that would allow European Muslims to be both fully European and fully Muslim." *Id.* ¶ 5. Professor Ramadan has also advocated the development of an Islamic feminism, *id.* ¶ 7, and he has called for an immediate moratorium on the imposition of corporal and capital punishments that some Muslims believe are stipulated in the Quran, *id.* ¶ 8.

Professor Ramadan is arguably the most prominent European scholar of the Muslim world. DeConcini Decl. ¶ 19; Buck ¶ 16; Roberts Decl. ¶ 27. In December 2000, *Time* magazine predicted that Professor Ramadan would be one of the most influential people of the 21st century, labeling him "the leading Islamic thinker among Europe's second- and third-generation Muslim immigrants." DeConcini Decl. ¶ 19, Exh. A (Nicholas Le Quesne, *Trying to Bridge a Great Divide*, Time, Dec. 11, 2000). In 2003, just before the French government imposed a prohibition on the display of Islamic headscarves and other religious symbols in state schools, Professor Ramadan debated the proposed law with France's Interior Minister, Nicolas Sarkozy, on French national television. *Id.* In September 2004, Jonathan Laurence wrote in

*Forward* newspaper that Professor Ramadan "may be the most well-known Muslim public figure in all of Europe" and that Professor Ramadan "has used his prominence to urge young Muslims in the West to choose integration over disaffection." *Id.* ¶ 19, Exh. D (Jonathan Laurence, *Is This How the U.S. Engages Muslims?*, Forward, Sept. 3, 2004). Paul Donnelly, in an op-ed in the *Washington Post*, described Professor Ramadan's latest book as "perhaps the most hopeful work of Muslim theology in the past thousand years." *Id.* ¶ 19, Exh. C (Paul Donnelly, *The Ban on a Muslim Scholar*, Wash. Post, Aug. 28, 2004).

Until August 2004, Professor Ramadan visited the United States frequently to lecture, attend conferences, and meet with other scholars. Ramadan Decl. ¶ 12. In January 2004, the University of Notre Dame offered Professor Ramadan a double-tenured position as a professor of Islamic Studies and Henry R. Luce Professor of Religion, Conflict and Peacebuilding. *Id.* ¶ 13. After Professor Ramadan accepted the appointment, the University of Notre Dame petitioned for an H-1B visa so that Professor Ramadan would be able to work in the United States. *Id.* Professor Ramadan was granted an H-1B visa on May 5, 2004. *Id.*

On July 28, 2004, nine days before Professor Ramadan and his family were to move to Indiana, and after the majority of their belongings had been shipped to the United States, Professor Ramadan received a telephone call from the United States Embassy in Bern, Switzerland, informing him that his visa had been revoked. *Id.* ¶ 14. Professor Ramadan was not provided a verbal explanation for the revocation and neither Professor Ramadan nor the University of Notre Dame has ever received a written explanation. *Id.* A spokesman for the Department of Homeland Security, however, cited the ideological exclusion provision as the basis for the revocation. *Id.* ¶ 14, Exh. G (*Muslim Scheduled to Teach at Notre Dame Has Visa Revoked*, Los Angeles Times, Aug. 25, 2004).

Professor Ramadan has sometimes been the target of misdirected criticism because he is the grandson of Hassan al-Banna, the founder of the Muslim Brotherhood, and he is controversial in some quarters because he has publicly criticized United States policies with respect to the Muslim world. *Id.* ¶¶ 9, 11, 16. However, Professor Ramadan has never endorsed or espoused terrorist activity or supported a terrorist organization. *Id.* ¶ 16. To the contrary, and as discussed further below, Professor Ramadan has been a consistent and prominent critic of terrorism. In a recent interview with *Foreign Policy* magazine, Professor Ramadan said:

> We have to condemn [terrorism] as Muslims and as human beings. And we have to do whatever possible within Islamic communities to spread better understanding about who we are and what we can do to deal with other people. We can have a legitimate resistance to oppression, but the means should be legitimate. Terrorism, which kills innocent people, is not Islamically acceptable. Within Islam there is an accepted diversity—you can be a literalist, a Sufi mystic, or a reformist, so long as you don't say others are less Muslim than others—and we must never say that terrorism or violence is part of this accepted diversity.

*Id.* ¶ 19, Exh. R (*Who's Afraid of Tariq Ramadan?*, Foreign Policy, Nov./Dec. 2004). What Professor Ramadan said to *Foreign Policy* "is no different than what [he] has said before to others, publicly and privately, in Europe and elsewhere, in writing and in speeches." *Id.*

On October 4, 2004, the University of Notre Dame submitted a second H-1B petition on Professor Ramadan's behalf. *Id.* ¶ 24. When defendants failed to act on this petition by December 2004, Professor Ramadan resigned his position at the University of Notre Dame, canceled plans to meet with and speak to academics in the United States, and began to search for an academic appointment outside the United States. *Id.* ¶¶ 24-25. Ultimately, Professor Ramadan was offered a position at the University of Oxford, which he accepted. *Id.* ¶ 2.

