UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMERICAN ACADEMY OF RELIGION,   AMERICAN   :
ASSOCIATION OF UNIVERSITY PROFESSORS,
PEN AMERICAN CENTER, and TARIQ RAMADAN,   :

                   Plaintiffs,   :

        - against -   :

MICHAEL CHERTOFF, in his official capacity as   :
Secretary of the Department of Homeland Security;
CONDOLEEZZA RICE, in her official capacity as   :
Secretary of State.

                    :

              Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

06 Civ. 588 (PAC)

OPINION & ORDER

        HONORABLE PAUL A. CROTTY, United States District Judge:


        On January 25, 2006, Plaintiffs American Academy of Religion ("AAR")[1], American

Association of University Professors ("AAUP")[2], PEN American Center ("PEN")[3], and Tariq

---

[1] AAR is a non-profit organization made up of teachers and research scholars in the field of religion. (Declaration of Barbara Deconcini, Mar. 13, 2006. ("Deconcini Decl.") ¶ 5.)  It is the world's largest scholarly society dedicated to the academic study of religion. (Id.) The association has over 10,000 members, from approximately 2,000 colleges, universities, seminaries and schools worldwide. (Id. ¶ 6.)

[2] AAUP is a non-profit organization made up of 45,000 university professors, graduate students, librarians and academic professionals, all committed to advancing academic freedom and developing professional standards for higher education. (Declaration of Jane Buck, Mar. 10, 2006 ("Buck Decl.") ¶ 5.)  The AAUP promotes academic freedom in the United States, and encourages the participation of foreign scholars in debates and conferences in the United States.  AAUP frequently advocates for changes in U.S. immigration policy so that foreign scholars and students may more readily enter this country. (Id. ¶¶ 8-13.)

[3] PEN is a non-profit organization comprised of 2,900 authors, editors and translators "committed to the advancement of literature and the unimpeded flow of ideas and information throughout

Ramadan[4] (collectively, "Plaintiffs") filed this lawsuit against Michael Chertoff and Condoleezza

Rice, in their official capacities as Secretary of the Department of Homeland Security ("DHS") and

Department of State, respectively, challenging the continued exclusion of Professor Tariq Ramadan

("Ramadan") from the United States. Plaintiffs' lawsuit has two parts: (1) a First Amendment

challenge to the Government's continued exclusion of Ramadan on the basis of his political views; and

(2) a broader constitutional attack on Section 411(a)(1)(A)(iii) of the Patriot Act, 8 U.S.C.

§ 1182(a)(3)(B)(i)(VII), which permits DHS to exclude from the United States any alien that has used a

"position of prominence within any country to endorse or espouse terrorist activity."[5]

Plaintiffs now move pursuant to Rule 65(a) of the Federal Rules of Civil Procedure for

a preliminary injunction so that Ramadan may enter the United States to attend their annual

conferences. Plaintiffs seek an injunction in four parts: (i) enjoining DHS from denying a visa to

Ramadan on the basis of 8 U.S.C. § 1182(a)(3)(B)(i)(VII); (ii) enjoining DHS from denying a visa to

Ramadan on the basis of speech that U.S. residents have a constitutional right to hear; (iii) requiring

DHS to immediately adjudicate Ramadan's pending visa application; and (iv) requiring DHS to

---

the world." (Declaration of Michael Roberts, Mar. 10, 2006 ("Roberts Decl.") ¶¶ 5-6.) PEN American
Center is the American chapter of a larger network consisting of 141 centers around the world. (Id. ¶ 6.)
Together, these centers make up the world's oldest international literary organization. (Id.) Like the
AAUP, PEN has a long history of advocating changes in U.S. immigration laws that exclude writers and
scholars from the United States on the basis of their political beliefs. (Id. ¶¶ 12-14.)

[4] The Complaint asserts the rights of the organizational plaintiffs, not those of Tariq Ramadan.
Ramadan is named as a plaintiff only "because he is symbolic of the problem," Kleindienst v. Mandel,
408 U.S. 753, 762 (1972), and not because Plaintiffs assert that Ramadan, a Swiss citizen residing
outside of the United States, has any constitutional or statutory right to enter the United States.

[5] The instant motion seeks relief only with respect to the Government's exclusion of Ramadan.
The Court does not rule on Plaintiffs' challenge to the constitutionality of the "endorses or espouses
terrorism" provision of the Patriot Act, 8 U.S.C. § 1182(a)(3)(B)(i)(VII).

immediately restore Ramadan's eligibility to rely on the visa waiver program.[6]

BACKGROUND

Professor Ramadan's Resume

Ramadan is a Swiss-born scholar of Arab descent. (Declaration of Tariq Ramadan, Mar. 10, 2006 ("Ramadan Decl.") ¶ 1.)  He holds Masters Degrees in Philosophy and French Literature and a Ph.D. in Islamic Studies, all from the University of Geneva. (Id. ¶ 3.)  After receiving his Ph.D., Ramadan taught taught Islamic Studies and Philosophy at the University of Fribourg in Switzerland. (Id. ¶ 2.)  Since July 2005, Ramadan has served as a Senior Research Fellow at the Loahi Foundation in London and a Visiting Fellow at Oxford University. (Id.)

Ramadan is a well-known scholar of the Muslim world.  He has published more than 20 books, 700 articles, and 170 audio tapes, most of which focus on the subject of Muslim identity and the practice of Islam in the Western world, particularly Europe. (Id. ¶¶ 4-10.)  Ramadan is perhaps best known for his vision of an independent European Islam.  Specifically, Ramadan encourages Europe's Muslims to "reject both isolation and assimilation," and instead explore "the possibility of a 'third path' that would allow European Muslims to be both fully European and fully Muslim."[7] (Id. ¶ 5.)

---

[6] The visa waiver program permits citizens of certain countries to enter the United States as a tourist for up to 90 days without first having to apply for a visa at the embassy in their country of residence. See 8 U.S.C. § 1187.  As a Swiss citizen, Ramadan was eligible for the visa waiver program prior to the revocation of his H-1B visa in July 2004. See Visa Waiver Program, U.S. Dep't of State, at http://www.travel.state.gov/visa/temp/without/without_1990.html#2 (listing Switzerland as one of the countries participating in the visa waiver program).

[7] By way of example, Ramadan writes:

> Western Muslims should not unquestioningly adopt the practices,
> culture, and beliefs of Muslims living in Muslim nations. . . .  Muslim
> citizens of Europe and other Western nations should not think of
> themselves as outsiders in their own countries. . .  "There is no true faith
> without understanding; for Muslims, this means understanding both the

Ramadan also advocates the development of an Islamic feminism and condemns the harsh penalties prescribed by the Islamic penal code. (Id. ¶¶ 7, 8 & Ex. A-C.)  He shuns violence as a form of activism and has consistently spoken out against terrorism and radical Islamists. (See id. ¶¶ 17-21 & Exs. A, C-U.)

Ramadan is equally critical of Western governments.  Ramadan openly opposed France's law banning female students from wearing religious head scarves and has criticized the French government's approach to the 2005 riots. (See id., Exs. A & E.)  He has also criticized U.S. foreign policy towards the Middle East as "misguided and counterproductive," condemned the current war in Iraq as "illegal," and lamented the "deleterious worldwide effects of unregulated American consumerism." (See id., Ex. E.)

Ramadan's scholarship has had a strong influence on Europe's Muslim population.  In December 2000, Time magazine labeled Ramadan "the leading Islamic thinker among Europe's second- and third-generation Muslim immigrants." (Deconcini Decl., Ex. A (Nicholas Le Quesne, Trying to Bridge a Great Divide, Time, Dec. 11, 2000).)  In September 2004, a journalist for the Forward newspaper wrote that Ramadan "may be the most well-known Muslim public figure in all of Europe," and that Ramadan "has used his prominence to urge young Muslims in the West to choose integration over disaffection." (Id., Ex. D (Jonathan Laurence, Is This How the U.S. Engages Muslims?, Forward, Sept. 3, 2004).)

