UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AMERICAN ACADEMY OF RELIGION;
AMERICAN ASSOCIATION OF UNIVERSITY
PROFESSORS; PEN AMERICAN CENTER; TARIQ
RAMADAN,

        *Plaintiffs,*

    against

MICHAEL CHERTOFF, in his official capacity as
Secretary of the Department of Homeland Security;
CONDOLEEZZA RICE, in her official capacity as
Secretary of State,

        *Defendants.*

**ECF CASE**

06-cv-0588 (PAC)

## MEMORANDUM OF LAW OF *AMICI CURIAE* AMERICAN ANTHROPOLOGICAL ASSOCIATION, COLLEGE ART ASSOCIATION, LATIN AMERICAN STUDIES ASSOCIATION, MIDDLE EAST STUDIES ASSOCIATION, ASSOCIATION OF AMERICAN UNIVERSITY PRESSES, AMERICAN STUDIES ASSOCIATION, HISTORY OF SCIENCE SOCIETY, ASSOCIATION OF AMERICAN LAW SCHOOLS, NATIONAL COALITION AGAINST CENSORSHIP, AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION, AMERICAN ASSOCIATION FOR THE ADVANCEMENT OF SLAVIC STUDIES, AND AMERICAN FOLKLORE SOCIETY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Charles S. Sims (CS0624)
Jennifer A. O'Brien (JO7801)
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
Phone: (212) 969-3000
Attorneys for *Amici Curiae*

Dated: March 2, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTERESTS OF AMICI CURIAE ............................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

I. IDEOLOGICAL EXCLUSION AMOUNTS TO AN IMPERMISSIBLE
INFRINGEMENT OF A FUNDAMENTAL FIRST AMENDMENT RIGHT .................... 3

    A. The First Amendment Guarantees The Right to Receive Information and Ideas
       from Speakers In Person ........................................................................................ 3

    B. The Ideological Exclusion Provision Cannot Withstand Strict Scrutiny ..................... 5

    C. The Ideological Exclusion Provision Violates the *Kleindienst* Standard ...................... 10

    D. The Ideological Exclusion Provision Is Unconstitutionally Vague ............................... 12

II. HISTORY REFLECTS THE GOVERNMENT'S TENDENCY TO EXCLUDE
SPEAKERS ON IDEOLOGICAL GROUNDS ANTITHETICAL TO THE FIRST
AMENDMENT .......................................................................................................... 14

CONCLUSION ................................................................................................................... 22

ADDENDUM 1 ................................................................................................................. A-1

*DESCRIPTION OF INDIVIDUAL AMICI CURIAE* .......................................................... A-2

ADDENDUM 2 ................................................................................................................. A-9

*TEXT OF* 8 U.S.C. § 1182(a)(3)(B)(i)(VII) ..................................................................... A-10

# TABLE OF AUTHORITIES

### CASES

*Abourezk v. Reagan,*
  592 F. Supp. 880 (D.D.C. 1984) ................................................................................7, 11

*American Academy of Religion v. Chertoff,*
  463 F. Supp. 2d 400 (S.D.N.Y. 2006) ........................................................................2, 11

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ......................................................................................................10

*Ashcroft v. Free Speech Coalition,*
  535 U.S. 234 (2002) ......................................................................................................6, 9

*First Nat'l Bank v. Bellotti,*
  435 U.S. 765 ..................................................................................................................8

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ......................................................................................................13

*Hamdi v. Rumsfeld,*
  542 U.S. 507 (2004) ......................................................................................................7

*Harvard Law School Forum v. Shultz,*
  633 F. Supp. 525 (D. Mass. 1986) ..............................................................................11, 12

*Keyishian v. Bd. of Regents,*
  385 U.S. 589 (1967) ......................................................................................................13

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ......................................................................................4, 5, 10, 11, 12

*Martin v. City of Struthers,*
  319 U.S. 141 (1943) ......................................................................................................3, 4

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ......................................................................................................6, 7

*Red Lion Broadcasting Co. v. FCC,*
  395 U.S. 367 (1969) ......................................................................................................4, 5

*Regan v. Time, Inc.,*
  468 U.S. 641 (1984) ......................................................................................................6

*Reno v. ACLU,*
  521 U.S. 844 (1997) ......................................................................................................9, 13

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995)............................................................................7

*Roth v. United States*,
   354 U.S. 476 (1957)............................................................................4

*Sable Communications of California, Inc. v. FCC*,
   492 U.S. 115 (1989)............................................................................9

*Simon & Schuster, Inc. v. Members of the N. Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991)............................................................................8

*Stanley v. Georgia*,
   394 U.S. 557 (1969)............................................................................4

*Turner Broadcasting Sys., Inc. v. FCC*,
   512 U.S. 622 (1994)..........................................................................5, 6

*United States v. Playboy Enm't Group, Inc.*,
   529 U.S. 803 (2000)............................................................................6

*United States v. Robel*,
   389 U.S. 258 (1967)............................................................................7

## STATUTES

U.S. Const. art. I, § 8............................................................................11

8 U.S.C. § 1182(a)(3)(B)(i)(VII) ..........................................................2

8 U.S.C § 1182(a)(3)(B)(iii) ..................................................................2

8 U.S.C. § 1182(a)(3)(B)(vi)..................................................................2

8 U.S.C. § 1189(b)(1) .............................................................................2

9 F. A. M. § 40.32 N6.2 ..........................................................................2

Act of Oct. 1, 1988, Pub. L. No. 100-461, 102 Stat. 2268..................16

Foreign Relations Authorization Act, Fiscal Year 1978, Pub. L. No. 95-105, sec. 112, §
   21, 91 Stat. 844, 848 (1977) (Codified as amended at 22 U.S.C.§ 2691(1981))....................15

Foreign Relations Authorization Act, Pub. L. No. 100-204, § 901, 101 Stat. 1331, 1400
   (1987), *amended by* Foreign relations Authorization Act, Fiscal Years 1990 and 1991,
   H.R. Conf. Rep. No. 343, 101st Cong., Ist Sess. § 128(b) (1989)............................16

