UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

AMERICAN ACADEMY OF RELIGION,  :
AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, PEN      :
AMERICAN CENTER, and TARIQ
RAMADAN,                        :

              Plaintiffs,       :        06 CV 588 (PAC)

        -against-           :

                                 <u>OPINION AND ORDER</u>

MICHAEL CHERTOFF, in his official  :
Capacity as Secretary of the Department
of Homeland Security; CONDOLEEZA :
RICE, in her official capacity as Secretary
of State,                       :

              Defendants.       :

-------------------------------------------------------X

     HONORABLE PAUL A. CROTTY, United States District Judge:

     In its opinion and order of June 23, 2006, the Court ordered Defendants

Michael Chertoff and Condoleeza Rice, in their capacities as Secretary of the Department

of Homeland Security and Secretary of State, respectively, (collectively "the

Government"), to issue a final decision on Tariq Ramadan's pending non-immigrant visa

application within 90 days of the date of the order.  On September 19, 2006, the

Government officially denied the visa and gave its reason:  Professor Ramadan had

contributed money to an organization which provided material support to Hamas, a

terrorist group.  Defendants assert that such contributions were made in violation of the

Immigration and Nationality Act ("INA") § 212(a)(3)(B), codified at 8 U.S.C.

§1182(a)(3)(B)(iv)(VI), thus rendering Ramadan inadmissible for providing material support to a terrorist organization.

After considering the matter for five months, Plaintiffs amended their complaint and on February 23, 2007, the American Academy of Religion, the American Association of University Professors, the PEN American Center, and Tariq Ramadan, (collectively "Plaintiffs"), moved for summary judgment on dual grounds: (1) that their First Amendment rights have been, and continue to be, violated by the Government's actions in the ongoing exclusion of Ramadan, and (2) that the section of the USA PATRIOT ACT ("Patriot Act") which provides a basis for excluding any alien from the United States who "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization" is unconstitutional.[1] 8 U.S.C. § 1182(a)(3)(B)(i)(VII). The Government responded and cross moved for summary judgment on May 21, 2007 on the grounds that it is entitled to exclude Ramadan from the United States as a matter of law under Congress' plenary power to control immigration policy and the delegation of that broad authority to the Executive. The matter was argued before the Court on October 25, 2007. For the reasons discussed below, Defendants' motion is granted and Plaintiffs' motion is denied.[2]

---

[1] Plaintiffs make this argument about the constitutionality of the "endorse and espouse" provision despite the fact that the "material support" provision, and not the "endorse and espouse" provision, is the basis cited by the Government for Ramadan's exclusion.

[2] Related case ACLU et al. v. U.S. Dep't of State et al., No. 05 Civ. 9509 (PAC), seeking information from several federal agencies under the Freedom of Information Act, was dismissed on Jan. 22, 2007 by stipulation of the parties.

**SUMMARY OF FACTS**

**Background and Brief Summary of Prior Argument**

The facts were fully set forth in the Court's June 23, 2006 opinion. <u>Am. Acad. of Religion v. Chertoff</u>, 463 F. Supp. 2d 400, 403-09 (S.D.N.Y. 2006). They are briefly summarized here and supplemented by the pertinent facts which occurred or came to light after the Court's decision.

Tariq Ramadan is a well-known and respected Muslim scholar who accepted an offer to become a tenured professor at the University of Notre Dame ("Notre Dame") in January 2004. Upon Ramadan's acceptance, Notre Dame submitted an H-1B visa petition on his behalf, which was approved by the United States Department of State (the "State Department") on May 5, 2004.[3]

On July 28, 2004, however, one week before Professor Ramadan's scheduled move from Switzerland to Notre Dame, Indiana, the United States Embassy in Bern, Switzerland revoked his visa. Consular officials did not provide an explanation for the revocation, but a spokesman for the Immigration and Customs Enforcement Division of the Department of Homeland Security ("DHS") stated to the media that the basis of the revocation was a provision of the Patriot Act permitting the United States to exclude any person who used a "position of prominence within any country to endorse or espouse terrorist activity." <u>Muslim Scheduled to Teach at Notre Dame Has Visa Revoked</u>, L.A. Times, Aug. 25, 2004, at A23.

---

[3] An H-1B visa is a temporary work visa for college-educated professionals which allows the visa holder to stay in the country for a minimum of three and maximum of six years. According to the State Department, the H-1B visa requires the holder to possess the equivalent of bachelor's degree and "applies to persons in a specialty occupation which requires the theoretical and practical application of a body of highly specialized knowledge requiring completion of a specific course of higher education." <u>See</u> Temporary Workers, U.S. Dep't of State, at http://travel.state.gov/visa/temp/types/types_1271.html.

Notwithstanding the revocation, United States officials informed Professor Ramadan that he could re-apply for a visa. Accordingly, Notre Dame submitted another visa application on his behalf on October 4, 2004. After Notre Dame learned that no decision would be made on the application in the near future, and with the fall semester nearly over, Professor Ramadan resigned his teaching position at Notre Dame on December 13, 2004. DHS, which was monitoring the situation, learned of the resignation and almost immediately thereafter, on December 21, 2004, revoked the renewed H-1B visa petition.

Prior to the initial revocation of his H-1B visa application in July 2004, Professor Ramadan frequently traveled to and lectured in the United States. As a Swiss citizen, Ramadan enjoyed the advantages of Switzerland's participation in a visa waiver program.[4] Since the revocation, however, he is ineligible for the visa waiver program and must apply for a visa for each visit. If the visa is not granted, he cannot attend the various scholarly events to which he has been invited.

On September 16, 2005, Ramadan applied for a B visa, a nonimmigrant visa which would allow him to enter the United States for short periods of time to attend academic events.[5] As part of his B visa application, Ramadan appeared for two interviews. Decl. of Aaron I. Martz ¶ 3 ("Martz Decl."). The first was held in September 2005. The second was conducted with officials from DHS at the United States Embassy

_____

[4] The United States Department of State has a visa waiver program whereby eligible citizens of certain countries, including Switzerland, are permitted to enter the United States for up to 90 days without first having to apply for a visa. See 8 U.S.C. § 1187; see also Visa Waiver Program, U.S. Dep't of State, at http://travel.state.gov/visa/temp/without/without_1990.html#countries (providing an overview of the visa waiver program and explaining procedural and eligibility requirements).