Since July 2004, when defendants' revoked his H-1B visa, numerous American organizations have invited Professor Ramadan to lecture, attend conferences, and meet with

scholars in the United States. Professor Ramadan has had to decline these invitations. *Id.* ¶¶ 23, 27, 31.[3]

On September 16, 2005, at the encouragement of individuals and organizations in the United States, Professor Ramadan submitted an application for a B visa, a nonimmigrant visa that would allow him to enter the United States to attend and participate in various conferences. *Id.* ¶ 28. Although Professor Ramadan was not seeking to work in the United States, he was required to submit a visa application because defendants' decision to deem him inadmissible under the ideological exclusion provision rendered him ineligible for admission to the United States under the visa waiver program. *Id.* ¶ 26. The new visa application, which Professor Ramadan submitted to the United States Embassy in Bern, appended invitations from numerous organizations in the United States. *Id.* ¶ 28.[4]

On December 2, 2005, approximately 11 weeks after he had submitted his B visa application, Professor Ramadan received an e-mail from the Visa Section of the United States Embassy in Bern, advising him to schedule an interview concerning his application. *Id.* ¶ 30. Professor Ramadan scheduled an interview for December 20. *Id.* At the interview, a representative of the Department of State and a representative of the Department of Homeland Security (who said he had flown in from Washington, D.C., for the interview) asked Professor Ramadan numerous questions about his political views and associations. *Id.* Professor Ramadan answered these questions to the best of his ability. *Id.* After the interview, Professor Ramadan

---

[3] In a handful of cases, Professor Ramadan has spoken to American audiences by telephone or video. Ramadan Decl. ¶¶ 23, 27.

[4] The invitations included: an invitation from the EastWest Institute to speak at a conference to be held in New York on September 21-22, 2005; an invitation from the Center for Global Studies to speak at George Mason University in Fairfax, Virginia, in October or November, 2005; an invitation from the Archbishop of Canterbury to participate in a seminar to be held at Georgetown University in Washington, DC, from March 27-30, 2006; and invitations to speak at other events later in 2006. Ramadan Decl. ¶ 28, Exh. W.

asked his interviewers whether he would be granted a visa and, if so, when. He was told that

consideration of the application would likely take close to two years. *Id.* He was also told that

he could not be assured of receiving a visa even at the end of that process. *Id.*

The result of defendants' actions is that Professor Ramadan has been excluded from the

United States since July 2004 and that he continues to be excluded today. Defendants' actions

have prevented Professor Ramadan from attending events sponsored by plaintiffs in the past, *id.*

¶¶ 27-28, 31; DeConcini Decl. ¶¶ 18-27; Buck Decl. ¶¶ 16-19, and defendants' actions, if not

enjoined, will prevent Professor Ramadan from attending events sponsored by plaintiffs in the

future. Most immediately:

- Plaintiff PEN has invited Professor Ramadan to speak at its World Voices Festival to be held in New York at the end of April. *See* Roberts Decl. ¶ 27.

- Plaintiff AAUP has invited Professor Ramadan to speak at its annual meeting to be held in Washington, D.C. in June. *See* Buck Decl. ¶ 20.

- Plaintiff AAR has invited Professor Ramadan to deliver a plenary address to its membership at the association's annual meeting to be held in Washington, D.C. in November. *See* DeConcini Decl. ¶ 28.

In the absence of preliminary injunctive relief, Professor Ramadan will be unable to speak at

these events and plaintiff organizations and their members will be denied their First Amendment

right to meet with Professor Ramadan, to hear his views, and to engage him in discussion and

debate.

**ARGUMENT**

A district court may enter a preliminary injunction staying "governmental action taken in

the public interest pursuant to a statutory or regulatory scheme" where the moving party has

demonstrated that (i) absent injunctive relief, he will suffer irreparable injury; and (ii) there is a

likelihood that he will succeed on the merits of his claim. *See Plaza Health Labs., Inc. v.*

*Perales*, 878 F.2d 577, 580 (2d Cir. 1989); *see also Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006). Where the moving party seeks a "mandatory" injunction against the government, he must show a "substantial" likelihood of success on the merits. *See Mastrovincenzo*, 435 F.3d at 89. Here, plaintiffs seek both prohibitory and mandatory relief. Whichever standard one applies, however, preliminary relief is plainly merited.

## I.    ABSENT INJUNCTIVE RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE INJURY.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996) ("violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction"); *Bronx Household of Faith v. Bd. of Educ. of New York*, 331 F.3d 342, 349 (2d Cir. 2003); *Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004). The courts have recognized, in circumstances similar to those presented here, that the exclusion of an invited scholar implicates the First Amendment rights of United States residents and inflicts irreparable injury for purposes of the preliminary injunction test. *See, e.g., Harvard Law School Forum v. Shultz*, 633 F. Supp. 525, 530 (D. Mass. 1986) (finding that United States citizens who challenged ideological exclusion of foreign political figure had demonstrated irreparable injury for purposes of preliminary injunction), *vacated as moot*, 852 F.2d 563 (1st Cir. 1986); *Mandel v. Mitchell*, 325 F. Supp. 620 (E.D.N.Y. 1971) (same), *rev'd on other grounds sub nom. Kleindienst v. Mandel*, 408 U.S. 753 (1972).