---

sources (the Qur'an and the Sunna) and the context in which they live."

. . . [I]t is necessary for Western Muslims to draw a clear distinction between inherited cultural customs and true Islamic principles.

(Ramadan Decl. ¶¶ 6-7.)

Ramadan's scholarship has also captured the attention of academics and political leaders throughout Europe and the United States. In 2003, shortly before the French government imposed a ban on the display of the Islamic head scarf and other religious symbols in public schools, Ramadan debated the proposed law with France's Interior Minister, Nicolas Sarkozy, live on French national television. (Deconcini Decl. ¶ 19.) While the United States has not granted Ramadan a visa to enter the country, Great Britain, its one staunch ally in the battle against terrorism, has not only admitted him into England so that he may teach at Oxford, but has enlisted him in the fight against terrorism. Notably, the London Metropolitan Police invited Ramadan to speak at a conference immediately after the bus and subway bombings in London in July 2005, and Prime Minister Blair recently asked Ramadan to join a Government task force to combat extremism in the United Kingdom. (Ramadan Aff. ¶ 20, 21 & Ex. C, D).

Despite his popularity (or perhaps because of it), Ramadan is not without critics. Some Westerners have accused Ramadan of "double talk," advocating a liberal vision when speaking in French and English, but advocating a radical vision when speaking to the Muslim world, one that encourages, or at least justifies, Islamic terrorism.[8] (See id., Exs. C, E, R.) But Ramadan is equally condemned within the Arab world. While Westerners criticize Ramadan's pro-Muslim (rather than fully assimilationist) vision, Arab Muslims criticize Ramadan's pro-Western sensibilities. In fact, in addition to his exclusion from the United States, Ramadan is currently banned from entering Saudi

---

[8] Westerners' mistrust of Ramadan is intensified by his roots. Ramadan is the grandson of Hassan al-Banna, the founder of the Muslim Brotherhood, an Islamic revival movement that criticized Western decadence and advocated a return to Muslim values. Ramadan claims, however, that he has not embraced his grandfather's vision and has never considered himself a Muslim Brother.

Arabia, Egypt, and Tunisia.[9] (Id., Ex. C.)

Ramadan's Exclusion from the United States

Prior to August 2004, Ramadan visited the United States on numerous occasions to give lectures, attend conferences, and meet with other scholars. Ramadan spoke in the United States twice in 2000, four times in 2001, eleven times in 2002 and nine times in 2003. (Id. ¶ 12.) Ramadan lectured at numerous academic institutions, including Princeton, Harvard, and Dartmouth, attended a meeting in January 2003 organized by former President William Clinton on the subject of "Islam and America in a Global World," and even delivered a speech at the Department of State in October 2003. (Id. ¶ 12, Exs. N & W, Attachment 2.)

As a Swiss citizen, Ramadan did not need to apply for a temporary nonimmigrant visa to enter the United States to attend these lectures and conferences. In January 2004, however, Ramadan accepted a long-term tenured teaching position at University of Notre Dame,[10] prompting the need for an H-1B visa. (Id. ¶ 13.) The University of Notre Dame submitted a visa petition on Ramadan's behalf, which was approved by the U.S. Citizenship and Immigration Services on May 5, 2004. (Id.; Dilworth Decl. ¶ 3.)

With the H-1B visa approved, Ramadan and his family made arrangements to move to South Bend, Indiana. (Ramadan Decl. ¶ 14.) On July 28, 2004, however, only one week before Ramadan was scheduled to move (and after all his furniture had already been shipped to Indiana), the

---

[9] The French government banned Ramadan from entering France from November 1995 through April 1996. (Ramadan Decl., Ex. F.) Ramadan challenged the ban and won the case in 1996, however, so the ban was lifted. (Id.) Ramadan claims that the ban was in error, due to a case of mistaken identity. (Id.) Ramadan now has an office in the Saint-Denis suburb of Paris. (Id., Ex. A.)

[10] Ramadan was offered a dual appointment as the Henry R. Luce Professor of Religion, Conflict and Peacebuilding and Professor of Islamic Studies in the Classics Department. (Id. ¶ 13.)

U.S. Embassy in Bern, Switzerland informed Ramadan by telephone that his visa had been revoked.

(Id. ¶¶ 14, 32.)  Consular officials did not provide an explanation for the revocation, but told Ramadan

that he was welcome to reapply. (Id.)  One month later, on August 25, 2004, the Los Angeles Times

reported on the revocation of Ramadan's visa:

> Russ Knocke, a spokesman for the Immigration and Customs
> Enforcement Division of the Department of Homeland Security, said
> the work visa was revoked because of a section in federal law that
> applies to aliens who have used a 'position of prominence within any
> country to endorse or espouse terrorist activity.'
>
> He said the revocation was based on 'public safety or national
> security interests,' but would not elaborate.

(Id., Ex. G.)  DHS's statement is the only explanation on record for the revocation.  As will be

explained later, the Government now states, without explanation or elaboration, that this statement was

"erroneous."

In reliance on the consul's representation that Ramadan could reapply, the University of

Notre Dame submitted a new visa petition on October 4, 2004. (Id. ¶ 24.)  Originally, Department of

State officials told the University that a decision would be imminent. (Id.)  When the University

contacted the Department of State in December 2004 to check on the status of Ramadan's application,

however, it was told that no decision would be made in the near future. (Id.)

Owing to the indefinite delay, on December 13, 2004, Ramadan resigned his teaching

post at University of Notre Dame. (Id. ¶ 25.)  DHS was apparently monitoring Ramadan, and noted

that Indystar.com, the on-line edition of the Indianapolis Star, reported that Ramadan had resigned his

position at the University of Notre Dame.  In sharp contrast to the dilatory pace at which DHS has

considered Ramadan's B-visa application for the last two years, DHS immediately wrote to Notre

Dame on December 21, 2004:

**INTENT TO REVOKE**

> This refers to the Petition for Non-Immigrant Worker which you filed on behalf of Tariq Ramadan on Febrauary (sic) 13, 2004. The petition was approved on February 19, 2004.

> It has now come to the attention of this Service that the approval of the petition should be revoked for the following reason:

> The Indystar.com, the on-line edition of the Indianapolis Star, has reported that Tariq Ramadan has resigned his appointment with the University of Notre Dame du Lac. . . .

> In view of the above, it appears that the approval of the petition should be revoked.

(Id., Ex. V.) The DHS letter made no reference to the May 5, 2004 approval or the July 28, 2004 revocation. (Id.)

The revocation cost Ramadan more than just the tenured position at Notre Dame. Once DHS revoked Ramadan's H-1B visa, Ramadan could no longer rely on the visa-waiver program to enter the United States, even for a short period. As a result, Ramadan was forced to cancel or decline a number of appearances at conferences in the United States, including the 41st Annual Islamic Society of North America Convention in September 2004, a meeting hosted by former Defense Secretary William Cohen in February 2005, a Georgetown University conference in April 2005, and the annual meetings of the Plaintiffs' organizations held in 2004, 2005 and 2006. (Id. ¶¶ 23, 26-27, 31.)

On September 16, 2005, at the urgings of various organizations within the United States, Ramadan applied for a B visa, a nonimmigrant visa that would permit Ramadan to enter the United States to participate in various conferences. (Id. ¶ 28.) He submitted the application to the U.S. Embassy in Bern, Switzerland (the "Embassy"), as required by U.S. immigration law, and appended to

the application invitations to a number of upcoming conferences. (Id.)  Ramadan appeared at the

Embassy for an interview on December 20, 2005, at which representatives from the Department of

State and DHS asked him questions about his political views and associations. (Id.)  After the

interview, Ramadan asked the interviewers whether his visa would be granted and, if so, when. (Id.)