H.R. Rep. No. 95-537, 1st Sess. 31-32 (1977) (Conf. Rep.), *reprinted in* 1977
U.S.C.C.A.N. 1658 ...................................................................................................15

House Conf. Rep. No. 100-475, 100th Cong., Ist Sess. (Dec. 14, 1987), *reprinted in* 133
Cong. Rec. H2424 (1987)........................................................................................15

Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 (1990)...............................16

Pub. L. No. 107-56, § 411, 115 Stat. 272 (Oct. 26, 2001) (codified at 8 U.S.C.
§1182(a)(3)(B)(i)(VI) (2004)) .................................................................................1

REAL ID Act of 2005, Pub. L. 109-13, Division B, Title I, 119 Stat. 231 (May 11, 2005) ...........1

S. Rep. No. 100-75, 100th Cong., 1st Sess. (June 18,), *reprinted in* 133 Cong. Rec. S2326
(1987)......................................................................................................................16

S. Rep. No. 95-194, 1st Sess. 13 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1625 .........................15

## OTHER AUTHORITIES

Academic Freedom and National Security in a Time of Crisis, Report of the AAUP
Special Committee on Academic Freedom and National Security in a Time of Crisis
(Oct. 2003), *available at*
http://www.aaup.org/AAUP/About/committees/committee+repts/crisistime.htm.................15

Conference on Security and Cooperation in Europe: Final Act, Aug. 1, 1975, Dep't of
State Pub. No. 8826 (Gen. For. Pol. Ser. 298), *reprinted in* 14 I.L.M. 1292 (1975)...............15

Ian Thomas & Jason Shuffler, *Professor Returns to Class After Long Visa Ordeal*, The
Golden Gate [X]Press (San Francisco Univ. Sept. 20, 2006), *available at*
http://xpress.sfsu.edu/archives/news/006906.html. ..........................................................20

Information on the exclusion of members of the African National Congress, *available at*
http://www.aclu.org/safefree/general/26213res20060724.html................................................17

Information on the exclusion of members of the African National Congress, *available at*
http://www.aclu.org/safefree/general/26213res20060712.html................................................19

John A. Scanlan, *Symposium on Academic Freedom: Aliens in the Marketplace of Ideas:
The Government, the Academy and the McCarran-Walter Act*, 66 Tex. L. Rev. 1481,
1496 n. 67 (1988) .....................................................................................................15

Larry McMurty, Testimony before the Subcommittee on Courts, Intellectual Property,
and Administrative Justice of the House Judiciary Committee (May 3, 1989),
*available at* http://www.pen.org/viewmedia.php/prmMID/41/prmID/341 .............................15

Michael Isikoff & Mark Hosenball, *Terror Watch: Muslim Leader Barred From U.S.*,
    Newsweek (Oct. 18, 2006), *available at*
    http://www.msnbc.msn.com/id/15320752/site/newsweek ....................................................... 19

Steven R. Shapiro, *Ideological Exclusions: Closing the Border to Political Dissidents*,
    100 Harv. L. Rev. 930, 930 (1987) ........................................................................................ 14

Tim Dowling, *Real Lives: They Shall Not Pass: The Homeland Security Hall of Fame*,
    The Guardian 6 (Mar. 23, 2005) ............................................................................................ 21

Tellez's Story, highlighted by NPR (Mar. 2005), *available at*
    http://www.npr.org/templates/story/story/php?storyID=4554643&sc=emaf. ......................... 19

University of Nebraska-Lincoln, *available at*
    http://www.unl.edu/history/news_events/ari/ari.html ............................................................ 18

## INTERESTS OF AMICI CURIAE

This brief is filed on behalf of numerous scholarly and other organizations dedicated to encouraging the free-flow of information and ideas across our nation's borders that has been and will continue to be circumscribed and threatened should the ideological exclusion provision of the USA Patriot Act be upheld. A list of *amici*, and description of each organization and their specific interest, is attached as an Addendum 1 *infra*.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As the history of immigration law in the United States reminds us all, since 1903 perceived threats to national security have been used to justify sweeping legislation excluding foreign speakers from the country on ideological grounds. While with the decline and fall of Communism Congress recognized that such ideological exclusions are antithetical to our nation's commitment to granting both people and ideas free access across America's borders, the post-9/11 landscape has seen a renewed assertion of power to bar speakers from the United States based on their statements or beliefs.

In the rush to fight terrorism in response to the attacks of September 11, 2001, Congress significantly expanded the government's authority to bar individuals from entering the United States.[1] The USA Patriot Act (the "Patriot Act") authorizes the Executive Branch to exclude from the United States an individual on the grounds that he or she

---

[1] As originally enacted, the ideological exclusion provision of the Patriot Act provided that aliens would be ineligible to receive visas if they had used their "position of prominence within any country to endorse or espouse terrorist activity, or to persuade others to support terrorist activity or a terrorist organization, in a way that the Secretary of State has determined undermines United States efforts to reduce or eliminate terrorist activities." Pub. L. No. 107-56, § 411, 115 Stat. 272 (Oct. 26, 2001) (codified at 8 U.S.C. §1182(a)(3)(B)(i)(VI) (2004)). The ideological exclusion provision was expanded to its current form by the REAL ID Act of 2005, Pub. L. 109-13, Division B, Title I, 119 Stat. 231 (May 11, 2005).

> endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization ....