[5] A B visa is a nonimmigrant visitor visa for "persons desiring to enter the United States temporarily for business." See Visitor Visas—Business and Pleasure, U.S. Dep't of State, at http://travel.state.gov/visa/temp/types/types_1262.html. If the purpose of planned travel is "to consult with business associates, [or] travel for a scientific, educational, professional or business convention, or conference on specific dates," a B visa is appropriate. Id.

in Bern on December 20, 2005. Id.  During the interview process, Ramadan revealed that between 1998 and 2002 he made donations to the Association de Secours Palestinien ("ASP"), totaling 1670 Swiss francs (approximately $1336.00 dollars). Second Decl. of Tariq Ramadan ¶ 14.[6]  On August 21, 2003, a year after the last donation was made and two years prior to the visa interview, the U.S. Department of the Treasury listed the ASP as an entity which supports terrorism by providing funding to Hamas, and designated ASP a "Specially Designated Global Terrorist."[7]

No decision was made on Ramadan's September, 2005 B visa application,[8] and on January 25, 2006, Plaintiffs filed this lawsuit challenging Professor Ramadan's ongoing exclusion from the United States.  After another two months passed, on March 15, 2006, with still no decision made on Ramadan's pending application, Plaintiffs filed a

[6] During his visa interview on December 20, 2005, Ramadan also stated that he made donations to the Comité de Bienfaisance de Secours aux Palestiniens ("CBSP") between 1998 and 2002. Pl. Br. 34. Plaintiffs assert that Ramadan later realized he had not, in fact, made any donations to CBSP, and was mistaken in saying that he had during his interview.  Plaintiffs submit that the only donations at issue are the donations admittedly made to the ASP.  Defendants argue that Ramadan's "after-the-fact disavowal" of his CBSP contributions has no bearing on the legitimacy of the Government's reason for denying his visa, and, in any event, that the ASP donations, standing alone, are an adequate basis for the Court to conduct its analysis.  We agree with Defendants, and the Court's analysis is based solely on Ramadan's admitted contributions to ASP.

[7] Pursuant to the 1977 International Emergency Economic Powers Act ("IEEPA"), the President has the power to declare a national emergency to deal with unusual and extraordinary threats, and may designate specific groups and individuals as particular threats and freeze their assets. IEEPA, Title II, Pub.L. 95-223, 91 Stat. 1626 et seq., codified at 50 U.S.C. § 1701 et seq.  In the wake of the attacks of September 11, 2001, President Bush exercised his IEEPA powers, declared a national emergency, and issued Executive Order 13224 prohibiting contributions to hundreds of "Specially Designated Global Terrorists" (SDGTs). Regulations implementing this order, the "Global Terrorism Sanctions Regulations," 31 C.F.R. § 594, were created by the Department of the Treasury in 2003.  These Treasury regulations define SDGTs as "any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224." 31 C.F.R. § 594.310; see also 31 C.F.R. § 594.308 (defining a "person" as an "individual or entity").  The SDGT list is maintained by the Office of Foreign Assets Control, Department of the Treasury, and the ASP was named an SDGT by order dated August 21, 2003. See http://www.treas.gov/offices/enforcement/ofac/.  A copy of the latest version of the SDGT list, which includes the ASP, is available at: http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf.

[8] According to the State Department, the typical wait time for a nonimmigrant visa to be processed is two days; those visa applications requiring special clearances or administrative processes are typically resolved within 30 days of application. See Visa Wait Times, U.S. Dep't of State, at http://travel.state.gov/visa/temp/wait/tempvisitors_wait.php.  By January 25, 2006, over four months had passed since Professor Ramadan's application and over 30 days had passed since his interview.  This suggests that Professor Ramadan's case was unusual; at the very least, it was not treated as a "typical" case.

motion for a preliminary injunction which the Court partially granted in its order of June 23, 2006. The Court ordered Defendants to issue a formal decision on Ramadan's pending B visa application within ninety days. Am. Acad. of Religion v. Chertoff, 463 F. Supp. 2d 400 (S.D.N.Y. 2006).

On September 19, 2006, Aaron Martz, a consular officer working at the United States Embassy in Bern, Switzerland, denied Ramadan's visa application on the grounds that Ramadan provided material support to a terrorist organization under 8 U.S.C. §§ 1182(a)(3)(B)(iv)(VI). In his affidavit of July 13, 2007, Mr. Martz recites that he had requested and received a Security Advisory Opinion ("SAO")—a report which contains "input from other interested U.S. Government agencies that may have information that is not otherwise available"—concerning Mr. Ramadan. Martz Decl. ¶ 2. Mr. Martz received the SAO, the information supplied by Mr. Ramadan in his interviews in September and December 2005, and "additional information provided by Washington." Martz Decl. ¶ 3. Based on this information, Mr. Martz determined that Ramadan was inadmissible on the basis of 8 U.S.C. § 1182(a)(3)(B)(iv)(VI), permitting exclusion of an alien who provides material support to a terrorist organization. Martz Decl. ¶ 3. With respect to the "knowledge" requirement in the cited statute, Mr. Martz found that "Mr. Ramadan knew, or reasonably should have known, that providing funds directly to a group would afford 'material support' to that group," and "Mr. Ramadan did not, and could not, demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that ASP and CBSP raised money for Hamas." Martz Decl. ¶¶ 3(a) & (b).

On September 19, 2006 Ramadan was notified of the decision by telephone and by letter from John O. Kinder, a consular official in Bern.  The letter stated in full:

> Dear Mr. Ramadan,
>
> Your application for a B1/B2 non-immigrant visa has been refused.  You have been found inadmissible to the United States for engaging in terrorist activity by providing material support to a terrorist organization.  Please see sections 212(a)(3)(B)(i)(I) and 212(a)(3)(B)(iv)(VI) of the Immigration and Nationality Act (INA) (attached).
>
> The basis for this determination includes the fact that during your two interviews with consular officials, you stated that you had made donations to the Comité de Bienfaisance et de Secours aux Palestiniens and the Association de Secours Palestinien.  Donations to these organizations, which you knew, or reasonably should have known, provided funds to Hamas, a designated Foreign Terrorist Organization, made you inadmissible under INA § 212(a)(3)(B)(i)(I).
>
> Under U.S. law, this ineligibility is permanent and you will be unable to enter the United States in the near future unless the ineligibility is waived in accordance with INA Sec. 212(d)(3).
>
> Yours sincerely,
>
> (original signature)
> John O. Kinder
> Consul
> US Embassy Bern

Letter from John O. Kinder to Dr. Tariq Ramadan, Sep. 19, 2006, Pl. Ex. E.

Five months later, on February 2, 2007, Plaintiffs amended their complaint which then challenged the denial of Ramadan's visa on the grounds that the Government's proffered reason for denying the visa was not "facially legitimate and bona fide" as required by case law,[9] and asserted that the "endorse or espouse" provision of the Patriot Act was unconstitutional under both the First and Fifth Amendments.

---

[9] See discussion of Kliendienst v. Mandel, 408 U.S. 753 (1972), and the "facially legitimate and bona fide" standard, infra Part V.

**DISCUSSION**

**I. Summary Judgment Standard**

Summary judgment is appropriate if the pleadings demonstrate "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party initially bears the burden of demonstrating that no genuine issues of material fact remain. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial" in order to survive the summary judgment motion, otherwise the case may be resolved as a matter of law. Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**II. The Relevant Statutes**

The controlling statute is the Immigration and Nationality Act, as modified by the Patriot Act in 2001, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001), and the REAL ID Act in 2005, Pub. L. 109-13, 119 Stat. 231 (May 11, 2005). The relevant provision of the statute, 8 U.S.C. §1182(a)(3)(B)(i)(I), bars from the United States any alien who has "engaged in terrorist activity." "Engaging in terrorist activity" is further defined as, inter alia, "commit[ting] an act that the actor knows, or reasonably should know, affords material support, including . . . funds, transfer of funds or other material financial benefit" to individuals or organizations engaged in terrorist activities, "unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. §1182(a)(3)(B)(iv)(VI).