The exclusion of invited scholars implicates First Amendment rights of United States residents because, as the Second Circuit has recognized, "[t]he First Amendment unwaveringly protects the right to receive information and ideas." *Dow Jones & Co. v. Simon*, 842 F.2d 603,

607 (2d Cir. 1988); *see also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("the right to receive information and ideas . . . is fundamental to our free society"); *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 390 (1969); *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.") (Brennan, J., concurring); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943). As the Supreme Court has explained, "[t]he right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982).

The Supreme Court has affirmed the right to receive ideas in precisely the context presented here. *Kleindienst v. Mandel*, 408 U.S. 753 (1972), involved a challenge brought by United States citizens to the government's refusal to grant a visa to Ernst Mandel, a Belgian journalist and scholar. Although the Court ultimately upheld the specific exclusion challenged, it categorically rejected the government's contention that the exclusion of an invited foreign scholar "involves no restriction on First Amendment rights." *Id.* at 764. The Court wrote: "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged . . . ." *Id.* at 763 (quoting *Red Lion Broadcasting Co.*, 395 U.S. at 390). The proposition that the exclusion of foreign scholars on ideological grounds abridges the First Amendment rights of United States citizens and residents is a proposition that, since *Mandel*, has been reaffirmed by numerous courts. *See, e.g., Abourezk v. Reagan*, 785 F.2d 1043, 1050-51 (D.C. Cir. 1986) (finding that United States citizens were aggrieved by government's

decision "to keep out people they have invited to engage in open discourse with them within the United States"), *aff'd by an equally divided court*, 484 U.S. 1 (1987); *Allende v. Shultz*, 605 F. Supp. 1220, 1223 (D. Mass. 1985) (holding that "First Amendment rights are implicated in the Government's refusal to grant a visa to an alien with whom American citizens wish to speak") (internal quotation marks omitted).[5]

The continuing exclusion of Professor Ramadan compromises plaintiffs' ability to meet with Professor Ramadan, to hear him speak, and to collaborate with him on academic projects. DeConcini Decl. ¶¶ 15-28; Buck Decl. ¶¶ 16-20; Roberts Decl. ¶¶ 23-30. Absent preliminary relief, plaintiffs will suffer irreparable injury to their First Amendment rights.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A. Defendants' continuing exclusion of Professor Ramadan violates the Administrative Procedures Act because there is no evidence that Professor Ramadan has endorsed or espoused terrorism.[6]

The Administrative Procedures Act provides that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory . . .

---

[5] *See also* Alexander Meiklejohn, *Free Speech and its Relation to Self Government* 60 (Harper and Brothers ed., 1948) ("The essential point is not that the alien has a right to speak but that we citizens have a right to hear him. The freedom in question is ours.").

[6] Defendants' failure to act on Professor Ramadan's pending visa application constitutes an independent violation of the APA. *See* 5 U.S.C. § 706(1) (reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed"). Professor Ramadan's application has now been pending for six months. Yet the website of the United States Department of State indicates that, at the United States Embassy in Bern, the "Typical Wait Time (Calendar Days) for a Nonimmigrant Visa Interview Appointment" is 9 days. Ramadan Decl. ¶ 29. It indicates that the "Typical Wait Time (Work Days) for a Non Immigrant Visa to be Processed" is 2 days. *Id.* While the website states that these wait times do not include "the time required for additional special clearance or administrative processing," it also states that "[m]ost special clearances are resolved within 30 days of application." *Id.* Whether or not a six month delay in visa processing would be "unreasonabl[e]" in another context, it is clearly unreasonable here, where First Amendment rights of United States citizens are at stake, where the government has been on notice of that fact since the day the visa application was filed, and where the delay seems deliberately aimed at insulating government action from judicial review.

authority, or limitations." 5 U.S.C. § 706(2)(C). When defendants revoked Professor Ramadan's H-1B visa in July 2004, they explained the revocation by pointing to the ideological exclusion provision. Ramadan Decl. ¶ 14. Since 2004, plaintiffs have urged defendants to reconsider their view that Professor Ramadan is inadmissible under that provision (or under any other) and have sought defendants' assurance that Professor Ramadan will not be excluded in the future. DeConcini Decl. ¶ 21, Exh. E (Letter from AAR and Middle East Studies Association to Secretaries Powell and Ridge, Aug. 30, 2004); Buck Decl. ¶ 17, Exh. F (Letter from AAUP to Secretaries Powell and Ridge, Aug. 27, 2004); *id.* ¶ 19, Exh. G. (Letter from AAUP to Secretaries Rice and Chertoff, March 29, 2005). These efforts have been unavailing. DeConcini Decl. ¶ 22, Exh. F (Letter from State Department to AAR and MESA, Sept. 3, 2004); Buck Decl. ¶ 19, Exh. H (Letter from State Department to AAUP, April 19, 2005); *id.* ¶ 19, Exh. I (Letter from Department of Homeland Security to AAUP, April 18, 2005). Yet defendants have never pointed to any evidence whatsoever that Professor Ramadan has endorsed or espoused terrorism. The public record, meanwhile, is replete with evidence that Professor Ramadan opposes terrorism and has consistently condemned it. Defendants' determination that Professor Ramadan has endorsed or espoused terrorism is "in excess of statutory authority [or] limitations" and must be set aside.[7]