He was told by a consular officer at the Embassy that he could expect that a decision "would take at

least two days but no more than two years." (Declaration of Christopher K. Derrick, Apr. 24, 2006

("Derrick Decl.") ¶ 5.)  To date, the Government has not acted on Ramadan's visa.

       This delay is not typical.  According to the U.S. Department of State website, the

typical wait time (in calendar days) at the Bern Embassy for a nonimmigrant-visa interview

appointment is 9 days. (Ramadan Decl. ¶ 29.)  The typical wait time for a nonimmigrant visa to be

processed is 2 days. (Id.)  While the website warns that the 2-day wait time does not include "the time

for additional special clearance or administrative process," it advises that "most special clearances are

resolved within 30 days of application." (Id.)

       The Government's revocation of Ramadan's H-1B visa has been criticized by numerous

organizations, including Plaintiffs AAR and AAUP. (Deconcini Decl., Ex. E; Buck Decl., Ex. F-G.)

Other groups, including the American Arab Anti-Discrimination Committee, the Jewish Council on

Urban Affairs, and the Notre Dame Jewish Law Students Society, issued statements in support of

admitting Ramadan into the United States (Ramadan Decl., Ex. H-K); and major newspapers

throughout the United States have commented on Ramadan's visa saga. (See Ramadan Decl., Ex. E

(New York Times), F & M (Chicago Tribune), G (Los Angeles Times), N & U (Washington Post).)

Despite this public criticism, the Government has neither granted Ramadan's visa application, nor

provided any explanation as to why it revoked Ramadan's H-1B visa in July 2004 or why it is unable

to render a decision on Ramadan's pending B-visa application. (Deconcini Decl., Ex. F; Buck Decl., H-I; Ramadan Decl., Ex. E-O.)

In opposing the instant motion for a preliminary injunction, the Government argues that Ramadan "has never had a visa revoked, a visa application denied, or any other adverse action taken against him" pursuant to 8 U.S.C. § 1182(a)(3)(B)(i)(VII). (Govt's Mem. Opp'n Mot'n Prelim. Inj. ("Govt's Opp'n") 7-8.)  In fact, the Government claims that Ramadan's visa application was never denied on any basis at all, because the July 2004 revocation was only a "prudential" revocation, which is not a denial, but rather is a means of cancelling a visa while the Government carries on additional investigation. (Id. at 5-6.)  Thereafter, the Government continued to investigate Ramadan's case from July through December 2004. (Id.)  This investigation was mooted, however, after Ramadan resigned his post at the University of Notre Dame in December 2004, since an H-1B visa is premised upon employment in the United States, and Ramadan no longer had nor sought such employment. (Id.)  Thus, the Government contends that it never actually denied Ramadan a visa. (Id.)  As to the September 2005 application for a B visa, the Government contends that it has not denied Ramadan a visa, as the application is still under active consideration.

Other than these bland nostrums, the Government gives no hint of what or who prompted the "prudential" revocation, although we can infer from public information on the Department of State's website that DHS, rather than consular officials in Bern, provided the information that led to the revocation.  Further, the Government gives no clue as to why it is suspicious of Ramadan, or what potential threats it is investigating or contemplating.  The Government assures, however, that "based on the information available to the Government, the relevant officials have not determined, and do not at this time intend to determine, for purposes of the pending visa application,

that Mr. Ramadan is ineligible under 8 U.S.C. § 1182(a)(3)(B)(i)(VII)." ( Id. at 8.)

The Government's position in this litigation directly contradicts DHS's August 2004 explanation for the revocation of Ramadan's H-1B visa, which was that Ramadan's visa was revoked "because of a section that applies to aliens who have used a 'position of prominence within any country to endorse or espouse terrorist activity.'" (Ramadan Decl., Ex. G). Mr. Knocke, the DHS spokesperson who made the August 2004 statement, is still an employee of DHS, and available to the Government, yet he has neither submitted an affidavit on the Government's behalf nor disavowed the statement attributed to him. Similarly, DHS has never renounced nor retracted it–except through this litigation.

Rather than explaining DHS's statement or reconciling it with the Government's position in this litigation, the Government attempts to render the statement inoperative by explaining:

> Plaintiffs allege that the July 2004 revocation of Mr. Ramadan's visa was based on 8 U.S.C. § 1182(a)(3)(B)(i)(VII) . . . . That allegation is incorrect. Mr. Ramadan has never had a visa revoked, a visa application denied, or any other adverse action taken against him pursuant to that provision [citation omitted]. Accordingly, any statement to the contrary that *may have appeared* in the media or *may have been made* by any Government spokesperson was erroneous.

(Govt's Opp'n 7-8 (emphasis added)).

Procedural History

Plaintiffs are frustrated by Ramadan's inability to enter the United States, as it means that Plaintiffs are unable to interact with him in person and engage him in debate. Ramadan applied for a B visa in September 2005. He was interviewed in September and again in December 2005, yet he –and therefore Plaintiffs–are still waiting. Ramadan was told in December 2005 that further review of his case could be as short as two days (a projection we now know to be inaccurate), or as long as two

years (a projection that becomes more accurate with each passing day). Dissatisfied with this state of affairs, Plaintiffs instituted this proceeding on January 26, 2006, and moved on March 16, 2006 for a preliminary injunction compelling the Government to permit Ramadan to enter the United States to attend their conferences, or, in the alternative, compelling the Government to render a final decision on Ramadan's pending visa application.

DISCUSSION

A district court may issue a mandatory preliminary injunction (i.e., an injunction that alters the status quo by commanding the government defendant to perform a specific act) only if Plaintiffs establish that (1) absent injunctive relief, they will suffer irreparable injury, and (2) there is a *"clear" or "substantial"* likelihood that the plaintiffs will prevail on the merits. See Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006); Union Carbide Agric. Prods. Co. v. Costle, 632 F.2d 1014, 1018 (2d Cir. 1980) ("When Congress authorizes or mandates governmental action that is in the public interest, more than a 'fair ground for litigation' must be shown before the action will be stopped in its tracks by court order."), cert. denied, 450 U.S. 966 (1981).

A preliminary injunction is considered an "extraordinary and drastic remedy," so the party seeking the injunction carries the burden of persuasion to demonstrate, "*by a clear showing*," that the above two elements are satisfied. See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (emphasis in original). Thus, in order to prevail on its motion for a preliminary injunction, Plaintiffs in this case must establish by a "clear showing" that (1) they will suffer irreparable harm if Ramadan is not permitted to enter the country to attend their annual conferences, and (2) there is a substantial likelihood that Plaintiffs will succeed on the merits of their First Amendment claim.

I. IRREPARABLE INJURY

The Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); accord Bery v. City of New York, 97 F.3d 689, 693 (2d Cir. 1996).  It has also recognized that the exclusion of an alien on the basis of his speech implicates the First Amendment rights of those U.S. citizens who desire to hear the alien speak. See Kleindienst v. Mandel, 408 U.S. 753, 762, 764 (1972).  On this basis, Plaintiffs urge that they have met the irreparable injury requirement.

The Supreme Court has also held, however, that when a citizen's First Amendment rights must be balanced with other legitimate governmental interests (e.g., immigration policy, security, public safety), non-face-to-face forms of communication may satisfy the First Amendment. In Pell v. Procunier, for example, the Supreme Court expressly held that the institutional considerations of prison systems, particularly public safety and the need to control the movement of prisoners, justified some limitation on prisoners' speech, and therefore alternative forms of communication were sufficient to satisfy a prisoner's First Amendment right to communicate with the media. See 417 U.S. 817, 823-28 (1974); see also Mandel, 408 U.S. at 765 (observing that "alternative means of access to [the alien speaker's] ideas might be a relevant factor were [the Court] called upon to balance First Amendment rights against governmental regulatory interests").  Interestingly, while Pell dealt with the prison context, the Supreme Court expressly relied on the Mandel decision, which dealt with the exclusion of an alien from the United States on the basis of his political views, to justify its holding:

> In order to properly evaluate the constitutionality of [the regulation],
> we think that the regulation cannot be considered in isolation but

> must be viewed in the light of the alternative means of
> communication permitted under the regulations with persons outside
> the prison.  We recognize that there 'may be particular qualities
> inherent in sustained, face-to-face debate, discussion and
> questioning,' and 'that (the) existence of other alternatives (does not)
> extinguis(h) altogether any constitutional interest in the part of the
> appellees in this particular form of access.' Kleindienst v. Mandel,
> 408 U.S. 753, 765, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972).  But
> we regard the available 'alternative means of (communication as) a
> relevant factor' in a case such as this where 'we (are) called upon the
> balance First Amendment rights against (legitimate) governmental . .
> . interests.' Ibid.