8 U.S.C. § 1182(a)(3)(B)(i)(VII) (the "ideological exclusion provision"). The measure of what this means to the present Administration is the contention, in the State Department's Foreign Affairs Manual, that the provision "is directed at irresponsible expressions of opinion by prominent aliens who are able to influence the actions of others." 9 F.A.M. § 40.32 N6.2.[2]  Importantly, the government contends that its exercise of this authority is subject to only the most limited judicial review.[3]  Further, neither an excluded visitor nor those who have invited that visitor to speak and seek to challenge that exclusion are granted the power to invoke a judicial review of the government's designation of foreign terrorist organizations.[4]  Both "terrorist activity" and "terrorist organization" are broadly defined in the statute, but of course if the government's say-so that a prospective visitor has "endorse[d or] espouse[d] terrorist activity" is conclusive, the breadth of the definitions are irrelevant in any event.[5]

As the Supreme Court has long recognized, the First Amendment protects both the right to disseminate information, as well as the right to hear speech from multifarious sources, in person, even when that speech is unpopular with either public opinion or government officials.  By passing

---

[2] In addition to the facial challenge to the ideological exclusion provision, *amici curiae* also support the ACLU's challenge to the ideological exclusion as it has been applied in the case of Professor Tariq Ramadan.

[3] While the government originally maintained the position in this litigation that the doctrine of consular nonreviewability completely insulates its determination from judicial review, it later conceded that there may be "very limited judicial review of fully ripe First Amendment claims by United States nationals." *See American Academy of Religion v. Chertoff*, 463 F. Supp. 2d 400, 422 (S.D.N.Y. 2006). Such concession, however, offers no meaningful guidance as to the contours or extent of such "very limited" review in actual application.

[4] Pursuant to 8 U.S.C. § 1189(b)(1), judicial review of the government's designation of an entity as a foreign terrorist organization is limited to challenges brought by the organization itself within 30 days of the publication of the designation in the Federal Register.

[5] *See* 8 U.S.C § 1182(a)(3)(B)(iii) and 8 U.S.C. § 1182(a)(3)(B)(vi). The relevant portion of the statute is Addendum 2, below.

the ideological exclusion provision, Congress went too far and authorized the government to circumscribe the ability of Americans to hear, in person, speech that the government dislikes.  The ideological exclusion provision is both unconstitutionally vague and incapable of withstanding the scrutiny applied to regulations suppressing speech because of its message, ideas, subject matter or content.[6]  The ideological exclusion provision is but the latest in a long line of immigration laws that have been, or are so loosely drafted and overbroad that they can be, used by the government to manipulate political debate in the United States by banning speakers based on their views, all in violation of the First Amendment.

Accordingly, *amici curiae* respectfully request that plaintiffs' motion for summary judgment declaring the ideological exclusion provision of the Patriot Act unconstitutional be granted.

## I.

## IDEOLOGICAL EXCLUSION AMOUNTS TO AN IMPERMISSIBLE INFRINGEMENT OF A FUNDAMENTAL FIRST AMENDMENT RIGHT

A.    The First Amendment Guarantees The Right to Receive
Information and Ideas from Speakers In Person

The Supreme Court held nearly seventy years ago that the First Amendment protects not only the right to speak and listen, but the right to exchange ideas face-to-face, in settings where persuasion can most readily be accomplished.  In *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943), in the height of wartime, the Supreme Court struck down an ordinance forbidding speakers from knocking on doors and ringing doorbells.  "The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a

---

[6] *Amici* further concur in the ACLU's position that the ideological exclusion provision amounts to an unconstitutional licensing scheme investing Executive officers with unrestrained discretion in repressing speech.

freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Id.* at 143. Freedom of speech was held to embrace the right to express ideas directly to others, even at their homes, and "necessarily protects the right to receive it" as well. *Id.* Such protection is necessary, the Court has held, to "assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484 (1957).

The right to receive information has been recognized in a variety of settings, and with regard to all kinds of speech, high and low. *See, e.g., Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Kleindienst v. Mandel*, 408 U.S. 753 (1972). In *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969), the Court highlighted the importance of ensuring such access to information, recognizing that it is the very purpose of the First Amendment

> to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged [by] Congress . . . .

*Id.* at 390.

In a nation committed to an "uninhibited marketplace of ideas," as each *amici* organization knows from its own experience, freedom of speech cannot be limited to the discourse and exchange of ideas between American citizens, or even those residing in our nation. The world is larger than that; the success of our nation, and of each of us, depends as never before on interactions of all sorts – political, economic, intellectual, scientific – with those from other nations. A society in which Americans could not speak face-to-face with persons from abroad, whose views are anti-thetical to the views of the present administration (whatever that happens to be at any given time) is not a free society, and not an open society. Permitting the Executive Branch to decide who Ameri-

cans cannot invite and speak with on our shores is entirely inconsistent with the kind of society the Founders intended this to be, one whose very goal was "to secure the Blessings of Liberty."

The First Amendment right to receive information and ideas from a multitude of sources, including from non-citizens seeking admission to the United States, for purposes of education and scholarship, was explicitly recognized in *Kleindienst v. Mandel*, where the Supreme Court rejected the government's argument that the First Amendment was inapplicable to a challenge brought to the exclusion of alien Ernest Mandel, a Belgian scholar and journalist, on ideological grounds. *Kleindienst*, 408 U.S. at 763. Citing *Red Lion Broadcasting*, the Court affirmed that the First Amendment right to receive information and ideas may not be abridged by Congress, and that the government could not prevail without proving a "facially legitimate and bona fide" reason not resting on grounds of speech or belief. 408 U.S. at 763, 770.

While Mandel's own exclusion was upheld as not violative of the First Amendment, given that the reason given for his exclusion was the "facially legitimate and bona fide" reason of his "previous abuses" of granted visas, the Court unanimously rejected the government's arguments that the exclusion of persons on ideological grounds did not implicate the First Amendment rights of persons who would meet with them, or that "the First Amendment is inapplicable because [would-be listeners had] free access to Mandel's ideas through his books and speeches, and because 'technological developments,' such as tapes or telephone hook-ups, readily supplant his physical presence." 408 U.S. at 764-65.