The statutory language challenged here is the current language of an immigration law that has been modified multiple times since its inception. The revisions relevant to this case have already been mentioned: the Patriot Act, which went into effect on October 26, 2001 and added the "material support" provision as a ground for the exclusion of aliens, and the REAL ID Act, which was enacted in May 2005 and further modified the "material support" provision by adding the "clear and convincing" language to the knowledge requirement, thus raising the burden of proof required for an alien to overcome a decision of inadmissibility.

The effective date of the REAL ID Act, delineated in subsection 103(d), provides:

> (d) EFFECTIVE DATE—The amendments made by this section shall take effect on the date of the enactment of this division, and these amendments, and section 212(a)(3)(B) of the Immigration and Nationality Act (8 U.S.C. §1182(a)(3)(B)), as amended by this section, shall apply to . . . acts and conditions constituting a ground for inadmissibility, excludability, deportation, or removal occurring or existing <u>before, on, or after such date</u>.

REAL ID Act §103(d), Pub L. 109-13, 119 Stat. 231 (May 11, 2005) (emphasis added).

Also in dispute is the "endorse and espouse" provision of the Patriot Act, which Plaintiffs refer to as the "ideological exclusion" provision. The "endorse and espouse" provision is codified at 8 U.S.C. §1182(a)(3)(B)(i)(VII) and states that "[a]ny alien who . . . endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization . . . is inadmissible." The Plaintiffs challenge the constitutionality of this provision even though the provision was not used to deny Ramadan's visa application. It is true that in August 2004 a DHS spokesperson mentioned the provision as the basis for the revocation of the original H-1B visa. L.A. Times, <u>supra</u>, at A23. Nonetheless, the Government has since disavowed the

statement;[10] in addition, numerous other events, including the Plaintiffs' motion for

preliminary injunction, the definitive denial of Ramadan's visa, and the Government's

submission of a separate statutory basis for his exclusion, have occurred in the interim.

The "endorse and espouse provision," therefore, no longer operates as the basis for

Ramadan's denial and is challenged on other grounds.

## III.  Concessions

A number of points are not disputed.  First, Professor Ramadan has no standing—

indeed he has no rights whatsoever—to challenge the consular decision denying his

visa.[11]  This view is supported by scholarly commentary and by case law. See Michael

James Burt, Recent Decision of the United States Court of Appeals for the District of

Columbia Circuit:  Immigration Law, 69 Geo. Wash. L. Rev. 679, 685 (2001) ("Under no

circumstances can a foreign national challenge a consular decision to deny or revoke

his visa in federal court."); Saavedra Bruno v. Albright, 197 F. 3d 1153, 1164 ("With

respect to purely statutory claims, courts have made no distinctions between aliens

seeking review of adverse consular decisions and the United States citizens sponsoring

---

[10] In its earlier submissions, the Government stated that "Mr. Ramadan has never had a visa revoked, a visa application denied, or any other adverse action taken against him pursuant to [the 'endorse and espouse' provision].  Accordingly, any statement to the contrary that may have appeared in the media or may have been made by any Government spokesperson was erroneous." Government's Opposition to Plaintiffs' Motion for Preliminary Injunction at 7-8, Mar. 31, 2006 (citation omitted).

[11] See Transcript of Oral Argument, Oct. 25, 2007 (hereinafter "Tr. of Oral Arg."):
>    The Court: "Absent the First Amendment rights of the Plaintiffs that you represent, am I correct that Professor Ramadan would have no standing here to challenge the determination, the consular determination that he is not admissible?  . . . ."
>    Mr. Jaffer [Plaintiffs' counsel]: "I think that in that kind of situation, the foreign national would have real problems with the doctrine of consular nonreviewability . . . "
>    The Court: "Can you say there is any case . . . where a foreign national has been allowed to challenge a consular determination?"
>    Mr. Jaffer: "I cannot."
>    The Court: "So it would suggest to me that this consular's decision, considering that it is only Professor Ramadan's personal interest, would be nonreviewable."
>    Mr. Jaffer: "Your Honor, I think there is a real argument to that effect."
Tr. of Oral Arg. at 5-7.

their admission; neither is entitled to judicial review."). Second, while Plaintiffs assert a First Amendment claim, their claim challenging the visa denial gives rise to only limited First Amendment review. Tr. of Oral Arg. at 56; <u>Kleindienst v. Mandel</u>, 408 U.S. 753 (1972). Finally, with respect to their constitutional challenge to the endorse and espouse provision, Plaintiffs admit that they cannot name a single alien they have invited to the country who has been excluded under that provision.[12]

## IV. The Doctrine of Consular Non-Reviewability

It is well-settled that the decision of a consular official to grant or deny a visa is nonreviewable by courts, absent a Constitutional challenge by a United States citizen.[13] This principle, now firmly rooted in our jurisprudence, has come to be known as the "doctrine of consular nonreviewability." The doctrine of consular nonreviewability provides that when a consular officer decides to negatively exercise the visa authority granted to the Executive by Congress, a court has no jurisdiction to review the exercise of that authority. In other words, the decision of a consular official to deny a visa is final and is not reviewable. It is not entirely clear why this is so—but it is.[14] It has been

---

[12] Tr. of Oral Arg., Oct. 25, 2007:
> The Court: "Who have you invited to the country . . . that has been excluded under the endorse or espouse provision? . . . ."
> Mr. Jaffer: "Your honor, we haven't invited anyone we know to have been excluded under that provision . . . . Nobody we've invited has been excluded under that provision."

Tr. of Oral Arg. at 23. In addition, on Oct. 16, 2007, Plaintiffs filed a motion for leave to file an additional declaration containing information regarding other aliens whose visas had been prudentially revoked or were awaiting decisions on pending visas. The Court admitted and considered the declaration, but the declaration did not identify any alien who had been excluded under the endorse and espouse provision.

[13] <u>See</u> <u>Hsieh v. Kiley</u>, 569 F.2d 1179, 1181 (2d Cir. 1978); <u>Rivera de Gomez v. Kissinger</u>, 534 F.2d 518, 519 (2d Cir. 1976); <u>Burrafato v. U.S. Dep't of State</u>, 523 F.2d 554, 556 (2d Cir. 1975); <u>Grullon v. Kissinger</u>, 417 F. Supp. 337, 338-40 (E.D.N.Y. 1976), <u>aff'd</u>, 559 F.2d 1203 (2d Cir. 1977); <u>Dong v. Ridge</u>, No. 02 Civ. 7178 (HB), 2005 WL 1994090, at *3 (S.D.N.Y. Aug. 18, 2005).

[14] <u>See</u> Leon Wildes, <u>Review of Visa Denials: The American Consul as 20th Century Absolute Monarch</u>, 26 San Diego L. Rev. 887, 891 (1989) ("Despite the confusion as to exactly why the [Supreme] Court ruled [that Congress had the power to exclude aliens and to assign this power to the executive branch], it is clear that Congress has plenary power to establish rules governing the admission of aliens and to exclude all those who possess whatever characteristics Congress has forbidden.").

frequently challenged in the legislature and in the courts, but all judicial and legislative proposals to limit the doctrine have been soundly rejected.