---

[7] Defendants' determination must be set aside for the additional reason that it is arbitrary and capricious. 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if the agency's "explanation for its decision . . . runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *see also State of New York Dep't of Social Services v. Shalala,* 21 F.3d 485, 492 (2d Cir. 1994) (in assessing whether agency action is arbitrary and capricious, court "must determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

For the reasons discussed below, *see* Section II.B, *infra,* defendants' continuing exclusion of Professor Ramadan is also "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Review of constitutional challenges to agency action "requires an independent assessment of the facts

The contention that Professor Ramadan has endorsed or espoused terrorism is simply insupportable. While the Immigration and Naturalization Act (INA) does not define the terms "endorse," "espouse," "persuade," and "support," each of those terms, in its ordinary usage, plainly implies at least some degree of *approval*. *See, e.g., Webster's Seventh New Collegiate Dictionary* 274 (1971) (defining "endorse" to mean "to express definite approval of"); *id.* at 284 (defining "espouse" to mean "to take up the cause of"); *id.* at 631 (defining "persuade" to mean "to move by argument, entreaty, or expostulation to a belief, position, or course of action); *id.* at 885 (defining "support" to mean "to promote the interests or cause of" or "to uphold or defend as valid or right"). There is simply no evidence – and the government has never pointed to any – that Professor Ramadan approves of terrorism.

In fact, Professor Ramadan has condemned terrorism repeatedly. Two days after the attacks of September 11, 2001, Professor Ramadan published an open letter to Muslims in which he wrote:

> Even if we don't know who did it, you know as I know that some Muslims can use Islam to justify the killing of an American, a Jew or a Christian only because he/she is an American, Jew, or a Christian; you have to condemn them and to condemn these attacks.

Ramadan Decl. ¶ 17. Approximately one month after the September 11 attacks, Professor Ramadan spoke in Paris at meeting sponsored by *La Medina,* a Muslim magazine. Professor Ramadan told his audience: "Now more than ever we need to criticize some of our brothers . . . You're unjustified if you use the Koran to justify murder." *Id.* ¶ 17, Exh. P (Nicholas Le Quesne, *Islam in Europe: A Changing Faith*, Time Europe, Dec. 17, 2001).

---

and the law." *Commercial Drapery Contractors, Inc. v. United States*, 967 F. Supp. 1, 3 (D.D.C. 1997); *see also Western Energy Co. v. U.S. Dept. of Interior*, 932 F.2d 807, 809 (9th Cir. 1991). *Cf. Melzer v. Bd. of Educ. of City School Dist. of City of New York*, 196 F. Supp. 2d 229, 242 n.13 (E.D.N.Y. 2002) ("Where . . . constitutional issues are implicated, federal district and appellate courts are each obliged to make an independent assessment of the factual record.").

In September 2002, on the eve of the first anniversary of the September 11 attacks,

Professor Ramadan joined a formal "Statement Rejecting Terrorism" issued by 199 prominent

Muslims and Muslim organizations from around the world. The statement reads, in part:

> As American Muslims and scholars of Islam, we wish to restate our conviction
> that peace and justice constitute the basic principles of the Muslim faith. We wish
> again to state unequivocals that neither the al-Qaeda organization nor Usama bin
> Laden represents Islam or reflects Muslim beliefs and practice. Rather, groups
> like al-Qaeda have misused and abused Islam in order to fit their own radical and
> indeed anti-Islamic agenda. Usama bin Laden and al-Qaeda's actions are
> criminal, misguided and counter to the true teachings of Islam.

Ramadan Decl. ¶ 18, Exh. Q (Press Release, Center for the Study of Islam and Democracy,

*American Muslims and Scholars Denounce Terrorism*, Sept. 9, 2002); *see also* Tariq Ramadan,

*Western Muslims and the Future of Islam* 172-73 (condemning "without hesitation" the

"atrocities of 11 September 2001").

Professor Ramadan has condemned recent terrorist attacks equally vehemently. Two

days after the July 2005 bus and subway bombings in London, Professor Ramadan published an

op-ed in the *Guardian*. He wrote: "we must condemn these attacks with our strongest energy . . .

[Muslims] must have the courage to denounce what is said and done by certain Muslims in the

name of their religion." Ramadan Decl. ¶ 20, Exh. S (Tariq Ramadan, *Living Together Takes

Effort: Every Individual Can Play a Part in Fighting Terror,* The Guardian, July 9, 2005). Two

weeks later, he spoke at a press conference sponsored by the London Metropolitan Police. At the

conference, he said: "All of us must not fan the flames, we must collaborate and send a signal to

try to find a way to get rid of this extremist threat to this country . . . There must be no more

killing. There is no justification. The Muslim community needs to work from within to solve

this." *Id.*, Exh. T (Sam Jones, *Islamic Scholars Urge Unity to Fight Terror*, July 25, 2005).