Pell, 417 U.S. at 823-24 (alterations in original).  Thus, a citizen's inability to interact with an alien

face-to-face, rather than through videoconferencing or other technological forms of communication,

does not always abridge the First Amendment.[11]

This case, like Pell, calls upon the Court to balance two legitimate governmental

interests: national security (if that, indeed, is the explanation for the Government's action with regard

to Ramadan's visa)[12] and Plaintiffs' constitutionally protected interest in hearing Ramadan speak in

---

[11]  Plaintiffs are correct that the Mandel Court warned that technological alternatives are not an exact substitute for face-to-face interaction, as they lack "what may be particular qualities inherent in sustained, face-to-face debate, discussion and questioning." 408 U.S. at 765.  As noted above, however, the Mandel Court did not exclude the possibility that technological alternatives could be sufficient to satisfy a listener's First Amendment right to receive information; it merely found, on the record available, that the existence of other alternatives did not extinguish the Plaintiffs' constitutional right to interact in person with Mandel, a Belgian journalist excluded from the United States based on his advocacy of world communism. See id. Thus, the Court left the door open to the possibility that technological alternatives to face-to-face communication could satisfy the First Amendment.

Regardless, the Mandel decision dates back more than 30 years, to a time when technological alternatives to face-to-face communication were limited to "tapes or telephone hook-ups." See id.  The technological options in 2006 are much more advanced.  With today's videoconferencing technology, Plaintiffs could not only hear Professor Ramadan's speech, they could see and interact with him, asking him questions and engaging him in debate in real time, almost as if Ramadan were in the room with them. But the Court recognizes that technoligical alternatives are expensive and limited.  While perhaps adequate at the preliminary injunction stage, they are not a long-term substitute for in-person interaction.

[12]  The Government has yet to articulate a reason for revoking Ramadan's H-1B visa or failing to adjudicate Ramadan's pending B-visa application.  DHS's statement is now said to be "erroneous," but

14

person.  Balancing these competing interests, the Court finds that the ability to engage Ramadan in debate by way of videoconferencing is sufficient to satisfy Plaintiffs' First Amendment rights prior to a final adjudication on the merits.[13]

II. SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

A. Threshold Justiciability Issues

*1. Standing*

The Government argues that this Court may not review the merits of Plaintiffs' motion because Plaintiffs lack standing to challenge Ramadan's pending visa application.  In order to bring a case, Article III of the U.S. Constitution requires that a plaintiff establish three elements:  (1) an injury-in-fact, (2) that is fairly traceable to defendant's allegedly violating conduct, and (3) that is likely to be redressed by the requested relief.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  The Government argues that the Plaintiffs in this case fail to satisfy the first and third elements of this test.  (Govt's Opp'n 16.)  Particularly, the Government argues that Plaintiffs lack standing to sue because:  (1) Plaintiffs cannot show that they have suffered or will imminently suffer an actual injury due to the exercise of § 1182(a)(3)(B)(i)(VII), and therefore there is no injury-in-fact; and (2) Plaintiffs' injury is

---

the Court assumes that the Government's actions (or lack of action) are driven, at least in part, by national security concerns.

[13]  This finding is limited to the current preliminary injunction motion.  The Court does not hold that technological alternatives are sufficient to satisfy Plaintiffs' First Amendment right to interact with Ramadan on a permanent basis, but only that the use of technological alternatives is sufficient to alleviate any irreparable injury prior to the final adjudication of this case.  The Court's finding that Plaintiffs have not established irreparable injury at this stage does not reduce or rid the Government of its burden to present a facially legitimate and bona fide explanation for Ramadan's exclusion.  If the Government fails to meet this burden in the future, thereby triggering a presumption that the Government excluded Ramadan in violation of the First Amendment, it cannot nullify this First Amendment violation and continue excluding Ramadan from the United States by arguing that technological alternatives readily supplant Ramadan's physical presence.

not likely to be redressed by the requested relief, since the Government does not have the present

intention to deny Ramadan's B-visa application on the basis of § 1182(a)(3)(B)(i)(VII). (Id.)  Neither

argument is persuasive.

Both of the Government's standing arguments focus only on Plaintiffs' challenge to the

ideological exclusion provision–a challenge raised in Plaintiffs' Complaint, but only indirectly

implicated at this stage in the litigation.  The Government has lost sight of the fact that Plaintiffs'

claim for injunctive relief is based on their First Amendment right to receive information from

Ramadan, through face-to-face discussion and debate.  Plaintiffs' injury is not caused by the

application of 8 U.S.C. § 1182(a)(3)(B)(i)(VII) specifically, but by Ramadan's exclusion more

generally.  Therefore, the fact that the Government may not have relied upon § 1182(a)(3)(B)(i)(VII)

when it revoked Ramadan's visa, and may not intend to rely upon that provision to exclude Ramadan

in the future, does not turn Plaintiffs' very real injury–their inability to interact with Ramadan, in

potential violation of their First Amendment rights–into conjecture.[14]  Regardless of the Government's

reason for excluding Ramadan, the fact remains that Ramadan is unable to enter the United States to

share his views with a willing American audience, to Plaintiffs' detriment and in potential violation of

their First Amendment rights.  Plaintiffs' inability to interact with Ramadan at their upcoming

conferences is actual and particularized, and therefore amounts to an injury-in-fact sufficient to create

---

[14]  It is not surprising that Plaintiffs may have been in error about the Government's reason for excluding Ramadan.  In August 2004, DHS's spokesperson publicly stated that Ramadan's "work visa was revoked" because he used a "position of prominence within any country to endorse or espouse terrorist activity." (Ramadan Decl., Ex. G.)  Plaintiffs did not learn that this statement was "erroneous" until the end of March 2006, when the Government said as much in its opposition to Plaintiffs' preliminary injunction papers.  In the nineteen months between these two dates, the Government did not correct, revise, renounce or retract DHS's statement.  While the Government now claims that the previous statement was "erroneous," it provides no alternate explanation for its conduct.

standing in this case. See Lujan, 504 U.S. at 560 (defining an "injury-in-fact," for purposes of Article III standing, as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural" (internal citations omitted)).

The Court also disagrees with the Government's position that "Plaintiffs lack standing because their alleged injury is not likely to be redressed by the requested relief." (Govt's Opp'n 16.) The Government is correct that if it did not exclude Ramadan on the basis of the "endorses or espouses terrorism" provision of the Patriot Act, and does not do so in the future, Plaintiffs' first requested remedy–a preliminary injunction enjoining the Government from excluding Ramadan on the basis of the "endorses or espouses terrorism" provision–becomes moot.[15] Plaintiffs have three other prayers for relief, however, all of which remain applicable even if the Government does not exclude Ramadan on the basis of 8 U.S.C. § 1182(a)(3)(B)(i)(VII). Should it prove necessary, the Court is confident that it would be able to fashion a remedy that provides appropriate relief and satisfies Article III.

*2. Ripeness*

The Government also attempts to evade review by invoking the ripeness doctrine, arguing that Plaintiffs' request for injunctive relief does not present a live case or controversy because it "relies exclusively upon an event that very well may not occur–the exclusion of Mr. Ramadan on a basis which the Government has said it does not presently intend to apply." (Govt's Opp'n 18.)