B.   The Ideological Exclusion Provision Cannot Withstand Strict Scrutiny

On its face, the ideological exclusion provision is a content-based legislative provision suppressing the speech of those who have "endorsed or espoused" terrorist activity themselves or persuaded others to do the same. *See Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 643

(1994) ("As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based.").  Content-based restrictions on the rights of American citizens and residents to receive information from multifarious sources are presumptively invalid, and therefore subject to strict scrutiny. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also Regan v. Time, Inc.*, 468 U.S. 641, 648-49 (1984) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment.").  To overcome the presumption of invalidity, a content-based regulation must withstand the most exacting judicial review, under which statutes regulating speech "based on its content . . . must be narrowly tailored to promote a compelling Government interest. ...  If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Enm't Group, Inc.*, 529 U.S. 803, 813-14 (2000).[7]  First Amendment concerns do not disappear merely because Congress or the Executive utter the words "national security" or "terrorism":

> [T]his concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal.  Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart.  For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment.  It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties ... which makes the defense of the Nation worthwhile.

---

[7] Speech proscribed by the ideological exclusion provision does not fall within the limited categories of speech the Supreme Court has characterized as beyond the scope of Constitutional protection.  As the Court has recognized, "[t]he government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.'" *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) (citations omitted).  Further, the "government may suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *Id.* (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)).  The ideological exclusion provision clearly regulates a substantial amount of speech outside this narrow classification.

*United States v. Robel*, 389 U.S. 258, 264 (1967) (holding unconstitutional a provision of the Subversive Activities Control Act as an unconstitutional abridgement of the right of association guaranteed by the First Amendment). The court recently reaffirmed this principle in *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004), recognizing that even "a state of war is not a blank check for the President when it comes to the rights of the Nation's citizens."

As courts have long recognized, the government does not have an inherent compelling interest in regulating speech on the basis of its content alone. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid."); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("[d]iscrimination against speech because of its message is presumed to be unconstitutional"); *cf. Abourezk v. Reagan*, 592 F. Supp. 880, 887 (D.D.C. 1984) (denying the ability of the government to deny entry to an alien "solely on account of the content of speech"). Even if the government's interest under the ideological exclusion provision is framed more broadly as an interest in protecting national security, however, the provision still cannot withstand strict scrutiny. While no one would dispute that the government has a compelling interest in protecting our nation and avoiding future attacks like those of 9/11, the government nonetheless bears the burden of showing that the ideological exclusion provision is narrowly-tailored to advance that interest. As the ideological exclusion provision now stands, the government seeks to advance its interest in preventing future violence by barring an alien based on *past* speech. Absent, however, is the causal connection between such prior speech and future threats to national security that justifies an argument that the ideological exclusion provision advances the government's interests. Further, the sweeping language of the ideological exclusion provision is both far broader than necessary and not narrowly tailored to further the government's goals.

A statute will be adjudged overly inclusive for First Amendment purposes when "a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals." *Simon & Schuster, Inc. v. Members of the N. Y. State Crime Victims Bd.*, 502 U.S. 105, 122 (1991) (citation and internal quotations omitted); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 794 (invalidating a statute prohibiting protected speech in a manner unjustified by a compelling state interest).

Here, it is evident that the ideological exclusion provision impacts far more speech than that directly related to advancing the government's interest in protecting national security and avoiding attacks on our people and communities.

The point is particularly clear if the government is correct in its assertion that its determinations under the ideological exclusion provision are subject to only the most limited judicial review.  In that event, the statutory language is effectively meaningless, bounded (if at all) only by the government's self-restraint.  Just as the Supreme Court long ago concluded that without effective sanctions (*e.g.*, suppression or exclusion for Fourth and Fifth Amendment violations) the provisions of the Bill of Rights guaranteeing civil liberties would be just forms of words, so too recognizing a nearly unreviewable executive power to exclude would effectively amount to creating an unlimited power to exclude.

But even if the government's application of the ideological exclusion provision were subject to effective judicial review, the provision remains overbroad.  "Endorsing or espousing terrorist activity" as defined by the statute reaches espousing or endorsing conspiracies, threats, or attempts to do anything unlawful under foreign law which involves nothing more than the sabotage of a vehicle or the use of any firearm.  By going that far, the provision authorizes the Executive to exclude any person who has ever endorsed the kinds of changes that Thomas Jefferson repeatedly

endorsed.[8]  The Administration could have prevented U.S. citizens from hosting patriots of the failed Hungarian revolt in 1956 and the failed East German revolt of 1953, Nelson Mandela and others fighting the apartheid regime in South Africa, and those resisting genocide in Darfur or, earlier, in Bosnia or Rwanda.  A statute that goes so far plainly reaches and infringes far more broadly than necessary on legitimate free speech interests of Americans.

In *Ashcroft v. Free Speech Coalition*, 535 U.S. at 255, the Supreme Court held that a practice of banning protected speech in order to advance the government's interests is fundamentally in tension with and contrary to the First Amendment rights of American citizens.  It is impossible to square the holding in that case with the power claimed here:

> [t]he Government may not suppress lawful speech as the means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter.  The Constitution requires the reverse.[9]

When a content-based restriction on speech "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another," such burden on protected speech "is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. ACLU*, 521 U.S. 844, 874 (1997); *see also Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("The Government may, however, regulate the content of constitutionally protected speech

---

[8] Jefferson's personal motto was, famously, "Rebellion to tyrants is obedience to God." He also wrote that "Every generation needs a new revolution," and, in the Declaration of Independence, declared that "But, when a long train of abuses and usurpations, pursuing invariably the same object, evinces a design to reduce [the people] under absolute despotism, it is their right, it is their duty, to throw off such government, and to provide new guards for their future security." An Iraqi exile while Saddam Hussein was still in power, dedicated to endorsing or espousing the overthrow of that regime, would have been (and remains) excludible by the Administration.