## A. A Brief History of the Visa Requirement

The requirement for an alien to obtain a visa from an American consulate did not exist until World War I when, in 1917, the Departments of State and Labor issued a joint order requiring the formality of documentation. See Joint Order of the Department of State and Department of Labor, July 26, 1917 (requiring passports and other information from aliens who desired to enter the United States during the First World War). Thereafter, in 1924, Congress delegated the responsibility for the issuance of visas from the Secretary of State to individual consular officers stationed abroad. Act of May 26, 1924, ch. 190, § 2(a), (f), 43 Stat. 153. This scheme operated generally unchanged until the passage of the Immigration and Nationality Act ("INA") of 1952, which remains the controlling statutory scheme today. 8 U.S.C. § 1104(a). The INA conferred exclusive authority to issue or deny visas upon consular officials. It stated:

> The Secretary of State shall be charged with the administration and enforcement of the provisions of this chapter and all other immigration and nationality laws relating to . . . the powers, duties, and functions of diplomatic and consular officers of the United States, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas.

Id. (emphasis added). Thus, Congress clearly identified the visa function, carved it out of the Secretary of State's purview, and committed it exclusively to consular officials.

The Supreme Court continually declined to interfere with Congress' carefully-constructed statutory scheme. "[T]he lower federal judiciary had been clearly and repeatedly informed by the Supreme Court that immigration matters were largely

committed to legislative and executive hands and were not a proper subject for judicial intervention." Wildes, <u>supra</u>, at 892. Indeed, as the Supreme Court stated,

> any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of Government. Such matters are so exclusively entrusted to the political branches of Government as to be largely immune from judicial inquiry or interference.

<u>Harisiades v. Shaughnessy</u>, 342 U.S. 580, 588-89 (1952). The Supreme Court clearly viewed immigration matters as political questions, and therefore beyond the institutional competence of Article III courts.

### B. The Origins of the Doctrine

By 1930, the doctrine of consular nonreviewability—originally conceived as a legislative and executive privilege—was incorporated into case law as a jurisdictional limit on the power of federal courts.[15]

Despite the fact that the doctrine took hold in the judiciary, no textual constitutional basis for the doctrine had been clearly identified. Early on, courts and commentators cited the Commerce Clause and the "necessary and proper" clause as justifications for its existence. Wildes, <u>supra</u>, at 891. Eventually, courts abandoned the effort to root the doctrine in the text of the Constitution and instead declined to review consular decisions citing other factors: prudential concerns, general notions of sovereignty, foreign affairs, public policy concerns, and separation of powers. <u>See id.</u> at 890-92. Over time, the separation of powers concern, coupled with the inherently political nature of immigration questions, became the primary justifications for the doctrine. <u>Id.</u> at 891. As one commentator noted, due to "the political nature of immigration decisions, the Supreme Court chose, early on, to insulate from judicial

---

[15] <u>See</u> <u>supra</u> note 13 and accompanying text.

review the immigration policies enacted by the legislature . . . .  [E]arly cases held that Congress had the power to delegate its immigration powers to the Executive branch and, in so doing, delegate much of its immunity from judicial scrutiny." Id.  Moreover, the doctrine insulated the decisions of consular officials from review even if they were based on faulty interpretations of law or fact. Romero v. Consulate of U.S., Barranquilla, Colom., 860 F. Supp. 319, 322 (E.D. Va. 1994) ("[T]he doctrine of nonreviewability of consular officers' visa determinations is essentially without exception.  Thus, even where a consular judgment rests on allegedly erroneous information, courts generally will not intervene.  Likewise, the fact that a consular officer may have erroneously interpreted and applied [the exclusion statute], or indeed, the fact that a consular officer's decision was not authorized by the [statute], does not entitle visa applicants to relief") (citations omitted).  The doctrine of consular nonreviewability, then, was an extraordinary show of deference by the Judiciary to the Executive and Legislative branches of government.

**C. Criticisms**

As the doctrine of consular nonreviewability became more established in our federal jurisprudence,[16] scholars and litigants began to criticize it, and sought ways to circumvent it.  The doctrine permitted broad unchecked authority on the part of relatively low-level administrative officials with virtually no accountability to courts or constituents.  Scholars objected and called consular officials the "absolute monarchs" of the Constitutional system. Wildes, supra, at 887.  The lack of review on consular decisions, which potentially had great impact on individual applicants and their families,

---

[16] See, e.g., Rivera de Gomez v. Kissinger, 534 F.2d 518, 519 (2d Cir. 1976) (per curiam); Castaneda-Gonzales v. INS, 564 F.2d 417, 428 n.25 (D.C. Cir. 1977);  Doan v. INS, 160 F.3d 508, 509 (8th Cir. 1998); Centeno v. Schulz, 817 F.2d 1212, 1213 (5th Cir. 1987) (per curiam); Li Hing of H.K., Inc. v. Levin, 800 F.2d 970, 970-71 (9th Cir. 1986).

was antithetical to a system based on the prevention of the aggregation of power in any one individual's hands.[17]  They petitioned courts to rethink the doctrine, and lobbied Congress to provide a statutory basis of review.  American spouses of aliens whose visas had been denied sought review of the consular decisions citing their own interests in the matter. See, e.g., Burrafato v. Dep't of State, 523 F.2d 554, 555-57 (2d Cir. 1975) (holding that a citizen's constitutional rights are not violated by the denial of an alien spouse's visa application).  All of these efforts failed.  Courts consistently refused to exercise jurisdiction over consular decisions and, although "[o]ver the years, a number of legislative proposals [were] introduced in the Congress to provide for either administrative or judicial review of visa denials.  None of these proposals [was] enacted into law." Wildes, supra, at 905.  The legislature considered, and rejected, judicial review of consular decisions to grant or refuse a visa.  Id. at 905-06.

Litigants mounted another attack from a different front claiming that the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., provided a basis for review of consular decisions.  Courts rejected this attempt to make inroads on the doctrine, as well. Saavedra, 197 F.3d 1153.  Clearly, "American consular officers, stationed abroad . . . wield unbridled power with respect to the issuance or denial of immigrant and nonimmigrant visas." Wildes, supra, at 888.  It is obvious that the doctrine of consular nonreviewability is both valid and currently vibrant.  Where an alien, standing alone, challenges the decision of a consular official to deny a visa, a court may

---

[17] See H. Comm. on the Judiciary, 82d Cong., 2d Sess. Hearing before the President's Commission on Immigration and Naturalization 1575, 1578, (Comm. Print 1952) (statement by Louis J. Jaffe and Henry M. Hart) ("it is indefeasible to give any man, acting in secret in a remote land, autocratic power to grant or withhold a privilege of such enormous value as that of entrance to this country") (quoted in Note, Judicial Review of Visa Denials:  Reexamining Consular Nonreviewability, 52 N.Y.U. L. Rev. 1137, 1137 n.1 (1977)).

not entertain the claim. It is no wonder that Plaintiffs so readily conceded that Ramadan has no individual rights in the matter. Any argument to the contrary would be vain, bordering on the frivolous.