Professor Ramadan has collaborated with scholars and government officials working to fight extremism. In May 2003, Professor Ramadan spoke at a meeting sponsored by the Brookings Project on U.S. Policy Towards the Islamic World in Washington, D.C. *Id.* ¶ 21. As the Brookings Institution's website states, this group was created to "examine how the United States can reconcile its need to eliminate terrorism and reduce the appeal of extremist movements with its need to build more positive relations with the wider Islamic world." *Id.* Recently, Professor Ramadan accepted an invitation from Prime Minister Tony Blair to join a government task force to combat extremism in the United Kingdom. *Id.*

In fact, Professor Ramadan's scholarship reflects an aversion to extremism of all kinds, and he has consistently advocated a modernist, reformist vision of Islam. Professor Ramadan has argued that Muslims living in the west should "not unquestioningly adopt the practices, culture, and beliefs of Muslims living in Muslim nations." *Id.* ¶ 6. He has also applauded the development of a "women's liberation within and through Islam itself." *Id.* ¶ 7. On this topic, he has written:

> [S]cholars, intellectuals, and women together are now giving birth to a movement of women's liberation within and through Islam itself. Distancing themselves from the most restrictive interpretations, it is in the name of Islam itself that they declare, together with many men, their opposition to discriminatory cultural practices, to the false Islamic identity of certain regulations, and to violence within marriage and their respect for the rights of women in matters of divorce, property, custody, and so on. The first time I used the phrase "Islamic feminism" to describe this movement, many Muslim men and women criticized me, and some non-Muslim critics were not convinced: but a study on the ground . . . reveals that a movement is afoot that clearly expresses the renewal of the place of women in Islamic societies and an affirmation of a liberation vindicated by complete fidelity to the principles of Islam.

*Id.* (quoting Tariq Ramadan, *Western Muslims and the Future of Islam* 141).

Professor Ramadan has also called on Muslim nations to suspend the imposition of corporal and capital punishments that some Muslim governments have instituted in the name of Islam. *Id.* ¶ 8. Specifically, he has written:

> We are accomplices and guilty when women and men are punished, stoned or executed in the name of a formalist application of the scriptural sources. . . . It leaves the responsibility to the Muslims of the entire world. It is for them to rise up to the challenge of remaining just to the message of Islam in the contemporary era; it is for them to denounce the failures and the treasons that are being carried out by certain authorities or Muslim individuals.

Ramadan Decl. ¶ 8, Exh. B (Tariq Ramadan, *Stop in the Name of Humanity*, The Globe and Mail, Mar. 30, 2005).

Professor Ramadan has criticized some United States policies. For example, he has been critical of what he sees as "the deleterious effects of unregulated consumerism." *Id.* ¶ 9. He has also condemned "current American policies toward the Middle East [as] misguided and counterproductive," though he has noted that his position with respect to these policies is "share[d] [by] millions of Americans and Europeans." *Id.* In a recent op-ed, Professor Ramadan wrote:

> In the Arab and Islamic world, one hears a great deal of legitimate criticism of American foreign policy. This is not to be confused with a rejection of American values. Rather, the misgivings are rooted in five specific grievances: the feeling that the United States role in the Israeli-Palestinian conflict is unbalanced; the longstanding American support of authoritarian regimes in Islamic states and indifference to genuine democratic movements (particularly those that have a religious bent); the belief that Washington's policies are driven by short-term economic and geostrategic interests; the willingness of some prominent Americans to tolerate Islam-bashing at home; and the use of military force as the primary means of establishing democracy.

> Instead of war, the Arab and Muslim worlds seek evidence of a lasting and substantive commitment by the United States to policies that would advance public education, equitable trade and mutually profitable economic and cultural partnerships. For this to occur, America first has to trust Muslims, genuinely listen to their hopes and grievances, and allow them to develop their own models of pluralism and democracy.

Ramadan Decl. ¶ 11, Exh. E (Tariq Ramadan, *Too Scary for the Classroom?*, New York Times, Sept. 1, 2004). It would be absurd to suggest that this criticism – the same kind of criticism that appears every morning in the editorial pages of major American newspapers – amounts to approval of terrorism. And the ideological exclusion provision, even broadly construed, does not invest defendants with authority to exclude aliens from the United States simply because they have criticized United States policies.[8]

That defendants' invocation of the ideological exclusion provision against Professor Ramadan exceeds statutory authority is strongly suggested by the sweeping construction that the State Department accords the provision in its Foreign Affairs Manual. As noted above, the Manual advises consular officials that the provision is directed at "irresponsible expressions of opinion by prominent aliens who are able to influence the actions of others." 9 F.A.M. § 40.32 n.6.2. The Manual thus makes clear that defendants have construed and implemented the provision in a manner that bears no relation whatever to the provision's actual language. Indeed, the Foreign Affairs Manual arrogates to the defendants authority that Congress plainly did not, and we believe could not, delegate. While the INA leaves undefined many of the ideological exclusion provision's operative terms, it is clear based on the ordinary usage of those terms that the provision was not intended to invest defendants with the authority to exclude anyone at all whose opinions defendants deem "irresponsible." Rather, the provision is directed specifically at those aliens who have endorsed or espoused terrorist activity or persuaded others to do so.[9]

---

[8] Notably, the other countries that have banned Professor Ramadan are countries not known for their respect for the freedom of speech. Ramadan Decl. ¶ 9 (noting exclusion from Saudi Arabia, Tunisia, and Egypt for having criticized the governments of those countries).