---

[15] The careful reader will note how frequently the Government asserts that it did not exclude Ramadan on the basis of 8 U.S.C. § 1182(a)(3)(B)(i)(VII), and it has no present intention of doing so. This argument is repeated no less than 14 times in the Government's opposition papers. The Government invokes this position in its recitation of the facts, and as part of its legal arguments on standing, ripeness, review under the Kleindienst standard, and the Administrative Procedure Act. Rather than argue what was not done in the past, and what will not be done in the future, the Government might be in a better position if it explained DHS's statement of August 2004, reconciled that statement with its current legal position, and provided a legitimate and bona fide reason for its exclusion of Ramadan.

Similarly, the Government contends that Plaintiffs will suffer no hardship if the Court declines to review this case because "the alleged injury (i.e., exclusion based on § 1182(a)(3)(B)(i)(VII)), has never occurred before and there is no non-speculative basis to believe that it will occur in the future absent the requested relief." (Id.)  As previously explained in the context of standing, however, this is incorrect as a matter of law.  Plaintiffs' request for injunctive relief is premised upon the Government's exclusion of Ramadan in potential violation of their First Amendment rights.  This exclusion began in July 2004, the moment the Government revoked Ramadan's H-1B visa, and continues for as long as the Government continues to exclude Ramadan–either through action or inaction–without a facially legitimate and bona fide reason.  At present, Ramadan cannot enter the United States, and so Plaintiffs cannot engage him in face-to-face dialogue and debate.  In these circumstances, Plaintiffs have a valid First Amendment claim that is ripe for review.[16]  See, e.g., Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967) (explaining that an administrative decision is fit for judicial review when "its effects [are] felt in a concrete way by the challenging parties"), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977).  Were the Court to decide otherwise, the Government could evade constitutional review indefinitely by delaying adjudication of visa applications, thereby achieving by inaction outcomes that it could not accomplish by direct action.

---

[16]   There are a number of actions that the Government could take that would render Plaintiffs' case nonjusticiable.  For example, were the Government to restore Ramadan's eligibility for the visa waiver program, Plaintiffs' request for injunctive relief would become moot.  Similarly, were the Government to grant Ramadan's pending visa application–in a manner that assures the Court that the Government would not impermissibly exclude Ramadan from the United States in the future–Plaintiffs' request for injunctive relief would also become moot.  If the Government were to decide Ramadan's B-visa application negatively, and provide a facially legitimate and bona fide reason for its decision, then the Executive's broad power to exclude aliens would prevail over Plaintiffs' First Amendment rights, thereby precluding further review by this Court.  See Mandel, 408 U.S. at 769-70.  As long as the Government continues to exclude Ramadan, however, letting Ramadan's long-pending visa application stagnate without decision or explanation, Plaintiffs have a valid First Amendment claim that is ripe for this Court's review.

18

B. Merits of Plaintiffs' First Amendment Claim and Request for Injunctive Relief

   *1. Plaintiffs' First Amendment right*

   It is a well-settled principle of constitutional law that the First Amendment includes not only a right to speak, but also a right to receive information and ideas. See Stanley v. Georgia, 394 U.S. 557, 564 (1969); Red Lion Broad. Co. v. F.C.C., 395 U.S. 367, 390 (1969); Dow Jones & Co. v. Simon, 842 F.2d 603, 607 (2d Cir. 1988); see also Lamont v. Postmaster General, 381 U.S. 301, 308 (1965) ("The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers."). This broad right to receive information includes a right by citizens of the United States "to have an alien enter and to hear him explain and seek to defend his views." Mandel, 408 U.S. at 762-64; accord Abourezk v. Reagan, 785 F.2d 1043, 1050-51 (D.C. Cir. 1986), aff'd by an equally divided court, 484 U.S. 1 (1987); Allende v. Shultz, 605 F. Supp. 1220, 1223 (D. Mass. 1985). Thus, the First Amendment rights of American citizens are implicated when the Government excludes an alien from the United States on the basis of his political views, even though the non-resident alien has no constitutionally or statutorily protected right to enter the United States to speak. Mandel, 408 U.S. at 764-65.

   A citizen's right to have an alien enter the United States to speak is hardly absolute. Indeed, it is quite conditional. As the Mandel Court recognized, "'[o]ver no conceivable subject is the legislative power to Congress more complete than it is over' the admission of aliens." Id. at 766 (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339 (1909)). Congress has delegated this power to the Executive, not the courts. Id. In respect for this delegation, the power of a court to override the Government's decision to exclude an alien is severely limited:

> Were [the Supreme Court] to endorse the proposition that
> governmental power to withhold a [visa] must yield whenever a bona
> fide claim is made that American citizens wish to meet and talk with
> an alien . . . one of two unsatisfactory results would necessarily ensue.
> Either every claim would prevail, in which case the plenary
> discretionary authority Congress granted the Executive becomes a
> nullity, or courts in each case would be required to weigh the strength
> of the audience's interest against that of the Government in refusing a
> [visa] to the particular alien applicant, according to some as yet
> undetermined standard.  The dangers and the undesirability of making
> that determination on the basis of factors such as the size of the
> audience or the probity of the speaker's ideas are obvious.  Indeed, it
> is for precisely this reason that the waiver decision has, properly,
> been placed in the hands of the Executive.

Id. at 769.

Nonetheless, there are limitations:

> The Executive has broad discretion over the admission and exclusion
> of aliens, but that discretion is not boundless.  It extends only as far as
> the statutory authority conferred by Congress and may not transgress
> constitutional limitations.  It is the duty of the courts . . . to say where
> those statutory and constitutional boundaries lie.

Abourezk, 785 F.2d at 1061; see also Red Lion Broad. Co., 395 U.S. at 386-90 (noting that the First

Amendment protects "the right of the public to receive suitable access to social, political, esthetic,

moral, and other ideas and experiences" and "that right may not constitutionally be abridged either by

Congress" or any administrative agency), quoted in Mandel, 408 U.S. at 763; cf. Zadvydas v. Davis,

533 U.S. 678, 695 (2001) (observing that the political branch's plenary power is "subject to important

constitutional limitations"); INS v. Chadha, 462 U.S. 919, 941-42 (1983) (stating that Congress's

plenary power over immigration may be carried out only by "constitutionally permissible means").

Thus, while the Executive may exclude an alien for almost any reason, it cannot do so solely because

the Executive disagrees with the content of the alien's speech and therefore wants to prevent the alien

from sharing this speech with a willing American audience.

Recognizing this tension, the Mandel Court held that the Executive may exercise its plenary power over immigration and visa issues negatively on the basis of any "facially legitimate and bona fide reason."[17] Mandel, 408 U.S. at 769-70; accord El-Werfalli v. Smith, 547 F. Supp. 152 (S.D.N.Y. 1982); NGO Committee on Disarmament v. Haig, No. 82 Civ. 3636, 1982 U.S. Dist. LEXIS 13583, at *4 (S.D.N.Y. June 10, 1982), aff'd mem., 697 F.2d 294 (2d Cir. 1982). Once the Government articulates a facially legitimate and bona fide explanation for excluding an alien, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." Mandel, 408 U.S. at 770. Only where the Government is unable to provide a facially legitimate and bona fide reason for excluding the alien, thereby revealing that the true reason for exclusion was the content of the alien's speech, may a court remedy the constitutional infirmity by enjoining the Government from excluding the alien in contravention to the First Amendment. See, e.g., Harvard Law Forum v. Shultz, 633 F. Supp. 525, 531-32 (D. Mass. 1986) (enjoining Secretary of State from prohibiting alien from participating in debate at Harvard Law School, where the court found the Secretary's proffered reason for denying the alien's request to travel "not facially legitimate," and

_____

[17] While the Mandel Court did not expressly define what constitutes a "facially legitimate and bona fide reason," it is clear from the Court's discussion that a facially legitimate and bona fide reason means any *constitutionally permissible* reason. In the context of the First Amendment, this would mean a reason unrelated to the alien's speech. See, e.g., Abourezk, 592 F. Supp. at 887 ("[A]lthough the government may deny entry to aliens altogether, or for any number of specific reasons, it may not, consistent with the First Amendment, deny entry solely on account of the content of speech."); accord Allende, 605 F. Supp. at 1225; cf. Mandel, 408 U.S. at 769 (finding that alien's violation of previous visa, by traveling to places outside the approved itinerary, a reason wholly unrelated to the alien's speech, was facially legitimate and bona fide reason for excluding alien). Excluding Ramadan based on his criticism of U.S. foreign policy towards the Middle East or his disagreement with the Iraq War, for example, would not be a facially legitimate and bona fide reason. See Gentile v. State Bar of Nevada, 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment.")

determined that the "Secretary's actions [would likely] be adjudged unconstitutional").