[9] As discussed *supra* in Footnote 7, the government has not proven that even speech "endorsing" or "espousing" terrorist activity is in itself unlawful. Thus, the concerns implicated in *Ashcroft* are even more relevant here, where none of the speech the government seeks to suppress is outside the protection of the First Amendment.

in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest."). As further articulated by the Supreme Court,

> [t]he purpose of the [least-restrictive means] test is not to consider whether the challenged restriction has some effect in achieving Congress' goal, regardless of the restriction it imposes. The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to assure that legitimate speech is not chilled or punished. For that reason, the test does not begin with the status quo of existing regulations, then ask whether the challenged restriction has some additional ability to achieve Congress' legitimate interest. Any restriction on speech could be justified under that analysis. Instead, the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives.

*Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

In order to justify the ideological exclusion provision as the least restrictive means of advancing its interest in fighting terrorism, the burden is on the government to prove that nothing less than a complete ban on all speech by any nonimmigrant alien who has allegedly endorsed or espoused terrorist activities or persuaded others to do the same will adequately serve its interest. The government clearly cannot carry that burden. Numerous readily available alternative mechanisms exist for furthering the government's interest in stopping the spread of terrorism – such as barring aliens who have provided material support to terrorist organizations – while simultaneously burdening less speech than the blanket ban of the ideological exclusion provision as it now stands, and without giving the Administration the means of manipulating political debate in the United States by excluding foreign speakers whom it finds too critical to admit.

C. The Ideological Exclusion Provision Violates the *Kleindienst* Standard

The ideological exclusion provision also fails the "facially legitimate and bona fide" test formulated by the Supreme Court in *Kleindienst* by allowing the government to exclude aliens from the United States solely because of the content of their speech. While the government has often asserted congressional and executive "plenary power" over immigration law as a talisman shielding

such legislation from judicial review,[10] the Supreme Court has explicitly recognized that the First Amendment rights of citizens and residents are not rendered irrelevant merely because the exclusion of aliens are subject to Congress' sovereign authority. *See Kleindienst*, 408 U.S. at 764.

As courts adjudicating claims challenging the exclusion of nonimmigrant aliens post-*Kleindienst* have indicated, excluding an invited alien speaker on the grounds of his past or expected speech is not a "bona fide and facially legitimate" reason for barring such individuals from the United States. *See Abourezk*, 592 F. Supp. at 887 (recognizing that under the First Amendment, an alien invited to the United States "to impart information and ideas" may not be excluded "solely on account of the content of speech"); *see also American Academy of Religion v. Chertoff*, 463 F. Supp. 2d 400, 416 n.17 (S.D.N.Y. 2006) (same).  While the *Abourezk* court eventually concluded that the government had proffered a "facially legitimate" reason for excluding the aliens at issue from the United States, it stressed in its holding that "these applicants were not denied entry because of the content of the expected speeches." 592 F. Supp. at 888.

Similarly, in *Harvard Law School Forum v. Shultz*, 633 F. Supp. 525 (D. Mass. 1986) (*vacated as moot* 852 F.2d 563 (1st Cir. 1986)), a court addressing a challenge to the government's denial of a request to temporarily allow Zuhdi Labib Terzi, a member of the PLO, into the United States for purposes of academic debate, rejected the government's basis as illegitimate:

> the Secretary concedes that his reason is based on Terzi's proposed participation in a political debate with American citizens.  Although the Secretary's reason appears to be bona fide, it is not facially legitimate.  The Secretary's justification is directly related to the suppression of a political debate with American citizens. … The Secretary's actions are completely at odds with the First Amendment's protection of political debate and our 'national commitment to the principle that debate on public issues should be uninhibited, robust and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on

---

[10] While there is no specific grant of power to regulate immigration contained in the Constitution, Congress is granted plenary power to enable it to establish laws of naturalization, and to promulgate those laws that will allow it to execute these powers. *See* U.S. Const. art. I, § 8.

> government and public officials.' ... The Secretary's proffered reason for denying Terzi's travel request *is not facially legitimate because it is related to the suppression of protected political discussion.*

*Id.* at 531 (citations omitted) (emphasis added).

As interpreted by the administration, the ideological exclusion provision grants the Executive authority to deny aliens entry to the United States solely on the content of speech and political views with only the most limited judicial review. To the extent that the ideological exclusion provision allows the Executive to exclude speakers because of their speech – for example, because of their perceived support for groups hostile to the Executive's foreign policies, or who have made what the Executive deems "irresponsible expressions of opinion" (*see* pg. 2 *supra*), or engaged in "support" of organizations that the Executive has unreviewably deemed as "terrorist organizations" – it cannot survive scrutiny under the *Kleindienst* standard. Violation of visa requirements is a bona fide and facially legitimate ground for exclusion; a conclusory statement that a speaker has been excluded because of what she "endorses" or "espouses" or "supports" is not, particularly where the government asserts that its conclusory assertions are subject to such limited review. As the ideological exclusion provision on its face allows the government to engage in just such practice, it clearly cannot withstand scrutiny under *Kleindienst*.

D. The Ideological Exclusion Provision Is Unconstitutionally Vague

In addition to failing to pass Constitutional muster as a content-based regulation of speech, the ideological exclusion provision is also unconstitutionally vague. As the Supreme Court has long recognized in the context of facial challenges to statutes impacting First Amendment interests:

> precision of regulation must be the touchstone in an area so closely touching our most precious freedoms ... for standards of permissible statutory vagueness are strict in the area of free expression. ... Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.

*Keyishian v. Bd. of Regents*, 385 U.S. 589, 603-04 (1967) (internal quotations omitted); *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) ("The vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect on free speech"); *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (recognizing that "where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked.") (citations omitted).

The terms "endorse," "espouse," and "persuade" are not defined within the Immigration and Naturalization Act. It is impossible to determine the level of discourse in which a foreign scholar or other alien can safely engage before being excluded for endorsing or espousing terrorism. As the Supreme Court recognized in evaluating the "vague contours" of the Communications Decency Act in *Reno*, a statute's burden on protected speech "cannot be justified if it could be avoided by a more carefully drafted statute." *Reno*, 521 U.S. at 874. In its current form, the ideological exclusion provision burdens an immense quantity of protected speech. Moreover, it has the effect of burdening precisely the speech that may be most valuable – not speech that agrees with the government's views, but speech that may be in fundamental disagreement with our nation's foreign policies. U.S. organizations like *amici* are thus compressed in their ability to invite those whose views may be controversial, as any such invitations are likely to be met with lengthy, unexplained delays and denials, as happened to those who invited Tariq Ramadan. A provision producing such delay, confusion, and consequent inhibition on even inviting such speakers is clearly not the type of "carefully drafted statute" that passes vagueness muster in an areas so closely touching on First Amendment freedom.