## V. Consular Nonreviewability and the First Amendment Claim

While the doctrine of consular nonreviewability bars a court from hearing an alien's challenge to a consular decision, a court has jurisdiction over a United States citizen's constitutional claim directly related to a consular decision. Abourezk v. Reagan, 785 F.2d 1043, 1051 n.6 (D.C. Cir. 1986); Saavedra, 197 F.3d 1153, 1163. The court does not exercise jurisdiction over the consular decision denying the alien entry, which is protected by consular nonreviewability, but rather, over the citizen's constitutional claim, which is an exercise of jurisdiction squarely within the court's Article III powers. As one commentator stated, "[a] federal court can properly assert jurisdiction to review a consular decision when a U.S. citizen claims that the consular decision abridged a constitutionally protected right." Burt, supra, at 685 (emphasis added); see also Burrafato, 523 F.2d at 556 (explaining that in cases where federal courts have exercised jurisdiction over visa denial decisions, "the claim was grounded on an alleged violation of First Amendment rights of American citizens over which the federal courts clearly had jurisdiction").

At oral argument, Plaintiffs asserted that it is "well-settled that [the doctrine of consular nonreviewability] has no application where the First Amendment rights of U.S. citizens and residents are at stake." Tr. of Oral Arg. at 10-11. That overstates the

proposition by a large measure.  The doctrine of consular nonreviewability clearly has

some application—albeit more limited—in the First Amendment context. [18]

It is conceded here that Ramadan has no rights—First Amendment or otherwise—

to challenge the denial of his visa application.  The Plaintiffs' First Amendment challenge

to the consular decision, however, provides an opportunity, but a very limited one, to

examine the consular determination.  The First Amendment claim does not eclipse the

consular decision.  Rather, the Court neither declines to review the consular decision

entirely (as it would under the doctrine of consular nonreviewability), nor does the Court

conduct a full-blown First Amendment review (as it would in an ordinary First

Amendment case).  The doctrine of consular nonreviewability still compels judicial

deference to consular decisions.  But where there is a First Amendment claim, the

Supreme Court has applied a separate test.  Kleindienst v. Mandel, 408 U.S. 753 (1972).

In Mandel, the State Department denied Ernest Mandel, a Belgian academic and

editor of a Socialist newspaper, a visa to visit the United States.  Similar to Professor

Ramadan, Mandel, who had previously visited and lectured in the United States on

several occasions, had been invited to speak at various academic conferences throughout

the country.  The State Department denied his visa on the grounds that he had, on

previous visits, "engaged in activities beyond the stated purposes" of his trip.  Id. at 758.

Upon the denial of his visa, Mandel applied to the Attorney General for a waiver of the

---

[18] The Saavedra decision states, "[in Abourezk] the court found this judicial practice inapplicable to the cases before it, because they involved 'claims by United States citizens rather than by aliens . . . and statutory claims that are accompanied by constitutional ones." Saavedra, 197 F.3d at 1163 (quoting Abourezk, 785 F.2d at 1051 n.6) (emphasis added).  Plaintiffs assert that the phrase "this judicial practice" refers to the doctrine of consular nonreviewability.  But a close reading of the passage quoted along with a review of preceding sections, reveals that the phrase "this judicial practice" refers not to the doctrine of consular nonreviewability generally, but to the practice of declining to exercise jurisdiction.  Thus, the passage is more correctly understood as meaning that the practice of declining jurisdiction over visa denials is inapplicable when an American citizen has raised a constitutional claim.

visa requirement.  The Attorney General refused to grant the waiver, and Mandel, along with several university professors, sought review of the decision in federal court claiming that he was excluded on the basis of unpopular speech.[19]  There, as here, the professors argued that excluding Mandel abridged their right to "hear his views and engage him in a free and open academic exchange" under the First Amendment. Id. at 760.

A three-judge District Court granted an injunction (2-1) which prevented the Government from enforcing certain provisions of the INA which excluded aliens on the basis of their political beliefs. Mandel v. Mitchell, 325 F. Supp. 620 (E.D.N.Y. 1971). The district court held that the provisions were impermissible under the First Amendment. Id.  It applied a balancing test where it weighed the "dangers" of the expression of Mandel's views against the Plaintiffs' First Amendment right to hear those views. See id. at 628.  Since the viewpoint could not be excluded, it did not make sense to exclude its proponent—especially when the professors' right to listen (the "free spirit" of academia, as the court called it)—would be adversely impacted. Id. at 632.  Further, the District Court stated that "[i]n this case the admission of [the alien] is but a lever by which the constitutional rights of his prospective citizen audience are to be given effect; they, as the articulately concerned portion of the sovereign people, assert a very high title to support Mandel's admission." Id. at 633.  On direct appeal, the Supreme Court wholly rejected the balancing approach and said very directly that it was unwise to base First

---

[19] In light of the fact that the decision at issue in Mandel was the Attorney General's decision not to waive the visa requirement, and not the underlying consular decision to deny the visa, the Mandel decision is not regarded as involving a direct application of the consular nonreviewability doctrine.  The Supreme Court determined, however, that the reason given by the consular official was "facially legitimate and bona fide." Mandel, 408 U.S. at 769-70.  The Court never ruled directly on the reasonableness of the Attorney General's denial of the waiver.

Amendment rights on the popularity or notoriety of the speaker, or the status of the listeners. Mandel, 408 U.S. at 768.

The Supreme Court reversed the decision of the three-judge panel below and made clear that the First Amendment does not give greater weight to those who are "articulate," "well known," or "popular." Id. The Supreme Court also refused to consider the potential "size of the audience" or the "probity of the speaker's ideas." Id. Instead, the Court searched the record and found an explanation for the rejection of the visa application. Since the plaintiffs were attacking the Attorney General's discretionary power, the Court found there was a reason for the State Department's rejection: Mandel had abused his prior visa by traveling outside the bounds authorized by the visa. This was a facially legitimate and bona fide reason.

> [P]lenary congressional power to make policies and rules for exclusion of aliens has long been firmly established . . . . Congress has delegated conditional exercise of this power to the Executive. We hold that when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.

Id. at 769-70 (emphasis added). The standard is clear: when a consular official denies a visa which implicates a United States citizen's First Amendment rights, he or she must have a facially legitimate and bona fide reason for doing so.

At oral argument, Plaintiffs agreed that the Mandel standard is the applicable standard in this case, and acknowledged that, "the Government [has] a very low burden . . . and the burden is facially legitimate and bona fide. That [is] not ordinary First Amendment review. Ordinary First Amendment review would be compelling interest.

This [facially legitimate and bona fide standard] is a very low standard." Tr. of Oral Arg. at 56.