[9] The INA defines "terrorist activity" to mean "any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of

There is simply no evidence that Professor Ramadan has ever engaged in speech that falls within the ambit of the ideological exclusion provision, and there is extensive evidence to the contrary. Ramadan Decl. ¶ 11, 16. Accordingly, the government's reliance on the provision to exclude him from the country must be set aside. In the same *New York Times* op-ed quoted above, published soon after the government revoked Professor Ramadan's H-1B visa, Professor Ramadan addressed the charges against him:

> The fact is, in the more than 20 books, 700 articles and 170 audio tapes I have produced, one will find no double talk, but a consistent set of themes, and an insistence that my fellow Muslims unequivocally condemn radical views and acts of extremism.

Ramadan Decl. ¶ 22, Exh. E (Tariq Ramadan, *Too Scary for the Classroom?*, New York Times, Sept. 1, 2004). He continued:

> I believe Western Muslims can make a critical difference in the Muslim majority world. To do this, we must become full, independent Western citizens, working with others to address social, economic and political problems. However, we can succeed only if Westerners do not cast doubt on our loyalty every time we criticize Western governments. Not only do our independent voices enrich Western societies, they are the only way for Western Muslims to be credible in Arab and Islamic countries so that we can help bring about freedom and democracy. That is the message I advocate. I do not understand how it can be judged as a threat to America.

*Id.*

---

the following: (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle)[;] (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained[;] (III) A violent attack upon an internationally protected person . . . or upon the liberty of such a person[;] (IV) An assassination[;] (V) The use of any – (a) biological agent, chemical agent, or nuclear weapon or device, or (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property[; or] (VI) A threat, attempt, or conspiracy to do any of the foregoing." 8 U.S.C. § 1182(a)(3)(B)(iii). The INA defines "terrorist organization" in 8 U.S.C. § 1182(a)(3)(B)(vi).

For the reasons above, defendants' past and continuing reliance on the ideological exclusion provision to bar Professor Ramadan from the United States exceeds statutory authority.

**B.    Defendants' exclusion of Professor Ramadan violates the First Amendment because the government's interest in preventing United States residents from hearing constitutionally protected speech does not supply a facially legitimate and bona fide reason for exclusion.**

The government may not exclude an invited scholar from the United States on the basis of speech that United States citizens and residents have a right to hear. While the Executive has broad discretion over the admission and exclusion of aliens, "that discretion is not boundless." *Abourezk*, 785 F.2d at 1061. The Executive's discretion "extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Id.; see also Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) (stating that plenary power is "subject to important constitutional limitations"); *I.N.S. v. Chadha*, 462 U.S. 919, 941-42 (1983) (noting that Congress must implement its plenary power through "constitutionally permissible means"). The courts have recognized that judicial scrutiny is "particularly appropriate in cases . . . which involve fundamental rights of United States citizens." *Allende*, 605 F. Supp. at 1223.

In the face of a First Amendment challenge to an invited scholar's exclusion, the government must carry two burdens. First, it must disclose its reason for denying or revoking the scholar's visa. *See, e.g., Burrafato v. United States*, 523 F.2d 554, 556 (2d Cir. 1975) ("the courts of this Circuit have interpreted *Mandel* to require justification for an alien's exclusion"), *cert. denied*, 424 U.S. 910 (1976); *Allende*, 605 F. Supp. at 1224 ("[t]he lower federal courts have interpreted *Mandel* to require the Government to provide a justification for an alien's

exclusion when that exclusion is challenged by United States citizens asserting constitutional claims"); *Abourezk v. Reagan*, 592 F. Supp. 880, 881 (D.D.C. 1984), *vacated on other grounds*, 785 F.2d 1043 (D.C. Cir. 1986). Second, the government must demonstrate that its reason for excluding the scholar is "facially legitimate" and "bona fide." *Abourezk*, 592 F. Supp. at 883 (citing *Mandel*); *Harvard Law School Forum*, 633 F. Supp. at 531 (same); *Allende*, 605 F.Supp at 1224 (same). In *Mandel* itself, the Supreme Court found that the government had excluded the plaintiff scholar because he had violated the terms of previous visas. *See Mandel*, 408 U.S. at 769; *see also Mandel v. Mitchell*, 325 F. Supp. 620, 622 (E.D.N.Y. 1971) (noting that consular officer had found past abuses to be "flagrant"). The Court found this reason – a reason wholly unrelated to speech – to be both "facially legitimate" and "bona fide."[10]