In this litigation, the Government has not provided any reason for excluding Ramadan from the United States. As previously noted, in August 2004, DHS publicly stated that the Government had revoked Ramadan's H-1B visa because Ramadan used his "position of prominence . . . to endorse or espouse terrorist activity," in violation of 8 U.S.C. § 1182(a)(3)(B)(i)(VII), a provision added to the Immigration and Nationality Act by the Patriot Act of 2001.[18] (Ramadan Decl. ¶ 14 & Exs. G, M.) The Government now abandons the DHS statement, claiming it to be "erroneous." It fails to provide an alternate explanation–or any explanation at all–making it impossible for the Court to determine, in accordance with Mandel, whether Plaintiffs' First Amendment rights have been violated.

---

[18] Interestingly, until Plaintiffs commenced this litigation in January 2006, the Government made no attempt to retract the spokesperson's August 2004 statement that Ramadan's H-1B visa had been revoked on the basis of the "endorses or espouses terrorism" provision of the Patriot Act. The Government's failure to retract or correct the spokesperson's statement was not for lack of opportunities to do so, however, as a number of organizations–including Plaintiff AAUP–wrote the Government after the statement was released expressing concern with the statement and asking the Government to reconsider. (See, e.g., Ramadan Decl., Ex. M; Buck Decl., Exs. F & G; DeConcini Decl., Ex. E.)

While the Government now takes the position that it has not excluded Ramadan on the basis of § 1182(a)(3)(B)(i)(VII), the "endorses or espouses terrorism" provision of the Patriot Act, and does not intend to exclude Ramadan on the basis of this provision in the future, both of the affidavits submitted by consular officers in support of the Government's opposition suggest that Ramadan's visa application implicates "certain provisions of INA § 212(a)(3)(B)," the section of the INA rendering inadmissible aliens involved in terrorist activities. (Govt's Opp'n 8; Dilworth Decl. ¶ 13-15; Derrick Decl. ¶ 4.).

Even more troubling is the Government's recent qualification or limitation of its representations (at least 14 times in its Memo in Opposition) that it has no present intention to exclude Ramadan on the basis of 8 U.S.C. § 1182(a)(3)(B)(i)(VII). In its supplement papers, filed on April 25, 2006, the Government stated that it "cannot rule out ever relying on this provision in the future . . . because . . . it needs to retain flexibility to act based upon . . . possible future statements . . ., a possible future discovery of statements that have already been made . . . or possible further analysis of information already known to the Government." (Govt's Suppl. Mem. 15, 16.) This would appear to vitiate the Government's prior position on the potential use of § 1182(a)(3)(B)(i)(VII). The lack of clarity and the shifting nature of the Government's position on the Ramadan applications further underscores the importance of judicial review in this case.

*2. The doctrine of consular nonreviewability*

The Government contends that it need not provide an explanation for its actions, because the doctrine of consular nonreviewability bars this Court from reviewing the Government's decision to exclude Ramadan. But this argument directly contradicts <u>Mandel</u> and its progeny, which require the Government to justify the exclusion of an alien when the First Amendment rights of American citizens are implicated. <u>See</u> <u>Burrafato v. U.S. Dep't of State</u>, 523 F.2d 554, 556 (2d Cir. 1975), <u>cert. denied</u>, 424 U.S. 910 (1976); <u>NGO Committee on Disarmament</u>, 1982 U.S. Dist. LEXIS 13583, at *4 (ordering the Government to submit an explanation to the court as to why it denied temporary visas to 320 foreign nationals desiring to enter the United States to attend United Nations disarmament conferences in an unofficial capacity); <u>MacDonald v. Kleindienst</u>, No. 72 Civ. 1228 (S.D.N.Y. Oct. 10, 1972) (three-judge panel) (ordering the Secretary of State to set forth his reasons for refusing to waive the ineligibility of an alien), <u>quoted in</u> <u>Burrafato</u>, 523 F.2d at 556; <u>cf.</u> <u>Azzouka v. Sava</u>, 777 F.2d 68, 76 (2d Cir. 1985) (stating that asylum applicant could challenge INS's determination that he was a threat to U.S. national security in the district court under the facially legitimate and bona fide reason standard set forth in <u>Mandel</u> and adopted in <u>El-Werfalli</u>). This limited review is necessary to ensure compliance with the First Amendment, a duty that has been expressly delegated to the federal courts. <u>See</u> <u>Abourezk</u>, 785 F.2d 1043 (recognizing that "it is the duty of the courts" to ensure that visa determinations fall within "constitutional boundaries"); <u>Abourezk v. Reagan</u>, 592 F. Supp. 880 (D.D.C. 1984) (noting that "judicial scrutiny of the specific reasons for denials of entry" are necessary to prevent "a mushrooming of . . . content-based denials"), <u>vacated on other grounds</u>, <u>Abourezk v. Reagan</u>, 785 F.2d 1043 (D.C. Cir. 1986).

The Government's argument also misapplies the doctrine of consular nonreviewability.

Consular nonreviewability is a long-standing judicial practice of refusing to review a consular official's decision to issue or withhold a visa. See Saavedra Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999). It has been applied by courts to preclude lawsuits by aliens–or their U.S. citizen sponsors–challenging a consular official's denial of a visa. See, e.g., id. at 1155; Hsieh v. Kiley, 569 F.2d 1179, 1181 (2d Cir. 1978); Rivera De Gomez v. Kissinger, 534 F.2d 518, 519 (2d Cir. 1976); Dong v. Ridge, No. 02 Civ. 7178, 2005 WL 1994090, at *3, 5 (S.D.N.Y. Aug. 18, 2005). But the doctrine does not apply in cases brought by U.S. citizens raising constitutional, rather than statutory, claims. In fact, in Saavedra Bruno, the D.C. Circuit expressly distinguished between cases like Saavedra, in which disappointed aliens seek review of their visa applications, and cases like this one, in which American citizens challenge the Government's action on constitutional grounds. See 197 F.3d at 1163 (discussing Abourezk); see also Burrafato, 523 F.2d at 556-57 (making a similar distinction). Consular nonreviewability applies in the former, but not the latter. See Saavedra Bruno, 197 F.3d at 1163; Burrafato, 523 F.2d at 556-57 (observing that the court did not have jurisdiction over U.S. citizen's challenge to Government's denial of visa to her alien husband, but that the court would have jurisdiction if the *constitutional rights* of American citizens were implicated (emphasis added)). Because this case, like Abourezk, involves "claims by United States citizens rather than aliens . . . and statutory claims that are accompanied by constitutional ones," the doctrine of consular nonreviewability is inapplicable. Saavedra Bruno, 197 F.3d at 1163 (quoting Abourezk, 785 F.2d at 1051 n.6).

Furthermore, the Government does not explain why the doctrine ought to apply here at all, since its papers demonstrate that consular officials are not in charge of Ramadan's case and are merely awaiting a Security Advisory Opinion ("SAO") from other Government officials before they

can adjudicate Ramadan's pending visa application. (Derrick Decl. ¶ 2.) Once the required SAO is received, consular officials in Bern are prepared to make a final determination on Ramadan's case. (Id.) Whichever federal agency is responsible for the delay in issuing an SAO in Ramadan's case, it is clear from Mr. Derrick's affidavit that consular officials are not the problem.