13

## II.

### HISTORY REFLECTS THE GOVERNMENT'S TENDENCY TO EXCLUDE SPEAKERS ON IDEOLOGICAL GROUNDS ANTITHETICAL TO THE FIRST AMENDMENT

Holmes' dictum that a page of history is worth a volume of logic is particularly apt in assessing whether the ideological exclusion provision violates the First Amendment, because that history makes plain that if the Executive can use an individual's beliefs or associations to justify barring or attempting to bar his or her entry into the United States it will do so, not to protect the nation but because exclusion is a cheap currency that can be used to curry favor with domestic constituencies.

Under Cold War legislation meant to protect Americans from, *inter alia*, the subversive influence of those associated with the Communist party or others alleged to advocate communist, anarchist, or totalitarian doctrines, the government justified seeking the exclusion of political figures including Pierre Trudeau, the former Prime Minister of Canada who was barred from the United States in 1952 after attending an economic conference in Moscow; Nino Pasti, the former NATO Deputy Supreme Commander and Italian senator who was denied a visa in 1983, ostensibly because of his membership in the World Peace Council, but quite evidently because he had been active in leading European opposition to the Reagan administration's policies regarding nuclear weapons; and Hortensia Allende, the widow of the slain Chilean President, denied a visa in 1983 because of her expected criticism of U.S. Latin American policy.[11]

Prominent literary icons have fared no better, as the government has sought to use ideological exclusions to bar the entry of Columbia novelist and Nobel Laureate Gabriel Garcia Marquez; Chilean poet and Nobel Laureate Pablo Neruda and numerous other acclaimed writers

---

[11] *See* Steven R. Shapiro, *Ideological Exclusions: Closing the Border to Political Dissidents*, 100 Harv. L. Rev. 930, 930 (1987). A history of these and other ideological exclusions are available at the ACLU's website at http://www.aclu.org/SafeandFree/details/mccarran.html.

including British novelist Doris Lessing; Swedish author Jan Myrdal and Italian playwright and Nobel Laureate Dario Fo.[12]  Such provisions have also been relied upon in denying visas to aliens including Cuban scholar Carlos Alzugaray Treto and philosophers Florentino Cruz Miranda and Arnaldo Silva Leon.[13]

At times, generally after exclusions on the grounds of speech have become embarrassing, the government has retreated, and made plain that the power to exclude on grounds of speech is in fact unnecessary to protect the nation.  Thus, with the United State's signing of the Helsinki Human Rights Accords ("the Accords") in 1975,[14]  Congress was forced to acknowledge that continued enforcement of the ideological exclusion provisions of the INA would make compliance with the Accords nearly impossible, as the United States had committed itself to furthering a "reduction in barriers to the free movement of people and ideas."[15]  Congress thus passed the "McGovern Amendment" in 1977, which amended portions of the INA in an effort to make it easier for "any alien who is excludible from the United States by reason of membership in or affiliation with a proscribed organization but who is otherwise admissible to the United States" to obtain a nonimmigrant visa.[16]

---

[12] *See id.*; *see also* Larry McMurtry, Testimony before the Subcommittee on Courts, Intellectual Property, and Administrative Justice of the House Judiciary Committee (May 3, 1989), *available at* http://www.pen.org/viewmedia.php/prmMID/41/prmID/341.

[13] *See* John A. Scanlan, *Symposium on Academic Freedom: Aliens in the Marketplace of Ideas: The Government, the Academy and the McCarran-Walter Act*, 66 Tex. L. Rev. 1481, 1496 n. 67 (1988); Academic Freedom and National Security in a Time of Crisis, Report of the AAUP Special Committee on Academic Freedom and National Security in a Time of Crisis (October 2003), *available at* http://www.aaup.org/AAUP/About/committees/committee+repts/crisistime.htm.

[14] *See* Conference on Security and Cooperation in Europe: Final Act, Aug. 1, 1975, Dep't of State Pub. No. 8826 (Gen. For. Pol. Ser. 298), *reprinted in* 14 I.L.M. 1292, 1313-14 (1975).

[15] *See* S. Rep. No. 95-194, 1st Sess. 13 (1977),*as reprinted in* 1977 U.S.C.C.A.N. 1625, 1635; H.R. Rep. No. 95-537, 1st Sess. 31-32 (1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 1658, 1661-62.

[16] Foreign Relations Authorization Act, Fiscal Year 1978, Pub. L. No. 95-105, sec. 112, § 21, 91 Stat. 844, 848 (1977) (codified as amended at 22 U.S.C. § 2691(1988)).  Specifically, the McGovern Amendment amended the waiver provision for exclusions based upon membership in, or affiliation with a "subversive"

Similarly, after the Reagan administration's overreaching exclusions, the law was again amended in 1987, accompanied by the recognition that in order

> to make it clear that the United States is not fearful of foreign ideas or criticism or the individuals who espouse such ideas or advance such criticism, a thorough reform of the grounds for exclusion and deportation is necessary and long overdue.[17]

The resulting passage of the Moynihan-Frank Amendment proscribed denial of a visa to any alien "because of any past, current, or expected beliefs, statements, or associations which, if engaged in by a United States citizen in the United States, would be protected under the Constitution of the United States," subject to certain limited exceptions.[18]  Such amendment was necessary, the government recognized, to address the fact that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs."[19]  Notably, in support of its call for further reform of the immigration law, the government itself highlighted the exclusion of individuals including Gabriel Garcia Marquez, Pablo Neruda, and Doris Lessing.[20]

The third sweeping change to ideological exclusion provisions in immigration law came with the passage of the Immigration Act of 1990,[21] which amended the INA to eliminate many of the remaining provisions used to exclude aliens on ideological grounds, and further permanently

---

organization by requiring that the Secretary of State should recommend to the Attorney General that a waiver be granted unless the Secretary of State had determined that admission of the subject alien would result in danger to the security interests of the United States.