The Supreme Court recognized that the three judge District Court's decision would require courts to weigh the First Amendment rights of citizens against the Government's compelling interest to exclude aliens. It specifically rejected that test. The First Amendment does not trump consular nonreviewability based on a speaker's fame or popularity, or the demand for his presence by learned audiences. When it comes to consular decisions, the Supreme Court refused to hold that the value of academic exchanges and conferences had greater weight, for example, than the value of the presence of an average citizen's alien husband, or mother-in-law, or brother, whose sole purpose in seeking admission to the United States would be to reunite a family. In terms of the strength of the individual interest, the desire to keep a nuclear family intact should arguably be on the same footing as the "right to hear." The Court found that the difficulty of the proposed balancing test, and concerns about giving weight to the "right to hear" based on "the size of the audience or the probity of the speaker's ideas," justified leaving the alien's admissibility decision "in the hands of the Executive." Mandel, 408 U.S. at 769. Once the Executive has exercised the discretion allotted by Congress, and has provided a facially legitimate and bona fide reason for doing so, the Court's inquiry must end. The Executive's decisions cannot be overturned by courts balancing the consular decision against First Amendment values.

**VI. Analysis**

Plaintiffs argue that the denial of Professor Ramadan's visa violates their First Amendment right to meet face to face with Professor Ramadan here in the United States.

Plaintiffs do have that right, but only up to the point of insisting that the reason for Professor Ramadan's exclusion be "facially legitimate and bona fide," as required by Mandel.  Plaintiffs contend that the reason proffered by the Government for Professor Ramadan's exclusion is neither facially legitimate nor bona fide.

In contrast, the Government argues that its consul in Switzerland has provided a written explanation for denying Professor Ramadan's visa application, the consular decision is nonreviewable, and the Court has no authority to inquire further.  If the Court does review the decision, however, the Government contends that it has provided a facially legitimate and bona fide reason for excluding Professor Ramadan.

The Court does not believe that the consular decision at issue here is beyond its review.  It comes to this conclusion based on several factors.  First and foremost is the presence of the Plaintiffs' First Amendment rights.  The values and freedoms inherent in the First Amendment are at the very core of our constitutional scheme.  "[T]he First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a . . . role to play in securing and fostering our republican system of self-government." Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 587 (1980) (Brennan, J., concurring).  The First Amendment includes not only a right to speak, but also a right to receive information and ideas, and a "right to hear." See Stanley v. Georgia, 394 U.S. 557, 564 (1969); see also Mandel, 408 U.S. at 762-64. Nevertheless, because "the stretch of [First Amendment] protection is theoretically endless, it must be invoked with discrimination and temperance." Richmond, 448 U.S. at 588 (Brennan, J., concurring) (citation omitted).  There are limits, and they are not to be

overcome by "ingenious argument." <u>Zemel v. Rusk</u>, 381 U.S. 1, 16-17 (1965).[20] The

Court does not hold that every denial of an alien's visa application would result in a First

Amendment claim reviewable by federal courts. That holding would interject the Court

into business long allocated to the political branches of government whenever able

counsel could devise an ingenious First Amendment argument. It would be an obvious

end-run around the doctrine of consular nonreviewability. But there are additional

factors here besides Plaintiffs' well-pleaded First Amendment complaint.

      Unlike most other cases that are shielded by consular nonreviewability, it is

uncontested that the decision at issue here was not made solely by consular officials.

Consular nonreviewability is premised, at least in part, on Congress' decision to commit

the visa authority exclusively into consular hands.[21] Where other agencies and other

officials become involved in the decision to grant or deny a visa, it is not clear that

Congress intended the same result to apply.

      This Court has previously recognized that consular officials were not in complete

control of Professor Ramadan's case. <u>Am. Acad. of Religion</u>, 463 F. Supp. 2d at 417-18.

DHS was clearly involved, as well. DHS officials made statements to the media

regarding Ramadan's exclusion in August 2004, statements now disavowed by the

Government. L.A. Times, <u>supra</u>, at A23. DHS monitored Ramadan's employment status,

as evidenced by its contact with Notre Dame in December 2004 to report that

---

[20] In <u>Zemel</u>, the Court explained that not every limitation on access to information constitutes a First Amendment violation. "For example," the Court stated, "the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information." <u>Zemel</u>, 381 U.S. at 17.

[21] <u>See</u> <u>generally</u> <u>supra</u> Part IV.A (concerning the statutory carve-out for the visa authority at 8 U.S.C. § 1104(a)).

Ramadan's visa application had been revoked because he had resigned his position. Indeed, DHS officials conducted the December 2005 visa interview in which Ramadan revealed his donations to the ASP. Under these circumstances, where the decision to deny the visa was not made solely by consular officials, it is not apparent that the doctrine of consular nonreviewability should apply with full force.

Finally, given the entire history of this case including the initial grant of the visa, followed by the unexplained (but claimed "prudential") revocation, and then the long, foot-dragging series of inexplicable delays in proceeding, it is appropriate to inquire whether the reason finally offered is satisfactory. Thus, under the unique circumstances of this case, the Court finds that the Government must have a facially legitimate and bona fide reason for excluding Professor Ramadan. The Court now turns to the question of whether the Government's proffered reason is facially legitimate and bona fide.

As this Court has previously noted, while the <u>Mandel</u> Court found that the Government had a "facially legitimate and bona fide" reason for excluding the alien, it did not define the term—nor did it explain its source, or instruct lower federal courts how to determine if the standard had been met. Therefore, to conduct the analysis in Ramadan's case, this Court has fashioned a three-part inquiry.

First, the Court inquires whether or not the Government has provided a reason for denial of the visa. The Government has done so: Ramadan's admitted donations to organizations supporting known terrorist organizations. It is noteworthy, in the context of the First Amendment challenge, that this reason is unrelated to Professor Ramadan's speech. Second, the Court asks whether the Government has a statutory basis for its decision. Here, the Government's reason is based on an appropriate statute, 8 U.S.C.

§1182(a)(3)(B), which permits exclusion when an alien provides material support to individuals or organizations supporting terrorists.  Finally, the Court must determine whether the cited provision is properly applied to Professor Ramadan.

Plaintiffs urge that the statute is not properly applied to Professor Ramadan.  The Court must resolve two issues:  (1) whether the material support provision of the REAL ID Act should be applied retroactively; and (2) whether Ramadan satisfies the knowledge requirement of the statute.

**A.  Retroactivity**

Plaintiffs argue that the material support provision of the REAL ID Act, permitting the exclusion of any alien who commits an act which "affords material support . . . to a terrorist organization," cannot be a facially legitimate and bona fide reason for exclusion as applied to Ramadan because it would require retroactive application of the statute without the requisite clear Congressional intent. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI). Plaintiffs urge that the REAL ID Act's provisions do not contain the header "Retroactive Application" (as did the Patriot Act's effective date provision) and accordingly it should not be given retroactive effect.  Further, Plaintiffs contend that retroactivity would cause problems for resident aliens.  Since Ramadan's donations to the ASP were not grounds for inadmissibility when they were made, Plaintiffs urge that they should not now provide the basis for denial of his visa.[22]  Plaintiffs urge the Court not to allow the phrase "before,

---

[22] As discussed in the summary of facts, Professor Ramadan made his donations to the ASP between 1998 and 2002, and the ASP was not listed by the U.S. Department of the Treasury as an entity supporting terrorism by providing funding to Hamas until Aug. 21, 2003.  Therefore, at the time the donations were made, they did not fall squarely within the provisions of the REAL ID Act.  If the REAL ID Act's provisions apply retroactively, however, then the material support provision applies to the donations that were made before the ASP was designated part of Hamas' European funding network.

on, or after," language which is present in the REAL ID Act, to become a statutory "talisman" for retroactivity. Tr. of Oral Arg. at 18.