The government does not act for "facially legitimate" and "bona fide" reasons when it excludes an alien solely because of speech that United States citizens and residents have a First Amendment right to hear. A bedrock principle of First Amendment jurisprudence is that the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); *see also Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("discrimination against speech because of its message is presumed to be unconstitutional"); *Regan v. Time, Inc.*, 468 U.S. 641, 648-649 (1984) ("Regulations which permit the Government to discriminate on

---

[10] There is a serious question whether the *Mandel* framework remains the appropriate framework for analysis in cases such as this one. The Supreme Court has recently eschewed more deferential standards of review when presented with constitutional challenges to immigration laws brought by United States citizens or legal permanent residents. *See, e.g., Nguyen v. I.N.S.*, 533 U.S. 53, 61 (2001) (applying intermediate scrutiny to equal protection challenge in immigration context and expressly refusing to decide "whether some lesser degree of scrutiny pertains because the statute implicates Congress' immigration and naturalization power"); *Zadvydas*, 533 U.S. at 695 (2001); Peter J. Spiro, *Explaining the End of Plenary Power*, 16 Geo. Immigr. L.J. 339 (2002). Here, however, it is clear that defendants' actions cannot be sustained even under the *Mandel* standard.

the basis of the content of the message cannot be tolerated under the First Amendment.");

*Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring) ("The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us."). Suppression of speech on the basis of content "pose[s] the inherent risk that the Government seeks . . . to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). Such suppression "rais[es] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Id.*

Suppression of speech on the basis of its content is not made lawful simply because the government uses the immigration law, rather than some other mechanism, as the instrument of censorship. To the contrary, every court to have confronted the issue has held that the content of an invited alien's speech cannot by itself supply a facially legitimate and bona fide reason for exclusion. In *Abourezk v. Reagan*, for example, the United States District Court for the District of Columbia addressed a challenge by United States citizens to the government's refusal to grant visas to individuals including Nino Pasti, a former member of the Italian Senate and a prominent advocate of nuclear disarmament. In considering the plaintiffs' claim, the court wrote:

> [A]n alien invited to impart information and ideas to American citizens in circumstances such as these may not be excluded [under a now-repealed provision of the I.N.A.] solely on account of the content of his proposed message. *For although the government may deny entry to aliens altogether, or for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech.* . . . [T]he government's theory would allow it to exercise its foreign relations power so as to keep the content of speech from American citizens.

*Abourezk*, 592 F. Supp. at 887 (emphasis added); *see also Harvard Law School Forum,* 633 F. Supp. at 531 (stating that government's reason for exclusion "is not facially legitimate [if] it is related to the suppression of protected political discussion"); *Allende*, 605 F. Supp. at 1225 ("an alien invited to impart information and ideas to American citizens in circumstances such as these may not be excluded . . . solely on account of the content of his proposed message") (internal quotation marks omitted); *Abourezk v. Reagan*, 1988 WL 59640, *2 n.8 (D.D.C. 1988) (reaffirming First Amendment holding after intervening appeal).

The government has not offered a facially legitimate and bona fide reason for its actions here. First, as discussed above, Professor Ramadan does not "endorse or espouse terrorism." Nor has he has never done so. While Professor Ramadan has been a sometime critic of specific policies of the United States government, mere criticism does not fall within the ambit of the statute, even if the statute is broadly construed.[11] The government's reason for excluding Professor Ramadan is not "facially legitimate and bona fide" here because the statute that the government has invoked as the basis for the exclusion simply has no application to the actual facts. *See Allende*, 605 F. Supp. at 1224 ("the explanation given must be 'facially legitimate and bona fide' not only in a general sense, but also within the context of the specific statutory provision on which the exclusion is based"). *Cf. Lesbian/Gay Freedom Day Comm., Inc. v. I.N.S.*, 541 F. Supp. 569, 586 n.9 (N.D. Cal. 1982) ("it is neither legitimate nor bona fide to continue . . . an exclusion when the reason for it is gone").

Second, all of the speech that Professor Ramadan has engaged in – and all of the speech that he would engage in if permitted to enter the United States – is speech that United States

---

[11] Plaintiffs assume, for the purposes of the instant motion, that the statute is constitutional on its face. *But cf. Rafeedie v. I.N.S.*, 795 F. Supp. 13, 21-23 (D.D.C. 1992) (striking down McCarran-Walter ideological exclusion provisions as unconstitutional under First Amendment).

citizens and residents plainly have a right to hear. Indeed the speech at issue in this case is political speech that is at the core of the First Amendment's protection. *See, e.g., Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 187 (1999) (noting that where political speech is at issue, the protection afforded by the First Amendment is "at its zenith") (internal quotation marks omitted); *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment."); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838 (1978) ("[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs"); *Stromberg v. California*, 283 U.S. 359, 369 (1931) ("[t]he maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system").[12]