DHS is clearly involved in Ramadan's case. At a Department of State Press Briefing on August 24, 2004, a press officer was asked why Mr. Ramadan's H-1B visa was revoked. The press officer responded: "Mr. Ramadan's visa was revoked pursuant to an action by the Department of Homeland Security to invalidate the petition on which it was based . . ." See http://www.state.gov/r/pa/prs/dpb/2004/35740.htm. In response to a follow-up question, the Department of State spokesperson repeated: " [T]he reason [Ramadan's visa] was revoked was on the basis of a Department of Homeland Security action to invalidate the petition on which it was based." Id. DHS's statement, which was published the following day in the Los Angeles Times, confirms that DHS was responsible for the July 2004 revocation. Finally, a DHS official attended the December 2005 visa interview. Considering this evidence in conjunction with Mr. Derrick's affidavit, it would appear that consular officials in Bern are awaiting instructions from DHS before proceeding on Ramadan's pending visa application.

The doctrine of consular nonreviewability applies to review of "a consular official's decision to issue or withhold a visa," not to the decisions of non-consular officials and certainly not to DHS. See Abourezk, 785 F.2d at 1051 n.6; see also Mulligan v. Schultz, 848 F.2d 655, 657 (5th Cir. 1988) (finding the doctrine of consular nonreviewability did not apply where the alien plaintiffs challenged the authority of the Secretary of State, rather than the discretion of consular officials).

*3.  The Government's facially legitimate and bona fide reason*

Since the Government has offered no explanation for its exclusion of Ramadan from the United States, the Court is unable to determine Plaintiffs' likelihood of success on the merits of their First Amendment claim.  To prevail on their motion for preliminary injunction, Plaintiffs must make a clear showing that the Government has no facially legitimate and bona fide reason for continuing to exclude Ramadan from the United States.  Such a showing is impossible since the Government has provided no explanation at all.

Plaintiffs ask the Court to bind the Government to the DHS statement, reported in the August 25, 2004 <u>Los Angeles Times</u>, that Ramadan's visa was revoked because he used a 'position of prominence to endorse or espouse terrorism,' and accept that statement as the Government's explanation for purposes of this litigation.  As the Court noted earlier, however, the Government now describes DHS's statement as "erroneous."  While the Government's shift in position is frustrating, and leaves the Court without any explanation upon which to review the constitutionality of the Government's conduct, in an area as sensitive as immigration and national security, the Court will not bind the Government to a statement to which it no longer subscribes.  At least the Government should be given an opportunity to provide a facially legitimate and bona fide explanation for excluding Ramadan.

The Government's opposition papers allude to "national security" concerns as a reason for its conduct.  Without more, however, this is not adequate.  There is no basis in the the record (<u>e.g.</u>, no affidavits or documents) upon which the Court could find that national security concerns are

facially legitimate or bona fide in Ramadan's case.[19]  "To find the conclusory statement that the entry of a particular individual would be contrary to United States foreign policy objectives to be a 'facially legitimate' reason would be to surrender to the Executive total discretion," even when the First Amendment rights of American citizens are at stake. Abourezk, 592 F. Supp. at 888.  This is a position long rejected by the Supreme Court:

> Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.

Mills v. Alabama, 384 U.S. 214, 218 (1966); see also discussion supra pp. 18-22 (explaining that the Executive's broad power to exclude aliens is bounded by the Constitution).  Thus, while the Government may exclude Ramadan if he poses a legitimate threat to national security, it may not invoke "national security" as a protective shroud to justify the exclusion of aliens on the basis of their political beliefs.  This should pose no dilemma for the Government.  If Ramadan is a threat to national security, or there is some other facially legitimate and bona fide reason for his exclusion, the Government may exclude him.  But the Government must provide an explanation.  It has not done so.

Given the Government's failure to provide an explanation for excluding Ramadan, the

---

[19] 22 C.F.R. § 41.122, entitled "revocation of visas," requires that consular officials create a record of the revocation, including a statement of the reasons for the revocation.  Subsection (e) mandates: "When a visa is revoked . . . the consular officer shall promptly submit notice of the revocation, including a full report on the facts of the case, to the Department for transmission to INS." 22 C.F.R. § 41.122(e).  Subsection (f) mandates that "[u]pon revocation of a nonimmigrant visa . . . the consular officer shall complete for the post files a Certificate of Revocation by Consular Officer which includes a statement of the reasons for the revocation." Id. § 41.122(f).  Thus, the Government should have records in its possession that would explain its conduct–and potentially provide the facially legitimate and bona fide reason that would end further Court review.  The transcript of the Department of State Press Briefing on August 24, 2004 confirms that there is a written petition by Homeland Security on which the revocation–"prudential" or otherwise–of Ramadan's H-1B visa is based.  The Government takes the position that such materials are exempt from judicial review.

Court might conclude that no legitimate reason exists, and so grant the injunction as Plaintiffs urge. The Court might also deny Plaintiffs' preliminary injunction for lack of sufficient information to adequately adjudicate its request, as the Government hopes. Neither result in justifiable or desirable, however, and so the Court declines to take either course.

The Court recognizes the political nature of the pending question, and the Executive's broad power to exclude aliens. It also recognizes the well-established limitation on its authority in this area. Even though the Government has not articulated a reason for excluding Ramadan, the Court acknowledges that such reason may exist. If so, Mandel makes clear that this Court has no authority to override the Government's decision. See Mandel, 406 U.S. at 769-70. Rather than speculate at this juncture as to the reasons why the Government has acted as it has with regard to Ramadan's visa applications, or assume from the absence of an explanation that the Government lacks a facially legitimate and bona fide reason for its conduct, it is distinctly preferable for the Government to explain itself.

C. The Government's Failure to Adjudicate Ramadan's Visa Application

The Government takes the position that it is "impossible" to "predict the additional time required to complete processing of Mr. Ramadan's pending visa application." (Derrick Decl. ¶ 4; Dilworth Decl. ¶ 15). The Government further indicates that cases like Ramadan's, which "may" involve INA § 212(a)(3)(B), "take significantly longer" than the average visa application. (Derrick Decl. ¶ 5.) Ramadan was previously informed that this could be as long as two years. Id. As the Court previously observed, see supra note 18, the Government's delay appears attributable, at least in part, to the fact that the Government is waiting for "possible future statements" that would render Ramadan ineligible to enter the United States. Accepting this position, and allowing the Government to wait for

"possible future discovery of statements" would mean that the Government could delay final

adjudication indefinitely, evading constitutional review by its own failure to render a decision on

Ramadan's application.  The Court will not allow this.  The Government cannot escape constitutional

review by its own inaction, nor can it exclude an alien <u>de facto</u>, by refusing to adjudicate the alien's

visa application, and thereby expand the scope of the Executive's power beyond statutorily and

constitutionally permissible means.  Under <u>Mandel</u> and its progeny, this Court retains a limited power

of review, to ensure that the Executive exercises its power to exclude aliens within the boundaries

permitted by Congressional mandate and the Constitution.

The Goverment contends that the Court has no legal or statutory authority to expedite

the adjudication of Ramadan's visa or compel consular officials to render a final decision.  The

Government is incorrect.  Section 6 of the Administrative Procedure Act ("APA") requires agencies,

including the Department of State and DHS, to render decisions "within a reasonable period of time."

8 U.S.C. § 555(b).  As one court of this District previously explained:

> [A] lthough there is no statutory or regulatory deadline by which the
> [Government] *must* adjudicate an application, at some point, [its]
> failure to take any action runs afoul of section 555(b).  Were it
> otherwise, [the Government] could hold [visa] applications in
> abeyance for decades without providing any reasoned basis for doing
> so.  Such an outcome defies logic–the [Government] simply does not
> possess unfettered discretion to relegate aliens to a state of "limbo,"
> leaving them to languish there indefinitely.  This result is explicably
> foreclosed by the APA.