[17] House Conf. Rep. No. 100-475, 100th Cong., 1st Sess. (Dec. 14, 1987) *reprinted in* 133 Cong. Rec. H2424 (1987).

[18] Foreign Relations Authorization Act, Pub. L. No. 100-204, § 901, 101 Stat. 1331, 1400 (1987), amended by Foreign Relations Authorization Act, Fiscal Years 1990 and 1991, H.R. Conf. Rep. No. 343, 101st Cong., 1st Sess. § 128(b) (1989).  The Act originally contained a termination provision which would have caused it to apply only to nonimmigrant visas applied for in 1988, as well as applications for admissions based on such visas through March 1, 1989.  The Act was later extended by Congress for an additional two years. *See* Act of Oct. 1, 1988, Pub. L. No. 100-461, 102 Stat. 2268.

[19] S. Rep. No. 100-75, 100th Cong., 1st Sess. (June 18, 1987) *reprinted in* 133 Cong. Rec. S2326 (1987).
[20] *Id.*

[21] Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 (1990).

incorporated the language of the Moynihan-Frank Amendment that precluded the exclusion of aliens on the basis of beliefs, statements, or associations "unless the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest."[22]

Although nothing about the 9/11 attacks was attributed to the admission of persons who would have been excluded under the Moynihan-Frank Amendment, in the wake of 9/11 the Administration sought, and Congress granted, new authority to deny even short-term visas to prominent persons on the grounds of speech and belief. As history repeats itself, the government is once again targeting those individuals whose speech or beliefs are deemed unpopular by the Administration. Shortly after 9/11, the government excluded prominent members of the African National Congress (although in 2003 the Administration informed Nelson Mandela and two associates that their exclusion would be eliminated for a ten-year period).[23] Professor Carlos Alzugaray Treto, a Cuban scholar and the first Cuban ambassador to the European Union, was denied a visa to speak at the Latin American Studies Association's International Congress in 2003. After submitting his visa application, he interviewed with the U.S. Interests Section in Havana, where he was asked the titles of his lectures and whether he had been a signatory on a letter condemning the U.S. war in Afghanistan.[24]

In a case that garnered significant media attention last year, the government initially relied upon the ideological exclusion provision of the Patriot Act to bar Swiss national and world-

---

[22] If such a determination by the Secretary of State is made, the Act necessitates that he or she must notify on a timely basis the chairmen of the Committees on the Judiciary and Foreign Affairs of the House of Representatives and of the Committees on the Judiciary and Foreign Relations of the Senate of the identities of the aliens and basis of the determination that they should be excluded.

[23] Information on the exclusion of members of the African National Congress is available through the ACLU's website at http://www.aclu.org/safefree/general/26213res20060724.html.

[24] See Academic Freedom and National Security in a Time of Crisis, supra note 13.

renowned scholar Tariq Ramadan from entering the United States to accept a tenured position with the University of Notre Dame.  Ramadan, who had been a frequent guest and lecturer in the United States in the past, was informed his visa had been revoked a mere nine days before he and his family were preparing to move to the United States, with the government – in a press conference – citing the ideological exclusion provision as the grounds for the revocation.[25]

Other foreign scholars seeking to enter the United States for academic purposes have been excluded under similar circumstances.  In 2005, Dr. Waskar Ari of Bolivia, a scholar of the Aymara indigenous community, was hired to teach at the University of Nebraska-Lincoln.  Previously, Ari had held a student visa, earned a Ph.D. in history from Georgetown University and had been employed as a visiting assistant professor with Western Michigan University.  While the University of Nebraska-Lincoln properly submitted a visa application on Ari's behalf, it was informed that the application had been referred to the Department of Homeland Security, and that extensive "security checks" would have to be conducted before Ari could be allowed to enter the United States.  As support for Ari's plight and calls for his admittance have spread throughout the academic community, he has still been denied entry.[26]

In January 2005, Dora Maria Tellez, a historian and professor who had made multiple visits to the United States similarly had her visa denied before she was to begin a teaching position at Harvard University, presumably stemming from Tellez's role in the Nicaraguan revolution in the

---

[25] In the face of a challenge to Professor Ramadan's exclusion by the ACLU, the government renounced its reliance on the ideological exclusion provision and is now using a separate provision of the Patriot Act to exclude Ramadan on allegations he provided material support to foreign terrorists through his donations to organizations that provide humanitarian aid to Palestinians.  The government's reliance on the material support provision is still likely pretextual, however, in that Professor Ramadan is being barred from the United States not because he is a threat to national security, but because his ideas are disfavored by the United States government.

[26] A summary of Ari's case along with numerous letters written in support of his admittance to the United States is maintained by the University of Nebraska-Lincoln at http://www.unl.edu/history/news_events/ari/ari.html.

late 1970s.  Although Tellez had gone on to become a Parliamentary leader and Minister of Health in Nicaragua in the 1980s, she is still barred from speaking about her experiences in the United States.[27]

In June 2006, Yoannis Milios, a professor at the National Technical University of Athens, was scheduled to give a presentation at the State University of New York at Stony Brook.  Instead of giving such presentation, however, Milios was interrogated for hours by immigration officials at the airport concerning Communist fiscal policy before being sent back to Athens. Basque historian, published and writer Inaki Egana was likewise detained by police when attempting to enter the country at a New York airport to conduct research on Basques in the United States.  After being detained by police for 24 hours and questioned about Mario Salegi, a Basque political activist and writer whom Egana intended to study, Egana and his young children were forced to return home.[28] As recently as October 2006, Kamal Helbway, an 80-year-old high-profile figure in Britain's Muslim community and founder of the Muslim Association of Britain was removed from a flight at London's Heathrow Airport while en route to the United States for an academic conference by invitation of New York University Law School.  While the government did not provide an immediate explanation for preventing Helbway from entering the United States, Helbway told the media that he was questioned about his background, connections to the Muslim Brotherhood and reasons for traveling to the United States after being removed from the plane.[29]

While the individuals detailed above share a common interest in their impassioned pursuit of academic discourse, what they do not share is equally clear: the government never publicly

---

[27] Tellez's story was highlighted by National Public Radio in March 2005. The broadcast is available at: http://www.npr.org/templates/story/story.php?storyId=4554643&sc=emaf.