The Supreme Court has held that "it is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect." INS v. St. Cyr, 533 U.S. 289, 316 (2001). Nevertheless, "[a] statute may not be applied retroactively . . . absent a clear indication from Congress that it intended such a result." Id. Courts, in turn, have routinely found that Congress demonstrates clear intent to give a statute's provisions retroactive effect when Congress includes language applying a statute's effects to events occurring "before, on, or after" the effective date of the legislation.[23]

The word "before" has a plain meaning.[24] As the Supreme Court has stated, "[i]t is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce [the statute] according to its terms." Caminetti v. U.S., 242 U.S. 470, 485 (1917).[25] The Court cannot divorce the word "before" from the plain meaning which Congress clearly intended. Congress selected the word and used it in a way which, in the context of the statute, comports with its ordinary usage. Further, Congress gave no indication that the word "before," or the phrase "before, on, or after," was to have any special meaning or significance other than the plain meaning understood by the average reader. Notwithstanding the objections to trying to divine Congress' intent through an

---

[23] See, e.g., INS v. St. Cyr, 533 U.S. 289, 318-19 (2001); Vargas-Sarmiento v. U.S. Dep't of Justice, 448 F.3d 159, 164 (2d Cir. 2006); Drax v. Reno, 338 F.3d 98, 109 (2d Cir. 2003); Rojas-Reyes v. INS, 235 F.3d 115, 121 n.1 (2d Cir. 2000).

[24] "Before" means "[i]n time previous or anterior to a time in question, previous to that or to this, earlier, sooner; hence beforehand; already, heretofore, in the past." 2 Oxford English Dictionary 63 (2d ed. 1989).

[25] The Supreme Court recently reiterated this view in Watson v. United States, No. 06-571, 2007 WL 4292111, at *3 (U.S. Dec. 10, 2007), stating, "[w]ith no statutory definition or definitive clue [from Congress], the meaning of [a word] has to turn on the language as we normally speak it, there is no other source of a reasonable inference about what Congress understood when writing or what its words will bring to the mind of a careful reader." Id. (citations omitted).

examination of the legislative history, comments in the REAL ID Act's legislative history confirm that lawmakers were aware of, and intended, its potential retroactive effects.[26]

The plain meaning of "before" yields an obvious and intended result—the statute applies to events which occurred "before" its effective date. The statute does not require a heading labeled "Retroactive Effect" as Plaintiffs contend. The language "before, on, or after" is a plain and straightforward statement of the legislature's desire to give the REAL ID Act's provisions retroactive, current, and future effect. The language Congress chose evinces a clear Congressional intent for the statute to have retroactive effect. The Supreme Court has held that "if the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that [is] the end of [the court's] analysis." Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 127 S.Ct. 1534, 1543 (2007). Here, the statutory language is clear, and the Court will give effect to its plain meaning. The material support provision will be applied retroactively.

**B. Knowledge**

Plaintiffs argue that the Government failed to demonstrate that Ramadan had the requisite statutory knowledge to fall within the material support provision. In support of this argument, Plaintiffs cite to the dual references to "knowledge" in the statute. The material support provision states:

---

[26] Senator Kennedy cautioned that "[a] major additional problem in the REAL ID provisions is that it could result in the deportation even of long-time permanent residents, for lawful speech or associations that occurred 20 years ago or more . . . . The provision could be applied retroactively." 151 Cong. Rec. S4614-01, S4629, 2005 WL 1083282 (May 9, 2005). Representative Stark stated that "[t]he bill would also retroactively make legal donations, even donations made decades ago, grounds for deportation . . . if the organization to which a donation was made was later added to a government terror list." 151 Cong. Rec. H536-03, H561, 2005 WL 320845 (Feb. 10, 2005). Plaintiffs suggest that the Court should not rely on these comments as they were made by minority members and opponents of the statute, who likely wished to cast the statute in a negative—and perhaps unfair—light. The comments demonstrate, however, that retroactivity was recognized and considered during debate.

to commit an act that <u>the actor knows, or reasonably should know,</u> affords material support . . . to a terrorist organization . . . <u>unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.</u>"

8 U.S.C. § 1182 (a)(3)(B)(iv)(VI)(dd) (emphasis added).

Plaintiffs rely on the first knowledge requirement ("knows, or reasonably should know") to argue that Ramadan did not know that ASP was providing support to Hamas. Defendants, in contrast, rely on the second knowledge requirement (requiring the actor to "demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known") to argue that Ramadan cannot demonstrate that he did not know that ASP was providing funding to Hamas.

Professor Ramadan admits that his 1998-2002 donations benefited ASP. Plaintiffs argue, however, that because ASP was not deemed a Specially Designated Global Terrorist until 2003, he could not have known he was funding terror. The first reference to knowledge in the statute requires that Ramadan must have known, or reasonably should have known, that he was giving money to the ASP itself. Professor Ramadan admits this. Indeed, he himself brought the ASP donations to the Government's attention at his visa interview in December 2005. This admission satisfies the first knowledge test. Since he knew, the statute then imposes on him the second part of the knowledge requirement. Accordingly, he has the burden to demonstrate "by clear and convincing evidence" that he "did not know, and should not reasonably have known, that the organization was a terrorist organization." The consular official determined that he did not satisfy this burden.

Ramadan offers the Court three critical pieces of evidence regarding his lack of knowledge that ASP was a terrorist organization. First, he offers his own statement that he did not know the ASP was supporting Hamas. See 2d Decl. of Tariq Ramadan ¶ 14. Ramadan claims that his intent was to provide humanitarian aid to Palestinian refugees, not to support Hamas. Id. This may well be true, but it is self-serving. It simply does not rise to the level of clear and convincing evidence. Second, he asserts that at the time of the donations, the ASP was a verified and legitimate charity according to the Swiss Government. Id. Again, this fact may be true, but the Swiss endorsement does not provide the "clear and convincing evidence" required by the statute that Ramadan himself was not aware of the organization's illegitimate activities. Third, Ramadan offers an expert declaration opining that somebody in Ramadan's situation would not have known that ASP was providing funding to Hamas. See Decl. of Jonathan Benthall. This evidence, while objectively illuminating, provides little comfort to the Court that Ramadan, subjectively, lacked the requisite knowledge.

The statute imposes a heavy burden: it requires Professor Ramadan to prove a negative, and to do so by clear and convincing proof. But this outcome is the direct result of the language Congress used. It is the Court's role to interpret the language of the statute as written by Congress, not to question Congress' wisdom in drawing the line where it did. Congress has decided to make the alien's burden a high one, and it was well within its power to do so. Given the high standard articulated by Congress, the consular official is then charged with the duty of determining whether the alien has met his or her burden. Once the consular official has made this decision, it is not the Court's role—

sitting without the benefit of the subject matter expertise or detailed information on the applicant available to the consular official—to second guess the result.