The First Amendment interest asserted here is especially strong for another reason: It relates to the freedom of intellectual inquiry in the academy. The Supreme Court has emphasized that the right to receive information and ideas is "nowhere more vital than in our schools and universities." *Mandel*, 408 U.S. at 763 (internal quotation marks omitted); *see also Grutter v. Bollinger*, 539 U.S. 306, 324 (2003) (stating that academic freedom "has long been

---

[12] It is black letter law that the First Amendment protects speech that is controversial. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 716 (2000); *Cohen v. California*, 403 U.S. 15, 18 (1971); *Whitehill v. Elkins*, 389 U.S. 54, 57 (1967) ("the First Amendment . . . protects a controversial as well as a conventional dialogue"). Of course, the First Amendment's protection does not extend to incitement. *See Brandenburg v. Ohio*, 395 U.S. 444 (1969). Professor Ramadan has never engaged in incitement, however, and the government has never suggested that it regards him as inadmissible under the INA's incitement provision.

viewed as a special concern of the First Amendment") (internal quotation marks omitted). As the Supreme Court has stated, the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967); *see also Sweezy v. State of New Hampshire*, 354 U.S. 234 (1957) ("Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.").

While some of Professor Ramadan's speech has been critical of United States policies, the First Amendment does not permit the government to stifle speech simply because it disagrees with the speaker's point of view. Indeed, viewpoint-based discrimination of the sort suggested by defendants' actions here raises particularly grave First Amendment concerns. *See, e.g., Rosenberger*, 515 U.S. at 829 ("[v]iewpoint discrimination is [regarded as a particularly] egregious form of content discrimination"). Even in those extremely narrow contexts in which content-based discrimination is permissible, the courts have been uniform in holding that viewpoint-based discrimination is unconstitutional. *See, e.g., Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 812 (1985); *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 150 (2d Cir. 2004) ("Even if a restriction on speech in a nonpublic forum is reasonable, it will be struck down if it is in reality a facade for viewpoint-based discrimination.") (internal quotation marks omitted); *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 356 (6th Cir. 1998) (explaining that "[w]here the proffered justification for restricting access to a nonpublic forum is facially legitimate, the government nevertheless violates the First Amendment when its stated purpose in reality conceals a bias against the viewpoint advanced by the excluded speakers").

The government does not have the authority to deny plaintiffs the right to hear from a foreign scholar simply because it disfavors what that scholar has to say. Indeed, to invest the government with this authority would be to afford it sweeping power to manipulate and censor debate inside the United States. *See* Meiklejohn, *Free Speech and its Relation to Self Government* xiii-xiv. There is no doubt that the Executive has broad authority over the exclusion of aliens. That authority, however, does not include the power to exclude invited aliens simply to suppress speech that residents of the United States have a constitutional right to hear.

## CONCLUSION

For the reasons stated above, plaintiffs respectfully request that the Court enter a preliminary injunction (i) enjoining defendants from denying a visa to Professor Ramadan on the basis of the ideological exclusion provision; (ii) enjoining defendants from denying a visa to Professor Ramadan on the basis of speech that United States residents have a constitutional right to hear; (iii) requiring defendants immediately to act on Professor Ramadan's pending visa application; and (iv) requiring defendants immediately to restore Professor Ramadan's eligibility to rely on the visa waiver program described in 8 U.S.C. § 1187(a).

Respectfully submitted,

JAMEEL JAFFER (JJ-4653)
MELISSA GOODMAN (MG-7844)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400
(212) 549-2500

JUDY RABINOVITZ (JR-1214)
LUCAS GUTTENTAG (LG-0329)
American Civil Liberties Union Foundation
  Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004-2400

ARTHUR N. EISENBERG (AE-2012)
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004

CLAUDIA SLOVINSKY (CS-1826)
396 Broadway, Suite 601
New York, NY 10013

Of Counsel
LEON FRIEDMAN (LF-7124)
148 East 78th Street
New York, NY 10021

Attorneys for Plaintiffs

March 15, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2005 I served the following documents: (1)

Plaintiffs' Motion for Certification to the Secretary of State to Release Visa Records; (2)

a proposed Certification of Need; (3) Plaintiffs' Motion for Preliminary Injunction; (4)

Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction; and (5) four

affidavits submitted in support of Plaintiffs' Motion for Preliminary Injunction, by

causing copies to be delivered via electronic mail and overnight courier to:

Kristin Vassello
Assistant U.S. Attorney
86 Chambers Street
New York City, NY 10007
Fax: (212) 637-2730
Telephone: (212) 637-2822
Email: Kristin.Vassallo@usdoj.gov

David Jones
Assistant U.S. Attorney
86 Chambers Street
New York City, NY 10007
Telephone: (212) 637-2739
Fax: (212) 637-2730
Email: David.Jones6@usdoj.gov

Jameel Jaffer (JJ-4653)
American Civil Liberties Union
    Foundation
National Legal Department
125 Broad Street, 17th Floor
New York, NY 10004
Ph: 212-519-7814
Fax: 212-549-2629
E-mail: jjaffer@aclu.org