<u>Kim v. Ashcroft</u>, 340 F. Supp. 2d 384, 393 (S.D.N.Y. 2004).[20]

Where the agency in charge of the adjudication fails to render a decision within a

_____

[20] While the <u>Kim</u> case dealt with adjustment of status applications reviewed by the Citizenship
and Immigration Services division of DHS, the court's logic applies with equal force to the adjudication
of nonimmigrant visa applications.

reasonable period of time, as required by § 555(b), the Court has the power to grant a writ of mandamus compelling an adjudication. See, e.g., Raduga USA Corp. v. Dep't of State, 2005 U.S. Dist. LEXIS 22941, at *22 (S.D. Cal. May 23, 2005) (compelling final decision on visa application over Government's assurances that a decision was "forthcoming"); Kim, 340 F. Supp. 2d at 393; id. at 393 n.40 (citing additional cases); Agbemaple v. INS, 1998 WL 202441, at *2 (N.D. Ill. May 18, 1998) (finding that "it is within the power of the court to order . . . an adjudication" on a visa application where CIS fails to issue a decision within a reasonable period of time); see also 28 U.S.C. § 1361 (mandamus statute).

The Goverment challenges the use of mandamus in this case. Specifically, the Government argues that the "extraordinary" remedy of mandamus is inappropriate in this case because "visa issuance is completely discretionary," and mandamus is available only where the official's duty is nondiscretionary. (Govt's Opp'n 22.) In making this argument, the Government is "confusing its discretion over how it resolves [the applications] . . . with its discretion over whether it resolves them." Yue Yu v. Brown, 36 F. Supp. 2d 922, 931 (D.N.M. 1999) (quoting Dabone v. Thornburgh, 734 F. Supp. 195, 200 (E.D. Pa. 1990)). The Government is correct that its decision to grant or deny Ramadan a visa is sufficiently discretionary to lie beyond the scope of mandamus. But the wide latitude given the Executive to grant or deny a visa application–a discretion bounded only by the U.S. Constitution and Congressional mandate–does not include the authority to refuse to adjudicate a visa application. In fact, 22 C.F.R. § 41.106 expressly requires that consular officers process nonimmigrant visa applications "properly and *promptly*," while 22 C.F.R. § 41.121 mandates that consular officers "either issue or refuse" a completed visa. See 22 C.F.R. § 41.106 (emphasis added); 22 C.F.R. § 41.121(a); cf. 22 C.F.R. § 41.121(c) ("If the ground(s) of ineligibility may be overcome by the

30

presentation of additional evidence . . . a review of the refusal may be deferred for not more than 120 days.").  Read together, these regulations make clear that allowing a visa application to stagnate undecided for an indefinite period of time, as the Government appears to be doing in this case, is not a permissible option.  Since the Government's obligation to adjudicate visa application is clearly prescribed, failure to issue or refuse a visa within a reasonable period of time triggers mandamus jurisdiction in federal court. See  Patel v. Reno, 134 F.3d 929, 932 (9th Cir. 1998) ("When the suit challenges the authority of the consul [or other Government agent] to take or fail to take an action as opposed to a decision taken within the [agent's] discretion, jurisdiction exists."); Kim, 340 F. Supp. 2d at 389-91, 393.

            The determination of what constitutes a "reasonable period of time" varies according to the circumstances of each particular case.  In this case, Ramadan has waited more than nine months for a decision on his application for a nonimmigrant visa.  The Department of State's own website indicates that most nonimmigrant visas submitted to the Bern Embassy are processed within 2 days of application, while "most special clearances are resolved within 30 days of application." See http://travel.state.gov/visa/temp/wait/tempvisitors_wait_result.php?post=Bern&x=95&y=13.  These representations suggest that Ramadan's nine-month wait is well beyond what is "reasonable."

            Additional facts make the Government's delay even more unreasonable: (1) the Government originally granted Ramadan's H-1B visa in 2004, presumably after a thorough review of Ramadan's background; and (2) the Government received the allegedly derogatory information about Ramadan that led to the revocation of Ramadan's previously issued H-1B visa in July 2004, giving the Government ample time to investigate Ramadan's case.  Moreover, the record reveals that DHS is actively monitoring Ramadan.  For example, DHS knew Ramadan had resigned his post at the

University of Notre Dame within a week of his resignation because DHS noted a news item in the on-line edition of the Indianapolis Star. Further, DHS participated in Ramadan's interview in December 2005. Thus, over the last 30 months the Government appears to have followed Ramadan's progress closely and investigated him thoroughly. While Ramadan's books, articles and tape recorded talks are extensive, they are finite in amount. Certainly there has been more than enough time to review these materials and come to a reasoned conclusion on Ramadan's admissibility.

            The Government makes no effort to explain the delay in adjudicating Ramadan's case, other than to suggest that "complicated cases that may raise issues under certain provisions of § 1182(a)(3)(B), such as the present case, take significantly longer" than simple applications, because "interested US Government agencies pursue and assess available information, as appropriate." This explanation is less than convincing, given the Government's repeated statements that it has not excluded Ramadan on the basis of § 1182(a)(3)(B)(i)(VII), and has no present plans to do so in the future. (Dilworth Decl. ¶ 15; Derrick Decl. ¶ 4.) Perhaps the delay is caused by the Government's hope of "possible future statements by Mr. Ramadan" that might justify exclusion. (Govt's Suppl. Mem. 16.) But in waiting, the Government does a disservice not only to Ramadan, but also to the visa application process and to Plaintiffs' First Amendment rights.

            In its supplemental papers, the Government concedes that "there may be very limited judicial review of fully ripe First Amendment claims by United States nationals." (Id. at 12.) Given this concession, and the Plaintiffs' First Amendment right to meet with Ramadan and engage him in face-to-face dialogue and debate, the Government's bare assurances that review of Ramadan's visa application is "actively underway" and will be resolved "at some point in the future" are totally inadequate. (Id. at 2, 17.) Acceding to the Government's position would mean the Government could

avoid judicial review simply by failing to adjudicate a petition.  <u>Mandel</u> and its progeny make clear that the First Amendment does not permit this.

If the Government has a legitimate and bona fide reason for excluding Ramadan, then it may exclude him, but it must do so by acting on the pending visa application, not by studying Ramadan's application indefinitely, while hoping for more supportive evidence to appear in the future. Ramadan's voluminous books, articles and speeches provide more than an adequate basis for review. His frequent visits to the United States, including a visit to the State Department in October 2003, provide ample first-hand insight into Ramadan's views.

The record suggests that the Government has more than adequate information at hand to decide this matter.  Moreover, the Government has a nondiscretionary obligation to render a decision on every visa application.  <u>See</u> 22 C.F.R. §§ 41.106, 41.121.  The Government studied this matter from January 2004 through December 2004, and then from September 2005 to date.  That is more than adequate time for adjudication of Ramadan's pending visa application.  Out of an excess of caution, however, the Court will give the Government another ninety (90) days from the date of this Order to adjudicate Ramadan's pending application for a B visa.  If the Government fails to issue a formal decision on Ramadan's pending application by this date, the Court will consider such other alternatives as are available and appropriate.

CONCLUSION

In light of the current records, the Court denies Plaintiffs' first, second and fourth prayers for relief, with leave to renew their requests for relief once the Government issues a decision on Ramadan's pending visa application.

The Court finds that the Government has failed to adjudicate Ramadan's pending B-

visa application within a reasonable period of time, as dictated by the Administrative Procedure Act.

Accordingly, the Court grants Plaintiffs' third prayer for relief. The Government is ORDERED to

issue a formal decision on Ramadan's pending nonimmigrant visa application within ninety (90) days

from the date of this Order.

Dated: New York, New York
      June 23, 2006

SO ORDERED

PAUL A. CROTTY
United States District Judge