[28] Information on these and other exclusions discussed above have been compiled by the ACLU and are available through the ACLU's website at http://www.aclu.org/safefree/general/26132prs20060712.html.

[29] *See* Michael Isikoff & Mark Hosenball, *Terror Watch: Muslim Leader Barred From U.S.*, Newsweek (October 18, 2006), *available at* http://www.msnbc.msn.com/id/15320752/site/newsweek/.

suggested, and there was no reason in the public record to believe, that those individuals endorsed or espoused terrorist activities or encouraged others to do the same.  Indeed, the public record is actually replete with examples of such foreign scholars denouncing the spread of terrorism while encouraging a greater understanding and appreciation of other countries, cultures and religion through knowledge and intellectual discourse.  Under the challenged provision, Americans have been and will continued to be deprived from gaining knowledge from such individuals through face-to-face discussion and debate in the United States.

Further, as the *amici* well know, alternative methods of enabling face-to-face dialogue amongst Americans and foreign scholars who may be banned from the United States, such as by holding events outside the United States to avoid potential visa restrictions under the ideological exclusion provision, have been plagued by multifarious hurdles.  In attempting to arrange meetings involving foreign scholars in non- U.S. venues, *amici* are now faced with the risk that U.S.-based foreign members of *amici* organizations holding temporary or single-entry visas may be prevented from re-entering the country after traveling to attend meetings, conferences or other events outside the United States.[30]  Scholarly events that result in the exclusion of such *amici* members – in addition to the prohibitive costs and expenditure of time and resources that such events will necessarily entail – show that such options are ultimately nonviable alternatives to holding such exchanges within the United States.

---

[30] A recent example of such an exclusion can be found in the case of Mohammad Ramadan Hassan Salama, an Egyptian-born assistant professor of Arabic at San Francisco State University who had lived and worked in the United States for seven years prior to his visa being cancelled during a two-day trip to Canada in June 2006.  Professor  Salama was informed that  he would not be allowed to return to the country until a "security clearance" was granted by the State Department and ultimately was barred from returning to the United States – and his teaching position – for almost three months.  Again, there were no allegations that Professor Salama was involved in or in any way endorsed any type of terrorist activity. *See* Ian Thomas & Jason Shuffler, *Professor Returns to Class After Long Visa Ordeal*, The Golden Gate [X]Press (San Francisco State University) (Sept. 20, 2006) *available at* http://xpress.sfsu.edu/archives/news/006906.html.

Exclusions on ideological grounds are not restricted to the academic community. In June 2006, over 70 South Korean activists planning to visit the United States to protest at the free trade negotiations in Washington, D.C. were denied visas, presumably due to national security concerns. The rapper "M.I.A.," a London-based artist who was planning on collaborating with American producers on an upcoming album was also denied a visa in 2006, allegedly stemming from the political content of her song lyrics concerning the Tamil Tigers and Palestinian Liberation Organization.[31]

Examples from an article published in a well-respected international media outlet further serve to illustrate the borderline absurd results ideological exclusions have brought about.[32] While the article recognizes that the government is justified in seeking to bar those individuals who "pose an immediate threat to national security," it details exclusions such that of John Clarke, an organizer for the Ontario Coalition Against Poverty, who was detained at the Canadian border and asked whether he was opposed to the "ideology of the United States." After his car was searched and he was made to undergo an interrogation during which he was questioned about, among other things, the whereabouts of Osama bin Laden, Clarke was denied entry to the United States and sent back to Canada. The article further details the exclusion of Professor Ramadan himself, noting that the teaching position that he has been forced to decline was with "that hotbed of Muslim extremism, the University of Notre Dame in Indiana." While the ironic tone of the article reflects the irrationality of some of the exclusions the government has justified over the years, the issues it highlights are chillingly serious. Without immediate action taken to curb the government's ability

---

[31] *See supra* note 28.

[32] *See* Tim Dowling, *Real Lives: They Shall Not Pass: The Homeland Security Hall of Fame*, The Guardian 6 (March 23, 2005).

to bar entry of nonimmigrant aliens under the Patriot Act, the list of individuals facing meritless exclusion will only continue to grow.

Although the government once embraced the sweeping provisions of Cold War legislation that allowed for exclusion on the basis of an individual's beliefs, speech, or associations, it has since realized that reform of such laws was necessary to ensure commitment to the principle that both people and ideas should be allowed to move freely across America's borders.  It is now time, once again, to concede that the current body of immigration law – specifically the Patriot Act's ideological exclusion provision – is fostering the exclusion of individuals whose ability to interact with Americans should in fact be welcomed and encouraged.  In order to avoid repeating the mistakes of our nation's past, the ideological exclusion must be seen as what it is – a content-based restriction on speech that is both unconstitutional on its face and capable of immeasurable harm to vital discourse and debate in its application.  A provision so antithetical to the First Amendment freedoms our government has been charged with protecting must not be allowed to stand.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment should be granted.

Respectfully submitted,

Dated:        New York, New York
              March 2, 2007

_____
Charles S. Sims
Jennifer A. O'Brien
PROSKAUER ROSE LLP
1585 Broadway
New York, NY  10036-8299
Phone: (212) 969-3000
*Attorneys for Amici Curiae*

22