The Court finds that the Government has satisfied the limited burden imposed by Mandel.  It has given a reason for the visa denial unrelated to Professor Ramadan's speech, linked the reason to a statutory provision providing the basis for exclusion, and demonstrated that the statute applies to Professor Ramadan.  The Plaintiffs' arguments to the contrary are insufficient.  Professor Ramadan has not demonstrated by clear and convincing evidence that he lacked knowledge of ASP's illicit activities.  The Government has provided a facially legitimate and bona fide reason for Professor Ramadan's exclusion.

## VII. The Endorse and Espouse Provision

Plaintiffs also challenge the "endorse and espouse" provision—the so-called "ideological exclusion" provision—of the Patriot Act.  Ramadan's visa was not denied under this provision, however.  As a result, the Plaintiffs recognize that their challenge creates questions of justiciability and standing.

A court should only render judgments on actual cases and controversies before it. See Neb. Press Ass'n v. Stuart, 427 U.S. 539, 546 (1976) ("[a federal court's] jurisdiction under Art. III, § 2 of the Constitution extends only to actual cases and controversies" (citing Indianapolis School Comm'rs v. Jacobs, 420 U.S. 128 (1975)).  As the Supreme Court has explained, "Article III, of course, gives the federal courts jurisdiction over only 'cases and controversies,' and the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990).  In order to satisfy the standing requirements of Article III,

plaintiffs must demonstrate that they have suffered an injury in fact, that their injury is traceable to the challenged statutory provision, and that their injury has a likelihood of being redressed by a favorable decision of the court. Id. at 155. Injury in fact requires the plaintiffs to demonstrate that they have suffered concrete and particularized harm that is actual or imminent, and not conjectural or hypothetical. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); see also Warth v. Seldin, 422 U.S. 490, 501 (1975) ("Of course, Art. III's requirement remains:  the plaintiff . . . must allege a distinct and palpable injury to himself.")

Even though Professor Ramadan's visa was not denied on the basis of the endorse and espouse provision, plaintiffs argue that they have four grounds on which to challenge the provision:  (1) the provision has a chilling effect on their First Amendment rights because it deters them from inviting scholars to speak, and deters scholars from accepting speaking invitations, for fear they will be subject to ideological scrutiny; (2) there is a credible threat that the provision will be used to exclude Plaintiffs' invitees in the future if scholars decide to accept speaking invitations, thereby subjecting themselves to ideological scrutiny and possibly visa revocation; (3) Plaintiffs have suffered concrete injury because they have suffered financial and administrative losses related to Ramadan's exclusion; and (4) the provision operates as an unconstitutional speech licensing scheme.  We reject each of Plaintiffs' arguments.

While a chilling effect may provide the basis for standing under certain circumstances, it cannot do so here.[27]  A court should render judgments only on actual

---

[27] Plaintiffs cite to, inter alia, Dombrowski v. Pfister, 380 U.S. 479, 494 (1965) and Abourezk, 785 F.2d at 1052 n.8, but these cases are inapposite.  In Dombrowksi, appellants made a Civil Rights Act challenge to a threat of future prosecution under state law, and claimed that the threat of prosecution chilled their speech. No such threat of prosecution exists for Plaintiffs here.  If the invited aliens are not permitted to enter the

cases and controversies before it. <u>Neb. Press Ass'n</u>, 427 U.S. at 546. Here the case and controversy arises from Ramadan's exclusion, but does not involve the endorse or espouse provision. There can be no case or controversy based on the hypothetical future exclusion of another—as of yet unidentified—alien, who, on another day, might possibly decline an invitation to some—at present unknown—event, organized by Plaintiffs. Plaintiffs have not identified anyone whom they wished to bring to the United States who has been excluded under the endorse and espouse provision. Their harm is not sufficiently concrete or particularized to confer standing.[28] Nor do the losses they assert in relation to Professor Ramadan's exclusion bear any relevance to the endorse and espouse provision, which was not the reason for his exclusion. Finally, Plaintiffs' argument that our national visa system is an unconstitutional speech licensing scheme is far too broad and is without foundation in the law.

The Court has found that Professor Ramadan was excluded on the basis of donations he admittedly made to an organization supporting known terrorist groups in direct violation of a specific provision of our immigration statute. It would be inappropriate to reach the constitutional merits of any other immigration provisions since

country, Plaintiffs can still interact with the aliens via teleconference or video. Neither the alien nor the Plaintiffs would face threat of prosecution of any kind, or any similar loss of freedom sufficient to create the kind of chilling effect discussed in <u>Dombrowksi</u>. Moreover, the <u>Dombrowski</u> case did not occur in the immigration context, with its accompanying deference to Congress and concerns about separation of powers. In <u>Abourezk</u>, the court did address a potential chilling effect that might result when an alien is <u>actually</u> excluded on the basis of their speech, but that does not apply to this case. 785 F.2d at 1052 n.8. The only alien <u>actually</u> excluded here is Professor Ramadan and he was excluded on the basis of donations he made to a terrorist organization under the material support provision, not on the basis of his speech.

[28] In our previous decision, we held that "Plaintiffs' inability to interact with Ramadan at their upcoming conferences is actual and particularized, and therefore amounts to an injury-in-fact sufficient to create standing in this case." <u>Am. Acad. of Religion</u>, 463 F. Supp. 2d at 412. The inability to interact with Ramadan, however, is conceptually distinct from the inability to interact with some unnamed alien on some uncertain future date at some unknown location. While Plaintiffs may have standing to challenge Ramadan's denial, that standing allows them to challenge only the material support provision, not the endorse and espouse provision. Ramadan was not denied entry on the basis of the endorse and espouse provision, and Plaintiffs have failed to demonstrate the requisite concrete and particularized harm caused by the endorse and espouse provision necessary for the court to confer standing on this claim.

a direct application of the "material support" provision—the provision actually at issue in Ramadan's visa denial—resolves the case.

## CONCLUSION

The Court finds that the reason provided by the Government for the exclusion of Professor Ramadan is facially legitimate and bona fide.  The Court recognizes the limits on its authority in this case.  The question of admissibility of aliens is a political question, a question which is best left to the Legislative and Executive branches.  Having articulated a facially legitimate and bona fide reason to exclude Professor Ramadan, Mandel makes clear that the Court has no authority to override the Government's consular decision. See Am. Acad. of Religion, 463 F. Supp. 2d at 419.

Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to enter judgment and close this case.


Dated:  New York, New York
            December 20, 2007


                                              SO ORDERED


                                              _____
                                              PAUL A. CROTTY
                                              United States District Judge

a direct application of the "material support" provision—the provision actually at issue in Ramadan's visa denial—resolves the case.

## CONCLUSION

The Court finds that the reason provided by the Government for the exclusion of Professor Ramadan is facially legitimate and bona fide. The Court recognizes the limits on its authority in this case. The question of admissibility of aliens is a political question, a question which is best left to the Legislative and Executive branches. Having articulated a facially legitimate and bona fide reason to exclude Professor Ramadan, Mandel makes clear that the Court has no authority to override the Government's consular decision. See Am. Acad. of Religion, 463 F. Supp. 2d at 419.

Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment and close this case.


Dated: New York, New York
       December 20, 2007


                                        SO ORDERED

                                        _____
                                        PAUL A. CROTTY
                                        United States District Judge